Emily **McINTYRE** and **Christopher McIntyre as co-administrators of the Estate of John L. McIntyre, Plaintiffs,**

v.

**The UNITED STATES of America, et al., Defendants.**

**Civil Action No. 01–CV–10408–RCL.**

United States District Court, D. Massachusetts.

Sept. 5, 2006.

---

Edward E. Berkin, Douglas S. Brooks, Kelly, Libby & Hoopes, PC, Boston, MA, Frank C. Corso Law, Office of Frank C. Corso, Boston, MA, Albert F. Cullen, Jr., Boston, MA, Jeffrey A. Denner, Denner Associates, P.C, Boston, MA, James P. Duggan, Boston, MA, Peter E. Gelhaar, Donnelly, Conroy & Gelhaar, LLP, Boston, MA, Robert A. George Robert, A. George & Associates, PC, Boston, MA, Edward T. Hinchey, Sloane & Walsh, Boston, MA, Michael A. Laurano, Laurano & Laurano, Boston, MA, Frank A. Libby, Jr., Kelly, Libby & Hoopes, PC, Boston, MA, James P. McDonald, Boston, MA, Stephen Neyman, Attorney at Law, Boston, MA, Robert S. Sinsheimer, Sinsheimer & Associates, Susan E. Sivacek, Sinsheimer & Associates, Boston, MA, William E. Christie, Shaheen & Gordon, P.A., Concord, NH, Steven M. Gordon, Concord, NH, Ann M. Donovan Law, Office of Ann M. Donovan, Newton, MA, George L. Garfinkle, Attorney at Law, Brookline, MA, Paul J. Griffin, Milton, MA, Christopher T. Meier, Mirick, O'Connell, DeMallie & Lougee, LLP, Worcester, MA, Peter J. Perroni, Nolan/Perroni, LLP, Lowell, MA, Edward M. Reilly, Law Offices of Edward M. Reilly, Abington, MA, Thomas C. Tretter, Healey, Deshaies & Gagliardi, PC, Amesbury, MA, for Plaintiffs.

Katherine A. Carey, Lawrence Eiser, Catherine J. Finnegan, Andrew D. Kaplan, Margaret Krawiec, Bridget Bailey Lips-

comb, Richard Montague, U.S. Department of Justice, Mary McElroy Leach, Washington, DC, Richard E. Bowman, Rose, Chinitz & Rose, Boston, MA, Kate M. Brown, William A. Brown, Boston, MA, Eric P. Christofferson, Ropes & Gray, LLP, Boston, MA, Michael K. Fee, Ropes & Gray LLP, Boston, MA, Edward J. Lonergan, Douglas I. Louison, Stephen C. Pfaff, Merrick, Louison & Costello, Christine M. Roach, Roach & Carpenter, P.C., Boston, MA, Alan D. Rose, Jr., Alan D. Rose, Sr., Rose, Chinitz & Rose, Boston, MA, Tory A. Weigand, Morrison, Mahoney, & Miller LLP, Boston, MA, Brian P. Fitzsimmons, Hanley, Hassett & Fitzsimmons, LLC, Quincy, MA, A. Douglas Matthews, Westport, MA, E. Peter Mullane, Mullane, Michel & McInnes, Cambridge, MA, for Defendants.

Earle C. Cooley, Cooley Manion Jones LLP, Kevin M. Glynn, Boston, MA, for Movants.

Joseph J. Machera, Law Offices of Joseph J. Machera, Street Revere, MA, for Intervenor.

Dean A. Mazzone, Attorney General's Office, for Interested Party.

Jaren D. Wilcockson, Goodwin Procter, LLP, Boston, MA, for Trustee.

## MEMORANDUM OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

LINDSAY, District Judge.

## TABLE OF CONTENTS

I. Introduction ............................................................. 58

II. Findings of Background Facts ............................................. 62
 A. The FBI and Cosa Nostra ............................................. 62
 1. National Priority of the Organized Crime Program ............... 62
 2. Priorities of the Boston Division's Organized Crime Program .... 62
 3. Priorities of the C–3 Squad in the Boston Office ............... 63
 4. Organization of the C–3 Squad ................................. 64
 B. The FBI and Informants .............................................. 65
 1. Importance of Informants ...................................... 66
 2. Responsibility for Development and Operation of Informants .... 66
 a. Special Agent in Charge ................................... 66
 b. Supervisory Special Agents ................................ 67
 c. Special Agents ............................................ 67
 3. Policies and Practices Regarding the Development and Operation of Informants ................................................. 67
 a. Suitability ............................................... 67
 b. Criminal Background and Ongoing Criminal Activity ......... 68
 c. Operation of Informants ................................... 71
 C. Recruitment and Use of Bulger and Flemmi as FBI Informants ........... 73
 D. Involvement of Bulger and Flemmi in Violent Criminal Activity ........ 75
 1. Loansharking and Bookmaking ................................... 76
 2. Reputation for Violence ....................................... 77
 3. Specific Criminal Acts ........................................ 78
 a. Bennett Murder and Fitzgerald Bombing .................... 78
 b. Castucci Murder .......................................... 79
 c. "Race Fix" Case .......................................... 80
 d. Wheeler, Halloran, Donahue and Callahan Murders .......... 81
 e. Drug Trafficking ......................................... 93
 E. Connolly Praised for Work with Informants ........................... 96

III. Findings of Fact Regarding the Murder of John McIntyre ................. 98

58

 A. McIntyre's Cooperation with Law Enforcement ............................98
 B. Leak of McIntyre's Identity........................................102
 C. Murder of John McIntyre ..........................................102

IV. Conclusions of Law and Ultimate Findings of Fact .............................104
 A. Duty .........................................................106
 B. Breach .......................................................108
 C. Scope of Employment ...........................................108
 D. Proximate Cause ...............................................111
 E. Injury........................................................112
 F. Conclusion as to Liability .......................................112
 G. Damages .....................................................112
 1. Proper Claimant Under Wrongful Death Statute .......................112
 2. Economic Damages ...........................................116
 3. Loss of Consortium ..........................................116
 4. Funeral and Burial Expenses ...................................117
 5. Conscious Suffering ..........................................117

V. Conclusion .......................................................119

## I. Introduction

This case arises out of the decades-long association between the Boston office of the Federal Bureau of Investigation ("FBI") and two of the most notorious criminals in Boston history—James J. Bulger ("Bulger") and Stephen J. Flemmi ("Flemmi"), who were, at the times relevant to this case, members of a criminal organization known as the Winter Hill Gang.[1] From the mid–1960s until 1990, Bulger and Flemmi periodically served as FBI informants, assisting the FBI in the prosecution of the Italian organized crime syndicate Cosa Nostra,[2] also known as the Mafia. Since this relationship was brought to light in *United States v. Salemme*, 91 F.Supp.2d 141 (D.Mass.1999), *rev'd in part*, 225 F.3d 78 (1st Cir.2000), *cert denied sub nom. Flemmi v. United States*, 531 U.S. 1170, 121 S.Ct. 1137, 148

L.Ed.2d 1002 (2001), a number of civil suits have been filed against the United States and agents of the FBI by family members and personal representatives of persons allegedly murdered by Bulger and Flemmi while the two were serving as FBI informants. Most of these lawsuits have been assigned to me.

The parties in the instant case seek damages from the United States and several individual defendants for the 1984 murder of John McIntyre ("McIntyre"), who was killed by Bulger and Flemmi after FBI agent John Connolly ("Connolly") disclosed to them critical information that led to the discovery of McIntyre's identity as a government informant. The plaintiffs here, Emily McIntyre[3] and Christopher McIntyre, as co-administrators of the Estate of John L. McIntyre,

1. Although the organization was known over time by several names, including "Winter Hill Gang," "Howard T. Winter Gang," "Winter Hill Organization," and the "Bulger Group," as I will discuss in detail in Section II(A)(3) and note 14, *infra*, I will use the name "Winter Hill" to refer to the criminal organization with which Bulger and Flemmi were associated, with apologies to the neighborhood of the same name in Somerville, Massachusetts.

2. The FBI and others refer to this organization as "La Cosa Nostra" or "LCN." However, I will refer to it here simply as "Cosa Nostra."

3. Emily McIntyre's name is spelled variously as "Emily" and "Emilie" throughout the record in this case. Because the complaint and resulting caption for the case list her name as "Emily," I will use that spelling here.

have brought suit pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671, *et seq.*, Chapter 229 of the Massachusetts General Laws, and *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), against Bulger and Flemmi and their criminal cohort, Kevin Weeks ("Weeks"); the United States of America; and eight former agents of the Boston office of the FBI, H. Paul Rico, John Morris, John J. Connolly, Roderick Kennedy, Robert Fitzpatrick, James Ring, James Greenleaf, and James Ahearn. Bulger and Flemmi have defaulted, *see* Notice of Default as to James Bulger, *McIntyre v. United States*, No. 01–10408 (D.Mass. Nov. 15, 2001); Notice of Default as to Stephen Flemmi, *McIntyre v. United States*, No. 01–10408 (D.Mass. Nov. 15, 2001), and a suggestion of death has been filed with respect to Rico, *see* Suggestion of Death, *McIntyre v. United States*, No. 01–10408 (D.Mass. Jan. 20, 2004). The case has proceeded against the remaining defendants.[4]

On May 23, 2006, with the consent of all parties, I bifurcated the trial of the plaintiffs' claims against the United States from the trial of the plaintiffs' claims against the individual defendants, *see* Order Granting Motions to Bifurcate, *McIntyre v. United States*, No. 01–10408 (D.Mass. May 23, 2006), and the plaintiffs' claims against the United States proceeded to trial on June 5, 2006. The claims against the United States, enumerated in counts I through VI of the complaint, were brought pursuant to the FTCA, which provides, in substance, that the United States may be sued for money damages for personal injury or death caused by the negligent or otherwise wrongful acts or omissions of its employees while acting within the scope of their office or employment. *See* 28 U.S.C. § 1346(b).

It is undisputed that McIntyre was murdered on November 30, 1984 by Bulger and Flemmi. The plaintiffs have alleged several theories of liability. First, they assert that Connolly, acting within the scope of his employment, leaked to Bulger and Flemmi McIntyre's identity as an informant for law enforcement agencies investigating matters inimical to the interests of Bulger and Flemmi, and that McIntyre's death was a foreseeable consequence of this act. Second, the plaintiffs claim that Connolly and other agents of the FBI protected Bulger and Flemmi from investigation, arrest, and prosecution in order to maintain them as informants, and that McIntyre was a foreseeable victim of these efforts. Third, the plaintiffs allege that several agents negligently supervised Connolly in that they knew or should have known that Connolly was leaking information to Bulger and Flemmi and protecting them from investigation, arrest, and prosecution; and that despite this knowledge, the supervisory agents took no corrective action, leading foreseeably to the murder of McIntyre.

The case against the United States was tried before me in an eighteen day nonjury trial. Thousands of pages of exhibits were introduced, and nine witnesses testified: Flemmi, convicted of Racketeering Influenced and Corrupt Organizations ("RICO") violations in 2003 [5]; Weeks, con-

---

**4.** Although Connolly initially defaulted, *see* Notice of Default as to John Connolly, *McIntyre v. United States*, No. 01–10408 (D.Mass. Nov. 15, 2001), a motion to set aside default was granted, *see* Order Granting Motion to Set Aside Default, *McIntyre v. United States*,

No. 01–10408 (D.Mass. Feb. 20, 2002), and he remains an active defendant in this case.

**5.** Flemmi pleaded guilty to racketeering acts that included the murders of Richard Castucci, Roger Wheeler, John Callahan, and McIn-

victed of RICO violations in 2000 [6]; former FBI agents Robert Fitzpatrick, Gerald Montanari, James Greenleaf, and James Ring; former Customs agent Philip Brady; plaintiff Emily McIntyre; and forensic economist Alan McCausland.

■ Although the plaintiffs' case as a whole presents several complex and difficult issues, this portion of the case is rather straightforward. As I will discuss in greater detail below, I find that the United States is liable to the plaintiffs, because Connolly, acting within the scope of his employment, disclosed information to Bulger and Flemmi sufficient for them to identify McIntyre as a government informant, and McIntyre's death was a foreseeable consequence of that disclosure. This portion of the case is simplified, because it does not implicate the discretionary function exception to the FTCA. *See* 28 U.S.C. § 2680(a) (excepting from the liability of the United States any claim based on the exercise or failure to exercise a discretionary function or duty on the part of a federal agency or employee of the Government).[7] It is undisputed that disclosing a government informant's identity is not an act embraced within the discretion granted to agents of the FBI. Thus my only concerns, for present purposes, are whether Connolly's disclosure breached a duty he owed to McIntyre that caused injury to McIntyre; and whether the breach occurred within the scope of Connolly's employment. Because I have answered these questions in the affirmative, I need not address the plaintiffs' other theories of liability. However, because the murder of McIntyre, accomplished with the assistance of an FBI agent-as shocking as that might appear-was not a singular event in the relationship between the FBI and Bulger and Flemmi, I will include additional findings that provide the context in which the murder occurred.[8]

Before I set out my findings of fact, I want to clarify their effect with respect to

tyre. Ex. 1, Third Superseding Indictment ¶¶ 32–35, 39–41, 43, *United States v. Flemmi*, No. 99–10371 (D.Mass. May 23, 2001); Ex. 2, Plea Agreement as to Stephen J. Flemmi, Oct. 2, 2003.

6. Weeks pleaded guilty to racketeering acts that included aiding and abetting the murders of Brian Halloran, Michael Donahue, and McIntyre. Ex. 4, Superseding Information as to Kevin J. Weeks ¶¶ 14–15, 17, *United States v. Weeks*, No. 00–10245 (D.Mass. Jul. 12, 2000); Ex. 5, Plea Agreement as to Kevin J. Weeks, July 6, 2000.

7. Analysis of the application of the discretionary exception consists of three steps. First, a court must "identify the conduct that allegedly caused the harm." *Muniz–Rivera v. United States*, 326 F.3d 8, 15 (1st Cir.2003). Second, the court must ask whether that conduct is discretionary. *Id.* As a general matter, if the decision to act or refrain from acting is "a matter of choice for the acting employee," it is considered discretionary. *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). If the challenged act or omission violates the Constitution, exceeds the scope of the official's authority, or "if a federal statute, regulation, or policy specifically instructed federal officials to follow a specified course of action," however, the conduct is not, and cannot be, discretionary. *Muniz–Rivera*, 326 F.3d at 15; *Thames Shipyard and Repair Co. v. United States*, 350 F.3d 247, 254 (1st Cir.2003). If a court determines that the conduct is discretionary, the analysis proceeds to the third question: "[D]oes the exercise of discretion involve (or is it susceptible to) policy-related judgments?" *Muniz–Rivera*, 326 F.3d at 15. This third step of the inquiry acknowledges the reality of the government's limited resources and the need to grant public officials some leeway in setting priorities and weighing competing policy considerations. *Id.* at 17.

8. While my background findings are derived solely from the record of the trial before me, many of them parallel the more extensive findings made by then Judge, now Chief Judge Mark L. Wolf in *U.S. v. Salemme*, 91 F.Supp.2d 141 (D.Mass.1999).

the related lawsuits. These findings do not bind the individual defendants in the second half of this case, as no final judgment will be entered before any second half is resolved. *See Acevedo–Garcia v. Monroig,* 351 F.3d 547, 560 (1st Cir.2003) (holding that since separate trials in bifurcated proceedings do not individually produce final judgments, collateral estoppel may not apply from one portion of the case to another). In addition, the defendants did not have an opportunity to litigate any issues during the trial of the first portion of the case. *See Monarch Life Ins. Co. v. Ropes & Gray,* 65 F.3d 973, 978 n. 8 (1st Cir.1995) (noting that a party invoking issue preclusion must demonstrate that "the party against whom issue preclusion will be applied had a fair opportunity to litigate the issue fully" (quoting *Kyricopoulos v. Town of Orleans,* 967 F.2d 14, 16 (1st Cir.1992))); *see also Bilida v. McCleod,* 211 F.3d 166, 170–71 (1st Cir.2000) (applying Rhode Island law to hold that individual police officer defendants to a § 1983 suit are not bound by adverse findings in the plaintiff's criminal case on the constitutionality of the search they conducted). These findings also do not bind the government in future cases, as nonmutual offensive collateral estoppel does not apply against the United States. *United States v. Plat 20, Lot 17,* 960 F.2d 200, 211 (1st Cir.1992) (citing *United States v. Mendoza,* 464 U.S. 154, 159–63, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984)).

I am compelled to address one other matter with respect to the first half of the instant bifurcated case. In most circumstances, the bringing of a suit against the United States under the FTCA bars an additional suit against the individual employees arising out of the same subject matter. 28 U.S.C. § 2679(b)(1) ("The remedy against the United States provided by sections 1346(b) and 2672 of this title . . . is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee."). The FTCA provides an exception to this exclusivity for claims against individual defendants "brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2)(A). This exception has allowed the prosecution of both the FTCA claim against the United States, addressed in these findings and conclusions, and the *Bivens* claims against the individual defendants, which have been bifurcated and presently are in pretrial proceedings. However, there is an additional limitation on parallel suits, provided by 28 U.S.C. § 2676. That provision instructs that "judgment in an action under section 1346(b) of this title shall constitute a *complete bar* to any action by the claimant, by reason of the same subject matter, against the employee of the government whose act or omission gave rise to the claim." 28 U.S.C. § 2676 (emphasis added). The judgment bar provision contains no exception for *Bivens* actions, and other courts consistently have interpreted it to apply to such claims. *See, e.g., Harris v. United States,* 422 F.3d 322, 333–34 (6th Cir.2005); *Estate of Trentadue v. United States,* 397 F.3d 840, 859 (10th Cir.2005); *Arevalo v. Woods,* 811 F.2d 487, 489–90 (9th Cir.1987).

The present findings and conclusions do not invoke this bar. As I noted above, I will not enter judgment until the conclusion of the second portion of the case. I note that other courts have found the judgment bar applicable even where, as here, the FTCA and *Bivens* claims were brought as part of the same suit and the judgments were entered simultaneously. *See Harris,* 422 F.3d at 334 (collecting cases). The courts that have considered the matter have all held that a judgment for or

against the United States bars further progress in *Bivens* actions against individual defendants, because the judgment bar was intended to preclude both multiple recoveries and multiple lawsuits. *See Farmer v. Perrill,* 275 F.3d 958, 963 (10th Cir.2001); *Hoosier Bancorp of Indiana, Inc. v. Rasmussen,* 90 F.3d 180, 184–85 (7th Cir.1996); *Gasho v. United States,* 39 F.3d 1420, 1437 (9th Cir.1994). *But see Hallock v. Bonner,* 387 F.3d 147, 155 (2nd Cir.2004) (distinguishing a judgment dismissing an FTCA claim for lack of subject matter jurisdiction, on the ground that such a claim was never a properly filed FTCA claim, and therefore should not require the application of the § 2676 judgment bar), *rev'd on other grounds sub nom Will v. Hallock,* —— U.S. ——, 126 S.Ct. 952, 163 L.Ed.2d 836 (2006). The only exception is one Ninth Circuit ruling that, where the claims were brought as part of the same suit, as here, the simultaneous entry of judgment *for the United States* on the FTCA claim did not bar recovery for the plaintiff on the *Bivens* claims. *Kreines v. United States,* 959 F.2d 834, 838 (9th Cir.1992). *But see Harris,* 422 F.3d at 335–36 (explicitly repudiating the Ninth Circuit's holding in *Kreines).* There does not appear to be any First Circuit precedent on this question. Because this issue is not ripe, and has not been briefed, I do not express an opinion on its merits. I mention it only so that the parties may consider the issue in light of the present decision, as they contemplate how they will proceed with the remainder of this case.

The odyssey now begins.

## II. Findings of Background Facts

### A. The FBI and Cosa Nostra

#### 1. National Priority of the Organized Crime Program

During the late 1970s and early 1980s, the stated national priority of the FBI's Organized Crime Program was the takedown of Cosa Nostra. *See* Ex. 69, Memo from Director, FBI to Attorney General at 17, Apr. 23, 1980; Ex. 110, Memo from Connolly to SAC, Boston, Addendum of Supervisor Morris, Apr. 1, 1981. Cosa Nostra was perceived to be the most powerful organized crime group in the country, representing a greater threat than all other organized crime groups combined. *See* Ex. 69, at 17. Consequently, in 1980, the Director of the FBI himself instructed that the majority of resources in the Organized Crime Program should be expended and directed against Cosa Nostra. Ex. 69, at 17. The word was out, even in the criminal underworld, that the FBI had commenced a crusade against Cosa Nostra. As Flemmi put it at trial, "the FBI, as an institution" was arrayed against Cosa Nostra.[9] Flemmi June 6, 2006 Tr. at 114.

#### 2. Priorities of the Boston Division's Organized Crime Program

In accordance with the Director's instructions, Cosa Nostra was the number-

---

**9.** Flemmi testified extensively about many events relevant to this case. As should be clear from these findings and conclusions, I understand that Flemmi is a violent criminal who callously participated in countless acts of cruelty and violence, including numerous murders. However, I found his testimony in this case generally to be credible. Notably, much of his testimony repeated facts present in the "Parties' Agreed Statement of Facts," a document listing the facts to which the United States and Flemmi agreed, prepared in contemplation of his guilty plea. Ex. 3, Parties' Agreed Statement of Facts, *United States v. Flemmi,* No. 99–10371 (D.Mass. Oct.14, 2003). The United States, as a signatory to that Agreed Statement, clearly found the statements contained in the document to be credible. Further, Flemmi is obligated, under his plea agreement, to testify truthfully. A violation of that agreement could lead to the reinstatement of capital charges against him. Ex. 2, at 9, 15–16.

one priority of the Organized Crime Program in the Boston Division of the FBI ("Boston Division") [10] in the 1970s and early 1980s. *See* Ex. 110, Addendum of Supervisor Morris; Ex. 71, Airtel from SAC, Boston to Director, FBI at MCN055–1716 to –1717, Aug. 28, 1981.[11] Consistent with directives from FBI Headquarters in Washington, the Organized Crime Program's goal in the late 1970s and early 1980s was to take down the Boston branch (the "Boston branch") of the larger New England Cosa Nostra Family headed by Raymond L.S. Patriarca of Providence, Rhode Island. *See, e.g.,* Ring June 27, 2006 Tr. at 31–33. The Boston branch was headed by Gennaro Angiulo. *See* Ex. 71, at MCN055–1715; Flemmi June 6, 2006 Tr. at 118. Angiulo's second-in-command was Illario Zannino, also known as Larry Baione. *See* Flemmi June 6, 2006 Tr. at 114, 117. After a series of arrests and some convictions of leaders of the Boston branch (see Section II(A)(3), *infra*), an important goal of the Organized Crime Program in the Boston Division was to prevent the rise of a new Cosa Nostra leader to fill the leadership vacuum. *See, e.g.,* Ex. 62, Memo from Ring to SAC, Boston at 1–2, Apr. 30, 1986; Fitzpatrick June 14, 2006 Tr. at 63–64; Ex. 59, Memo from Ring to SAC, Boston at MCN055–3646, Mar. 14, 1983.[12]

### 3. Priorities of the C–3 Squad in the Boston Office

The Boston office of the FBI ("Boston Office") was the largest office in the Boston Division; it consisted of a number of squads with different investigative responsibilities. The C–3 Squad worked solely on organized crime. *See, e.g.,* Ex. 62, at 1. Although the C–3 Squad had investigative responsibility for a number of different criminal organizations, its number-one priority was always Cosa Nostra, and the Squad often had insufficient personnel to address any group other than Cosa Nostra. *See* Ring June 27, 2006 Tr. at 30; Ex. 71, at 3. During the early 1980s, the Squad focused exclusively on several operations to obtain and analyze Title III wiretaps and electronic surveillance [13] of Cosa Nostra targets: "Bostar" was an operation to place a Title III intercept at 98 Prince Street, the headquarters of Gennaro Angiulo; and "Mandarin" was an operation to place a Title III intercept at 51 North Margin Street, the headquarters of Illario Zannino. *See* Ex. 71, at 3; Fitzpatrick June 12, 2006 Tr. at 61–65. These operations were ultimately successful, and led to the 1983 arrests and 1986 convictions of Angiulo, Zannino, and other Boston Cosa Nostra figures. *See, e.g.,* Flemmi June 6, 2006 Tr. at 118–120; *United States v. Zan-*

**10.** The Boston Division of the FBI covered a large territory that extended beyond the city of Boston itself and encompassed the states of Massachusetts, Rhode Island, New Hampshire, and Maine. At all times relevant to this case, the Boston Division included the Boston Office as well as eleven small resident agencies located throughout the four states. *See, e.g.,* Greenleaf June 22, 2006 Tr. at 8.

**11.** Many of the documents produced by the United States in this case are marked with Bates Numbers beginning with the prefix "MCN." Where documents do not have clear internal page numbers, I will cite to the appropriate Bates-numbered page.

**12.** Exhibit 59 includes eight pages with consecutive Bates Numbers. However, the internal page numbering is non-consecutive, and although the date on the first page is March 14, 1983, subsequent pages refer to events in 1987 and 1988. *See, e.g.,* Ex. 59, at MCN055–3650.

**13.** Title III of the Omnibus Crime Control and Safe Streets Act ("Title III"), 18 U.S.C. §§ 2510–2520, grants authority to federal law enforcement agents to use court-authorized wiretaps and electronic surveillance.

*nino,* 895 F.2d 1 (1st Cir.1990); *United States v. Angiulo,* 897 F.2d 1169 (1st Cir. 1990). In July 1983, Cosa Nostra became the sole investigative responsibility of the C–3 Squad when responsibility for all other organized crime groups was shifted to the C–2 Squad. *See* Ring June 27, 2006 Tr. at 30–34; Ex. 61, Memo from Ring to SAC, Boston at 1, Jan. 6, 1984. The C–2 Squad previously had focused on several investigative areas, including labor law violations, civil rights violations, and interstate transportation of stolen motor vehicles. *See* Montanari June 21, 2006 Tr. at 80.

In the 1970s and 1980s, the C–3 Squad was aware of the existence of other organized crime groups in Boston, including Winter Hill. However, the prevailing view in the Squad in the early 1980s was that the arrest and/or flight of several leaders of Winter Hill by 1979 had weakened the organization, and Winter Hill was considered to present a significantly lower level of threat to the community than Cosa Nostra. Ex. 71, at 3; Ex. 59, at MCN055–3644. Winter Hill was formed in the 1970s when two South Boston criminal groups merged. Ex. 1, ¶ 4. The principal members of the group in the 1970s included Howard T. Winter ("Winter"), James Sims ("Sims"), Joseph McDonald ("McDonald"), John Martorano ("Martorano"), Bulger, and Flemmi. Ex. 1, ¶ 5. Sims and McDonald became fugitives in 1976; Winter was incarcerated in 1978; and Martorano was a fugitive from 1978 until his apprehension in 1995. By 1979, Bulger and Flemmi had assumed control of the organization.[14] Ex. 1, ¶ 5.

### 4. Organization of the C–3 Squad

The C–3 Squad had a hierarchical structure, as did the entire FBI. The C–3 Squad consisted of a number of special agents ("agents") and a supervisory special agent ("Supervisor"); the Supervisor reported to an assistant special agent in charge ("ASAC"); and the ASAC reported to the special agent in charge ("SAC").[15] The Supervisor also regularly communicated with the supervisor of the Organized Crime Section at FBI Headquarters. This supervisor reported to a Unit Chief, who, in turn, reported to the Organized Crime Section Chief. *See* Ring June 27, 2006 Tr. at 34–35.

The SAC had managerial responsibility for the entire Boston Division, including

---

**14.** There appears to be some difference of opinion about the *name* of the organization after the 1979 shift in power. Kevin Weeks testified that the "Winter Hill Gang" was decimated in 1979, Weeks June 8, 2006 Tr. at 73–74, and the C–3 Squad apparently agreed. However, an organization of *some name,* with historical ties to Howard Winter's group, continued to operate out of South Boston under the control of Bulger and Flemmi. *See* Ex. 1, ¶ 5. The United States has referred to this organization as the "Bulger Group," "South Boston," and the "Winter Hill Gang." *See, e.g.,* Ex. 1, ¶ 1; Ex. 3, at 1–2; Ex. 4, ¶ 1. I will continue to refer to it as "Winter Hill."

**15.** Documents addressed to "SAC, Boston," were not necessarily directed to the SAC himself. Instead, all internal correspondence intended for the files of the Boston Office and some external correspondence to and from the Boston Office was addressed to and from "SAC, Boston." If a document was intended for the personal review of the SAC, it would be addressed to "SAC, Boston (personal attention)." Similarly, documents which flowed to FBI Headquarters were often addressed to "Director, FBI" but were not necessarily intended for his personal attention unless so marked. Documents often were widely distributed to multiple agents within the Boston Office or at FBI Headquarters. When a particular person received a document, he would initial it. Thus, the only way to confirm that a particular individual actually received a document is to verify his initials on the document. *See, e.g.,* Greenleaf June 22, 2006 Tr. at 12–13.

the Boston Office and the eleven resident agencies. There were two different SACs in the Boston Division during the years relevant to this case. Lawrence Sarhatt was the SAC from at least 1980 until November 1982, and James Greenleaf was the SAC from November 29, 1982 through October 31, 1986. The Boston Division had two ASACs; each was responsible for approximately half of the squads in the Boston Office. Robert Fitzpatrick was the ASAC with responsibility for the C–3 Squad from January 5, 1981 through June 3, 1986. The C–3 Squad had two different supervisors during the years relevant to this case. John Morris was the supervisor from August 2, 1976 through January 11, 1983; and James Ring was the supervisor from July 18, 1983 through August 31, 1990.[16] Connolly was a special agent in the C–3 Squad from October 29, 1973 until March 10, 1988. *See* Ex. 91, Chronology of Offices and Assignments of Connolly/Morris and Openings/Closings of Bulger/Flemmi; Ex. 93, Graphic of Connolly's Assignments to Boston Field Division and Bulger/Flemmi's Status as Informants. All of these men were aware that the number-one priority of the C–3 Squad was the takedown of Cosa Nostra.[17]

## B. The FBI and Informants

The FBI had rules and regulations regarding the handling of informants, which were laid out in Section 137 of the Manual of Investigative Operations and Guidelines ("MIOG") and in a separate Manual of Rules and Regulations. Greenleaf June 22, 2006 Tr. at 36. Section 137 of the MIOG incorporated and implemented the Attorney General Guidelines in the Use of Informants ("Guidelines").[18] The Guidelines were first issued by then Attorney General Edward H. Levi in December 1976, and were amended in 1981. *See* Ex. 8, Memo from Director William H. Webster to All Special Agents at 1, Jan. 5, 1981. The Guidelines were "a formal statement of [the FBI's] present policies and practices regarding the operation of informants."[19] Ex. 8, at 1.

According to the MIOG, an informant is "any person who furnishes information to the FBI on a confidential basis." Ex. 6, Manual of Investigative Operations and Guidelines § 137–1 (1982).[20] Informants

---

**16.** Ring served as the "acting supervisor" from January 1983 until his official transfer in July 1983. Ring June 27, 2006 Tr. at 19–21.

**17.** *See, e.g.,* Ex. 71 (Sarhatt signed off on memorandum defining the Squad's priorities); Greenleaf June 22, 2006 Tr. at 43–44 (Greenleaf testified that Cosa Nostra was the highest priority of the organized crime program); Fitzpatrick June 12, 2006 Tr. at 55–56, 66, 70 (Fitzpatrick testified that C–3 targeted Cosa Nostra in accordance with a directive from Washington); Ex. 110, Addendum of Supervisor Morris (Morris wrote that Cosa Nostra was the number-one priority of the Organized Crime Program in Boston).

**18.** The Guidelines were promulgated under the authority of 28 U.S.C. §§ 509, 510, and 533, and required the FBI to issue detailed instructions implementing the Guidelines.

Ex. 6, Manual of Investigative Operations and Guidelines § 137–17(1), Attorney General Guidelines ("Guidelines"), Part A(2) (1981). The MIOG includes a section re-printing the Guidelines, *see, e.g.,* Ex. 6, § 137–17(1) (1981), and also incorporates the Guidelines throughout section 137. Although the Guidelines were sometimes referred to as the "Levi Guidelines," I will refer to them simply as the "Guidelines."

**19.** The Guidelines did not create any substantive or procedural rights enforceable by a party in a civil or criminal suit. Ex. 6, § 137–17(1), Guidelines Part N (1981).

**20.** Exhibit 6 contains section 137 of the MIOG as it was in effect on January 31, 1978, as well as changes made to section 137 in 1979, 1981, 1982, 1984, and later years. I will cite to the year in which the relevant portion was added or amended. If the por-

are asked to provide information in their possession, to provide information which comes to their attention, and affirmatively to seek out information concerning criminal conduct or other subjects of investigative activity. Ex. 6, § 137–17(1), Guidelines Part C(1) (1981). The FBI separated informants into several categories, including Organized Crime ("OC") and Top Echelon ("TE"). Ex. 6, § 137–1.1 (1981). A Top Echelon informant was usually associated with organized crime and was expected to provide information about a criminal group's activity at the management level. *See* Fitzpatrick June 13, 2006 Tr. at 14–16; Ring June 27, 2006 Tr. at 11–12. During the early 1980s, there were approximately 250 to 300 informants in the Boston Division at any given time. Greenleaf June 22, 2006 Tr. at 9.

### 1. Importance of Informants

The FBI viewed informants as *essential* to the accomplishment of its investigative goals. The use of informants was "the single most important tool available to the FBI for the gathering of information bearing on our investigations," Ex. 8, at 9, and one of the most effective investigative techniques employed against organized crime, Ex. 69, at 16. Informants provided information that could not otherwise be obtained. Greenleaf June 22, 2006 Tr. at 29. Indeed, Ring testified that he did not know of *any* serious criminal activity that could be combated without the use of informants. Ring June 27, 2006 Tr. at 10–11.

Each division and program in the FBI constantly reassessed the adequacy of its informant coverage. Adequacy was based on the number and type of pending cases and the needs of each geographic and investigative area. As Greenleaf explained: "The idea was to try to promote as much informant coverage as we could. We never, ever reached a point where we were satisfied." Greenleaf June 22, 2006 Tr. at 43.

### 2. Responsibility for Development and Operation of Informants

Informants were so important to the FBI that *every agent* had a role in the development and operation of informants.

### a. Special Agent in Charge

The SAC had personal responsibility for the establishment of informant coverage within his or her territory and was responsible for constantly assessing informant coverage to ensure that adequate coverage was maintained. Ex. 6, § 137–2(1) (1978). The MIOG instructed SACs that "[t]he development and operation of informants must be closely supervised because of the contribution they make to our investigations and problems inherent in their operation." *Id.* To that end, the SAC was required to ensure that informant files were reviewed by supervisors every 60 days. Ex. 6, § 137–2(1) (1981).[21]

tion was subsequently amended in a way relevant to the discussion, I will note the change. Because the events central to this case occurred in or before 1984, I do not rely on amendments made to the MIOG after 1984 in deciding this case.

21. Greenleaf acknowledged in his trial testimony that he did not personally "constantly assess" informant coverage or ensure that files were reviewed; rather, he delegated this

task to the supervisors and an "Informant Coordinator." He created the position of "Informant Coordinator" and gave the Coordinator the responsibility of assisting agents and supervisors in meeting the requirements of the Guidelines and Rules and Regulations. Knowledge of the development and operation of informants came to Greenleaf by means of discussions in weekly supervisory meetings on an as-needed basis. Greenleaf June 22, 2006 Tr. at 45–46, 52.

#### b. Supervisory Special Agents

Supervisors were responsible for the development and operation of informants by agents under their supervision. Ex. 6, § 137–2(2) (1978). Specifically, they were responsible for ensuring that agents were making efforts to develop informants and were receiving training and guidance to do so. *Id.* In addition, supervisors were instructed to "directly supervise the informant files" of the agents under their supervision by reviewing the files at least once every 60 days to ensure that the informants were being operated properly and developed to their fullest potential. *Id.* In 1981, the MIOG suggested that supervisors also periodically meet with the informants being operated by agents under their supervision "to ensure that the informant is being handled by the contacting agent pursuant to FBI policy." Ex. 6, § 137–2(2) (1981).[22]

#### c. Special Agents

Prior to 1981, the MIOG directed each agent to *attempt* to develop and operate informants; but in 1981, the MIOG was amended to give every agent an *obligation* to develop and operate productive informants. *See* Ex. 6, § 137–2(3) (1978); Ex. 6, § 137–2(3) (1981). The MIOG stated: "The proper operation of informants is a basic skill which requires dedication and ingenuity. The success each agent enjoys normally depends on the strength of the Agent's personality and the resourcefulness exercised in obtaining information." Ex. 6, § 137–2(3) (1978). Agents were evaluated, in substantial part, on the basis of their development and handling of informants.[23]

#### 3. Policies and Practices Regarding the Development and Operation of Informants

The Guidelines acknowledged that the use of informants might involve some deception, as well as cooperation with people "whose reliability and motivation can be open to question." Ex. 6, § 137–17(1), Guidelines Part A(1) (1981). Therefore, *"special care must be taken to carefully evaluate and closely supervise their use,* to ensure that individual rights are not infringed and that the government itself does not become a violator of the law."[24] *Id.* (emphasis added).

#### a. Suitability

In order to use an individual as an informant, a supervisor was required to make written findings that the individual was *suitable* for use as an informant and was likely to provide *pertinent* information to the FBI. Ex. 6, § 137–17(1), Guidelines

---

22. In 1984, the MIOG was amended to state that Supervisors were *strongly* urged to meet with informants being handled by their agents. Ex. 6, § 137–2(2) (1984).

23. Beginning in 1981, development and handling of informants was one of four critical elements upon which agents were evaluated. *See, e.g.,* Ex. 55e, Performance Appraisal Report as to Connolly, Nov. 15, 1981 to Nov. 12, 1982; Ex. 55f, Performance Appraisal as to Connolly, July 2, 1981 to Dec. 5, 1981; Ex. 55*l*, Performance Appraisal Report as to Connolly, Apr. 2, 1984; Ex. 55s, Performance Appraisal Report as to Connolly, Mar. 31, 1985. Prior to that time, it had been one of

twenty-four factors included in performance evaluations. *See, e.g.,* Ex. 55a, Report of Performance Rating as to Connolly, Mar. 31, 1976; Ex. 55b, Report of Performance Rating as to Connolly, Mar. 31, 1979; Ex. 55c, Report of Performance Rating as to Connolly, Mar. 31, 1980; Ex. 55d, Report of Performance Rating as to Connolly, Mar. 31, 1981.

24. Before 1981, the Guidelines were even more cautious; rather than instructing agents to "carefully evaluate and closely supervise their use," the Guidelines told agents to *"minimize* their use." Ex. 6, § 137–13(1), Guidelines, Introduction (1978).

Part D(1) (1981); Ex. 8, at 2. Beginning in 1981, each field office seeking to open or re-open an informant was required to conduct a 120–day "suitability inquiry"; a field supervisor was required to review each informant's suitability every 90 days; FBI Headquarters was required to review each informant's suitability at least once each year; and any time the FBI learned that an informant was no longer suitable, "his relationship with the Bureau [was required to] be promptly terminated." *See* Ex. 6, §§ 137.3.1 to 137.3.2 (1981); Ex. 6, § 137–17(1), Guidelines Part D(5) (1981); Ex. 8, at 2–3. Although these requirements were not spelled out in detail before 1981, the explicit statement of the requirements in the 1981 Guidelines and MIOG was not considered a significant departure from previous policy. Ex. 8, at 2.

The suitability inquiry conducted before the opening or re-opening of an informant was used to assess a potential informant's "emotional stability, controllability, reliability, truthfulness and conformance to instructions." Ex. 8, at 2–3. In determining an individual's suitability, agents were *required* to consider the following factors: whether the individual was willing and able to provide information to the FBI, whether the individual did not seem directed by others to obtain information *from* the FBI, and whether there was anything in the individual's background that would make him unfit as an informant. In addition, agents were instructed to weigh the importance of the information being furnished by the informant against the seriousness of past and contemporaneous criminal activity of which the informant may be suspected; agents were also instructed to consider the ability of the FBI closely to monitor

and control the informant's activities insofar as the informant was acting on behalf of the FBI. However, the MIOG stated that these latter two factors were not, in and of themselves, crucial in determining suitability.[25] Ex. 6, § 137–3.1.1(1) to – 3.1.1(2) (1981).[26]

### b. Criminal Background and Ongoing Criminal Activity

Informants, by their very nature, are likely to have criminal histories. In order to be in a position to provide information about criminal activity, informants also are likely to have *some* contemporaneous involvement in criminal activity. As Ring pointed out, "It's people who are criminals for a living who are informants." Ring June 27, 2006 Tr. at 53.

In 1981, the Attorney General granted the FBI authority to use informants who were involved in contemporaneous criminal activity, provided that the criminal activity was not of a serious nature. "Serious" criminal activity, however, was not defined. *See* Ex. 8, at 7; Ex. 6, § 137–17(1), Guidelines Part G(2) (1981). The Guidelines only instructed supervisors to consider whether the crime was a felony or misdemeanor, the potential penalty under law, and the impact on any victim. Ex. 8, at 7. Moreover, there was no explicit prohibition on using the head of a criminal organization as an informant. However, agents were required to advise informants at least once each year that they were not to participate in acts of violence, use unlawful techniques to obtain information, initiate a plan to commit criminal acts, or participate in criminal activities of persons under investigation, unless authorized by the FBI.

---

**25.** If these two matters are not crucial, it is hard to know what is crucial. In fact, the MIOG does not indicate what factors *were* crucial in determining suitability.

**26.** Similar factors were outlined in the 1976 version of the Guidelines. *See* Ex. 6, § 137–13, Guidelines Part A (1978).

Ex. 6, § 137–3.4 (1981); Ex. 6, § 137–17(1), Guidelines Part E(1) (1981).[27] It seems likely, however, that an informant who was the head of a criminal organization *would* be involved in some, if not all, of these activities.[28]

If an agent learned of the commission of a serious crime by an informant, he was instructed to notify a field office supervisor. Ex. 6, § 137–17(1), Guidelines Part G(2) (1981). Any time "a field office learn[ed] of the commission of a *serious crime* by an informant ..., even if unconnected with an FBI assignment,[29] FBIHQ *must be notified.*" Ex. 6, § 137–4(5)(b) (1981) (emphasis added). The field office was required to make a recommendation about whether state or local law enforcement or prosecutive authorities should be informed,[30] as well as whether the informant should continue to be used. If the field office believed notification of local authorities was inadvisable, or if the field office recommended that local authorities delay or forego enforcement, it was required to advise FBI Headquarters of the details of the criminal activity and the communications with state or local authorities. At that point, FBI Headquarters would make a specific determination of whether to continue to use the informant. Ex. 6, § 137–4(5) (1981).

If a field office learned of "participation by an informant ... in a *serious act of violence,*" it was required to notify FBI Headquarters, even if the appropriate state or local authorities had been notified.

27. Agents were required to advise informants of these matters even before 1981; the only change made in 1981 was to require annual advisement or readvisement whenever necessary. *See* Ex. 6, § 137–13, Guidelines Part B (1978); Ex. 8, at 4.

28. In light of this predicament, agents called as witnesses at trial or whose views appear in trial exhibits disagreed about the *appropriateness* of using the head of a criminal organization as an informant. Fitzpatrick testified that the FBI could not use the head of an organization as an informant, because if it did so, the FBI would effectively be sponsoring the criminal organization. Fitzpatrick June 13, 2006 Tr. at 67. Connolly, appearing in an FBI instructional video, also cautioned that, in selecting informants, he would not advise targeting a "boss" in the area of organized crime; rather, he stated that agents should target "someone perhaps close to the level of criminal activity but not necessarily involved deeply." Ex. 72 Transcript, Informant Training Video at 1, Sept. 16, 1983. (Connolly clearly did not follow his own advice when he kept Bulger and Flemmi as informants.) Agent Gerald Montanari testified that the best information would come from people who were closer to the criminal operations, and someone higher up in an organization would provide better information. Montanari June 31, 2006 Tr. at 113–14. Ring testified that he would use the head of a criminal organization as an informant only if doing so would lead him to the head of another criminal organization or to someone higher up in a national organization. Ring June 27, 2006 Tr. at 18–19.

29. The MIOG sets forth detailed rules regarding authorized criminal activity by informants, as well as *criminal activity committed in connection with an FBI assignment. See* Ex. 6, § 137–4 (1981).

30. In determining whether to notify the appropriate authorities of criminal activity by informants, agents were instructed to consider the following factors:

 a. whether the crime is completed, imminent or inchoate;
 b. seriousness of the crime in terms of danger to life and property;
 c. whether the crime is in violation of federal or state law, and whether a felony, misdemeanor or lesser offense;
 d. the degree of certainty of the information regarding the criminal activity;
 e. whether the appropriate authorities already know of the criminal activity and the informant's identity; and
 f. the effect of notification on FBI investigative activity.

 Ex. 6, § 137–17(1), Guidelines Part G(4)(f) (1981).

Ex. 6, § 137–4(5)(c) (1981) (emphasis added); *see also* Ex. 8, at 7. The field office was instructed to send a teletype detailing the informant's violent activity and stating whether the field office wished to continue to use the informant. *See* Ex. 6, § 137–4(5)(c) (1981); Ex. 8, at 7. The Guidelines mandated that a determination to continue to use the informant be approved by the Director or a senior official at FBI Headquarters after consultation with the Assistant Attorney General in charge of the Criminal Division. Ex. 6, § 137–17(1), Guidelines Part G(3) (1981).[31]

Regardless of whether the FBI decided to inform state and local authorities of criminal activity by an informant, it was *never* appropriate for the FBI to take any action to conceal a crime by an informant. Ex. 6, § 137–13, Guidelines Part 1(c)(1) (1978), *renumbered as* § 137–17(1), Guidelines Part G(5) (1981).

The MIOG consistently gave FBI Headquarters the ultimate decision-making authority regarding questionable informants. For example, if agents had questions regarding the interpretation of the Guidelines, they were instructed to obtain the advice of FBI Headquarters before refusing or discontinuing the services of a valuable informant. Ex. 6, § 137–17(1), Guidelines Part N(2) (1981). Further, although any informant found to be unsuitable was to have his relationship with the FBI promptly terminated, Ex. 6, § 137–17(1), Guidelines Part D(7) (1981), the MIOG never directed an agent to close an informant in response to specific behavior; rather, it directed the agent and field office to inform FBI Headquarters.

During his tenure as contact agent for Bulger and Flemmi, Connolly was aware of these reporting requirements, but he sought to avoid any required reports to FBI Headquarters by closing his eyes and ears to information about criminal activity by his informants. In fact, he even instructed other agents on how to avoid the reporting requirements by recommending that agents tell informants *not to inform them* of ongoing criminal activity.

[I]f you're goin' out to develop an informant that's not what you want. Someone else can do that. Other agents can make the case on him. That's not my function but *my function is early on to let him know I don't wanna know.* Don't tell me something you've done because if you do, you're puttin' me in a position where I have to act on it.[32]

---

**31.** Prior to 1981, if the FBI had knowledge of the actual commission of a serious crime by an informant unconnected with his FBI assignment, the FBI was instructed to notify the appropriate law enforcement or prosecutive authorities, unless notification was inadvisable. If notification to other law enforcement agencies was inadvisable, the FBI was to notify the Department of Justice. Ex. 6, § 137–13, Guidelines Part 1(c)(3) (1978). The 1978 Guidelines drew a distinction between criminal activity in connection with an FBI assignment and criminal activity unrelated to an FBI assignment. The FBI was required to act if it *learned* of criminal activity in connection with an assignment, but was only required to act if it had *knowledge of* criminal activity unrelated to an assignment. The Guidelines stated that "learning" involved a "comparatively minimal degree of certainty," while "knowing" involved a "substantial degree of certainty." Ex. 6, § 137–13, Guidelines Part 1(c)(2) to -(3) (1978). The "knowledge" standard was derived from the federal Misprision of Felony statute, 18 U.S.C. § 4. However, this distinction was eliminated in the 1981 Guidelines, and the 1981 MIOG required the field office to act if it learned of criminal activity by an informant, but did not define "learn."

**32.** Connolly followed his own advice when handling Bulger and Flemmi. He reported to Greenleaf that because Bulger and Flemmi were aware of Connolly's obligation to report any of their criminal activity to FBI Headquarters, "they do not discuss any criminal activity which they may be engaged in front of

Ex. 72, Transcript at 10–11 (emphasis added).

### c. Operation of Informants

The MIOG advised that "[s]uccessful operation of informants demands more of an Agent than almost any other investigative activity," and provided agents with detailed guidance about how to operate informants. Ex. 6, § 137–4(1) (1978), *renumbered as* § 137–5(1) (1981).

#### i. Control of Informants

Agents were instructed to direct the activities of informants as much as possible, and to make every effort to control the informant's activities when he or she was acting on the FBI's behalf. Ex. 6, § 137–4(2) to –4(3) (1978), *renumbered as* § 137–5(2) (1981). Although it was not possible for agents completely to control all day-to-day activities by informants, *see* Ring June 27, 2006 Tr. at 58; Montanari June 21, 2006 Tr. at 113, Fitzpatrick and Connolly were aware that someone, either the agent or the informant, would control the informant *relationship*. Fitzpatrick testified that there was a need to control the informant relationship so that informants do not "go both ways" and use information gleaned from the FBI in their criminal endeavors. Fitzpatrick June 12, 2006 Tr. at 73–74. Connolly himself, in his instructional video, observed that either the informant would rule the agent, or the agent would rule the informant, and "if they're ruling you you're wastin' your time and the Bureau's time and you could put yourself and the Bureau in a very melancholy situation." Ex. 72, Transcript at 12. Agents were also instructed that Organized Crime

informants presented a particular problem in this regard. Connolly pointed out in his training video that Organized Crime informants "never really consider themselves as an informant." Ex. 72, Transcript at 13. Rather, they may use the FBI to "get to" rival criminals, in contrast to a "stick up guy in Wichita," who knows he is an informant and is willing to let the agent direct him. *Id.*

#### ii. Maintenance of Informant Files

Agents were required to record "all investigative activity" related to an informant in a file maintained for each informant. Ex. 6, § 137–4(8) (1978), *renumbered as* § 137–5(7) (1981). The MIOG instructed that agents were required to record both positive (useful information was obtained) and negative (no useful information was obtained) contacts. *Id.* Each informant file had two sections: the "administrative" section including administrative and identifying data; and a substantive section including reports provided by the informant, recorded on FD 209 ("209") forms. Ex. 6, § 137–7(5) (1979), *renumbered as* § 137–9(4) (1981). If an informant provided information relevant to an investigation, the agent routed the 209 with the relevant information to the agent responsible for the investigation. *See* Ring June 27, 2006 Tr. at 12–13; Ex. 50, Report of Review of Bulger and Flemmi Informant Files for Compliance Issues at 12–14, Oct. 8, 1999. Each informant file was to have a table of contents or index recorded on a form FD–237. Ex. 6, § 137–7(3) (1978), *re-*

writer." Ex. 13*l*, Memo from Connolly to SAC, Boston at 5, Nov. 1, 1984.

It is not surprising, therefore, that while Greenleaf acknowledged that there was a procedure to deal with a report of serious criminal activity by an informant, he testified that

he was *never notified* of any report of serious criminal activity by Bulger or Flemmi, with the exception of the Drug Enforcement Administration investigation in 1984, discussed below in Section II(D)(3)(e). Greenleaf June 22, 2006 Tr. at 16.

*numbered as § 137–7(4) (1979), renumbered as § 137–9(3) (1981).*

The MIOG directed that all informant files, both pending and closed, were to be "maintained under lock and key under the personal supervision of the SAC or a person designated by the SAC," and "handled in a secure fashion at all times." Ex. 6, § 137–7(2) (1978), *renumbered as § 137–7(3) (1979), renumbered as § 137–9(1) (1981).*

In addition to maintaining the informant file, agents were required to submit quarterly progress letters to FBI Headquarters for each informant. These progress letters were to include statistical accomplishments to be credited to the informants. Originally, the rationale for the letters was to justify payment to the informants. Ex. 6, § 137–9(1)(e) (1978). In 1981, the MIOG provided that the letters existed accurately to demonstrate the contributions of the informant program. Ex. 6, § 137–11(5) (1981).

### iii. Promises to Informants

Agents were instructed not to promise immunity or reduction of sentence to criminals who furnished information. Ex. 6, § 137–3(6) (1978), *renumbered as § 137–5(4) (1981).* In fact, agents were required to tell informants at least once each year that the informant's relationship with the FBI would not protect him or her from arrest or prosecution unless the supervisor or SAC determined that his or her criminal activity was justified under the Guidelines. Ex. 6, § 137–3.4 (1981); Ex. 6, § 137–17(1), Guidelines Part E(1) (1981). Connolly instructed agents that they should be careful not to make promises to informants which would authorize criminal activity. Ex. 72, Transcript at 11.

### iv. Providing Information to Informants

Agents were instructed to be careful not to provide information to informants other than such information as was necessary for informants to carry out their assignments. Ex. 6, § 137–3(8) (1978), *renumbered as § 137–5(10) (1981).* Giving too much information to an informant increased the risk that the informant could divine the FBI's priorities and interests from the very questions asked by agents, and then misuse that information. Fitzpatrick June 12, 2006 Tr. at 73–74.

### v. Confidentiality of Informant Identities

Agents were instructed to take all possible steps to maintain the confidentiality of the informant's relationship with the FBI. Ex. 6, § 137–3(10) (1978), *renumbered as § 137–3(9)(d) (1979), renumbered as § 137–3.4(c) (1981).* "Constant care should be exercised to avoid any disclosure to anyone which might result in the identification of an informant or cast suspicion upon an informant." Ex. 6, § 137–3(7) (1978), *renumbered as § 137–5(9) (1981).* Even when the FBI was responding to a subpoena, court order, or request for information that related to the identification of an informant, the response was to be coordinated with FBI Headquarters. Ex. 6, § 137–4(14) (1979), *renumbered as § 137–5(16) (1981), renumbered as § 137–5(19) (1982).* Before information received from an informant could be used in a prosecution, FBI Headquarters was to be advised and given an opportunity to discuss the matter with the Department of Justice. Ex. 6, § 137–6(11) (1978). Moreover, the Department of Justice instructed all United States Attorneys that they could not interview or subpoena informants without prior consent from the Department. Ex. 6, § 137–6(11) (1978).

The central justification for maintaining the confidentiality of informant identities, of course, was safety and security. Ring testified that it was "absolutely" important to keep informants' identities confidential because "[y]ou had an informant's life in your hands. If that identity got out, ... the informant's life would be in danger.... [I]f you're dealing in the area of organized crime, it's essential to protect the informant's life." Ring June 27, 2006 Tr. at 7–8. Brady and Montanari testified to the same effect. *See* Brady June 21, 2006 Tr. at 6; Montanari June 21, 2006 Tr. at 114–115. In his training video, Connolly too acknowledged the necessity of keeping confidential the identities of informants for reasons of the informants' safety and security. He said: "You should make every effort to ensure the security of this person. They are risking their lives[;] we should recognize that." Ex. 72, Transcript at 6.

## C. Recruitment and Use of Bulger and Flemmi as FBI Informants

Bulger and Flemmi were informants for the FBI at various times over a period of twenty-five years.[33] Although they were

only two of the 250 to 300 informants in the Boston Division, they were repeatedly lauded as among the most valuable informants in the Division. Bulger was called "one of the highest caliber sources in the Division within recent memory," Ex. 13e, Memo from Connolly to SAC, Boston at 2, Dec. 2, 1980, and "one of the most highly placed and valuable informants in the Boston division," Ex. 13e, Addendum of Supervisor Morris at 2. When questions were raised about whether Bulger should be "closed" (terminated) as an informant, Morris opined that the closing "would deal a serious blow to the OCP[34] of the Boston division." Ex. 13e, Addendum of Supervisor Morris at 2. Flemmi was described as the type of informant who "form[ed] the nucleus of any viable long range Organized Crime Program," and was viewed as a "highly placed and valuable" informant of the type that takes years to develop. Ex. 110, Addendum of Supervisor Morris.

Flemmi was first recruited as an FBI informant in 1964. He provided information, off and on, until 1990. Bulger was first recruited as an FBI informant in 1971 and provided information until 1990.[35] Be-

---

**33.** Bulger and Flemmi were often referred to in FBI documents by their "symbol numbers" in order to protect their confidentiality: Bulger was BS1544–TE (or BS1544–OC); and Flemmi was BS–955–TE (or BS–955–OC). Each symbol number consisted of a code for the FBI office in which the informant was located, a number identifying the informant, and a code for the type of informant. BS is the code for Boston; TE is the code for Top Echelon informant; and OC is the code for Organized Crime informant.

**34.** Organized Crime Program.

**35.** The following is a chronology of Bulger and Flemmi's openings and closings as informants over the period 1964 to 1990:

| | |
|---|---|
| 11/27/1964 | Flemmi opened as an FBI Informant |
| 10/30/1965 | Flemmi closed |
| 11/03/1965 | Flemmi re-opened as an FBI Informant |
| 02/14/1967 | Flemmi designated a Top Echelon Informant |
| 09/15/1969 | Flemmi closed (continued ...) |
| 05/13/1971 | Bulger opened as an FBI Informant |
| 09/10/1971 | Bulger closed |
| 09/18/1975 | Bulger re-opened as an FBI Informant |
| 02/04/1976 | Bulger designated a Top Echelon Informant |
| 01/27/1978 | Bulger closed |
| 05/04/1979 | Bulger re-opened as an FBI Informant |
| 09/12/1980 | Flemmi re-opened as Top Echelon Informant |
| 09/23/1982 | Flemmi closed |
| 02/23/1983 | Bulger designated a Top Echelon Informant |
| 07/10/1986 | Flemmi re-opened as FBI Informant |
| 12/03/1990 | Bulger and Flemmi closed |

*See* Ex. 87, Summary of Openings/Closings of James Bulger; Ex. 88, Summary of Openings/Closings of Stephen Flemmi.

ginning in 1975, Connolly was the FBI agent assigned to handle Bulger and Flemmi. Fitzpatrick June 12, 2006 Tr. at 75–76. Bulger and Flemmi were recruited for their ability to provide high-level information about Cosa Nostra, owing to their status as equals at the policy-making level to major Cosa Nostra figures, including Angiulo and Zannino. *See* Ex. 13h, Teletype from Boston to Director, Feb. 23, 1983. They were "very influential" in the Boston criminal world. Ex. 10, Flemmi Informant File at MCN016–0210 to –0211. Bulger was "one of the top criminals in Boston," Weeks June 8, 2006 Tr. at 99, and a "major Boston underworld figure," Ex. 14, Stipulation Regarding James Bulger and Stephen Flemmi's Reported Criminal Activities at 1, *United States v. Connolly*, No. 99–10428 (D.Mass.) (citing FBI document authored by Connolly, from SAC, Boston to Director, June 5, 1974). He was known to be the head of Winter Hill. *See, e.g.,* Ex. 13h (stating that Bulger was "the titular head of the Winter Hill Mob"); Ex. 12, Bulger Informant File at MCN016–1523 (Bulger self-identified as one of the heads of the South Boston Irish Mafia). Winter Hill interacted with Cosa Nostra on matters of mutual interest. Ex. 59, at MCN055–3646; Ex. 110, Addendum of Supervisor Morris. Flemmi also traveled in Cosa Nostra circles; he had a past criminal association with Cosa Nostra and was twice offered the opportunity to become a made member. Flemmi June 8, 2006 Tr. at 20–21; Ex. 110, Addendum of Supervisor Morris. Accordingly, he was able to provide an insider's perspective on the organization. Bulger and Flemmi thus were uniquely positioned to provide information about high-level activity in Cosa Nostra.

At times, Bulger and Flemmi were designated as "Top Echelon" informants.[36] Although they were occasionally "closed" and "re-opened" as FBI informants, the FBI never completely terminated its relationship with either informant during the 1970s and 1980s.[37] The official action of opening and closing Flemmi had such little practical impact that Flemmi himself was never aware that he was being officially opened and closed. He continued to provide information even when he was closed in the 1970s and 1980s, and that information was reported in his informant file, which remained open even when Flemmi was officially "closed." Ring testified that although Flemmi was sometimes closed, the FBI continued to meet with him and "information volunteered by [him] is accepted." Ex. 13j, Memo from Ring to SAC, Boston at 1, Oct. 17, 1984; Ring June 28, 2006 Tr. at 56–57. Other agents also treated Flemmi as an informant regardless of his official open or closed status. While he was closed in 1983, Montanari, who wanted to interview him in connection with a murder investigation, approached him through Connolly because he was an informant. Montanari June 21, 2006 Tr. at 105–107.

In 1981, information provided by Bulger and Flemmi was used in the successful applications for Title III wiretaps and electronic surveillance in the Bostar and Mandarin operations against Angiulo and Zannino. Connolly and Morris repeatedly trumpeted the roles played by Bulger and Flemmi in providing information that re-

---

**36.** As noted earlier, Top Echelon informants were expected to provide information about a criminal group's activities at the management level. *See* Fitzpatrick June 13, 2006 Tr. at 14–16; Ring June 27, 2006 Tr. at 11–12.

**37.** The MIOG does not require mere closing of an unsuitable informant; rather, it requires that "his relationship with the Bureau shall be promptly terminated." *See* Ex. 6, §§ 137.3.1 to 137.3.2 (1981); Ex. 8, at 2–3; Ex. 6 § 137–17(1), Guidelines Part D(5) (1981).

sulted in the Bostar and Mandarin wiretaps, and the operation against Angiulo was referred to as "one of the highest priority organized crime cases in the FBI today, [involving] what has been characterized by FBIHQ officials as one of the most important and successful Title III's to have been conducted by the FBI in the past ten years." *See, e.g.*, Ex. 11b, Memo from Connolly to SAC, Boston at 2, Dec. 2, 1980; Ex. 13f, Memo from Connolly to SAC, Boston at 1, Addendum of Supervisor Morris, Apr. 1, 1981; Ex. 110, Addendum of Supervisor Morris. The Boston Organized Crime Program was commended by the Director for these two "exemplary" and "outstanding" cases. Ex. 70, Memo from Director, FBI to SAC, Boston at 1, May 28, 1981.

Bulger and Flemmi provided other valuable information regarding Cosa Nostra. For example, Flemmi provided the FBI with a diagram of the Bella Napoli Restaurant in Boston's North End, Zannino's favorite meeting place. Ex. 10, at MCN016–0500 to –0502; Flemmi June 6, 2006 Tr. at 113–115. Flemmi's information included the location of Zannino's customary table and the nights he held meetings at the restaurant. *Id.* Likewise, he provided a diagram of Francesco's Restaurant in the North End, Angiulo's favorite meeting place. The diagram pinpointed the location of Angiulo's favorite table and where he customarily sat at that table. Ex. 10, at MCN016–0497 to –0499; Flemmi June 6, 2006 Tr. at 116–117. In 1986, Flemmi provided a diagram of Vanessa's Restaurant, a meeting place for Cosa Nostra leaders in Boston subsequent to the arrest and conviction of Angiulo. Ex. 10 at MCN016–0355 to –0358; Flemmi June 7,

2006 Tr. at 5–7. The diagram and other information provided by Flemmi were used in an application for a Title III wiretap at the restaurant. June 8, 2006 Tr. at 53–54. Information provided by Flemmi was also used in an application for a Title III wiretap of a Cosa Nostra induction ceremony in 1989. June 8, 2006 Tr. at 54–55; *see also* Flemmi June 7, 2006 Tr. at 10–11.

### D. Involvement of Bulger and Flemmi in Violent Criminal Activity

Bulger and Flemmi were involved in violent criminal activity throughout their tenure as FBI informants. *See generally* the trial testimony of Flemmi, June 5, 2006–June 8, 2006. Both were indicted for, and Flemmi pleaded guilty to, a racketeering conspiracy that included bookmaking, loansharking, extortion, narcotics trafficking, and murder. Bulger was indicted for involvement in twenty-six murders between 1973 and 1985; and Flemmi pleaded guilty to involvement in eleven murders during the same period. *See* Ex. 1; Ex. 2.

Although agents of the FBI may not have been aware of *all* of this criminal activity during all of the time that Bulger and Flemmi were FBI informants, agents in Connolly's chain of command in the Boston Office and at FBI Headquarters knew, or had reason to know, that Bulger and Flemmi were involved in violent criminal activity during the time they were informants. Organized crime, by the FBI's own definition, involves the "use of violence or threat of violence." [38] Ex. 69, at 5. Agents in the Boston Office and officials at FBI Headquarters knew that Bulger and Flemmi were members, then leaders,

---

**38.** The FBI defined organized crime as "any group having some manner of formalized structure whose primary objective is to obtain money through illegal activities and maintains its position through *use of violence or threat of* *violence,* corrupt public officials, graft and extortion, and has a significant impact on the people in its locale, or region, or the country as a whole." Ex. 69, at 5 (emphasis added).

of Winter Hill, an organized crime group. Flemmi himself testified that the FBI knew he and Bulger were committing crimes: "that was our business. That's all we did . . ., and they [the FBI] knew what we were doing." Flemmi June 7, 2006 Tr. at 81–82. In addition, as I will discuss in detail below, the files of the Boston Office contain scores of references to specific criminal activity by Bulger and Flemmi. Some of these references appear in Bulger and Flemmi's own informant files. Bulger and Flemmi would "self-report" criminal activity to their handler, Connolly, who would record their reports in 209s which were then placed in their informant files. Other references to Bulger and Flemmi's criminal activity come from the reports of other informants of the FBI. If an informant told his handler about criminal activity by Bulger or Flemmi, that information would be recorded in the informant's own informant file and also copied to an investigative file. Any mention of Bulger or Flemmi in an investigative file should have been listed in the indices of the Boston Office.[39]

## 1. Loansharking and Bookmaking

The files of the Boston Office, including Bulger and Flemmi's informant files, are replete with references to their involvement in loansharking and bookmaking between 1965 and 1987. Loansharking and bookmaking, by definition, involve violence

---

**39.** According to the procedures for maintaining files, any information received by the FBI concerning Bulger or Flemmi should have been noted and linked to their names in an index. Any time a suitability review was conducted for Bulger or Flemmi, when they were opened or re-opened, the indices should have been checked:

> Within the FBI system of records, whether utilizing index cards or automated means, when information is received concerning an individual a reference is made in general indices which indicates what file/serial/page the information can be found. If the information pertains to a current investigative matter, [then] it is routed to that investigative file. (Informant files being an exception. Informant files are not noted in general indices.) If the information is general in nature, it will be routed to a general control file maintained for that particular investigative classification. The following hypothetical, will illustrate. Assume that individual X is an informant and the subject of no other active investigative matters. If information is received stating simply that X is a member of organized crime, the information would be recorded and placed in an organized crime control file for future reference. A card would be filled out stating X's name and the location of the file. . . . In this example, the information would not be routed to X's informant file because the Agent filing the report would not know of X's status as an informant, such status being compartmentalized.
>
> There are two primary ways that information about X would come to the attention of the handling Agent and/or Supervisor, the exact procedures of the Boston Office, during the various time periods, being unknown to writer. First, the organized crime squad supervisor or the organized crime coordinator in the office is usually charged with reviewing control files on a periodic basis. Secondly, when an informant is opened, or reopened as the case may be, the handling agent is charged with conducting an 'indices search' to determine what information is in FBI files regarding the individual. In the above example, if the indices search is conducted after receipt of the general organized crime information, the completed search slip will note that there is information about X available [in a particular file]. It is then the responsibility of the handling Agent to retrieve the file and review the information. In some instances, the information is so voluminous that the completed search slip will note 'numerous references.' It is the responsibility of the handling Agent to follow up by requesting a list of these references and reviewing same. This indices search and file review is part of the process of determining the suitability of the individual for use as an informant.
>
> Ex. 50, at 12–14.

and threats of violence.[40] A 1965 review of Flemmi's files, prepared by Flora Fitzgerald for the SAC of the Boston Office, noted two reports of bookmaking and four reports of loansharking, as well as one report of arson, two reports of threats of violence, and several reports of other criminal activity by Flemmi. *See* Ex. 10, at MCN016–0225 to –0238. In 1967, the SAC of the Boston Office informed the Director of the FBI that Flemmi had been involved in bookmaking, loansharking, robberies, and was suspected of involvement in murder. Ex. 10, at MCN016–0177 to –0181. Throughout the 1970s and 1980s, Connolly knew, and his supervisors should have known, that Bulger and Flemmi continued to be involved in gambling, loansharking, and bookmaking, based upon the self-reports of Bulger and Flemmi. For example, they self-reported that Winter Hill was involved in gambling in 1976, 1986, and 1987, *see* Ex. 12, at MCN016–1598 to –1600; Ex. 10, at MCN016–0365 to–0367, MCN016–0359 to –0360, MCN016–0352 to –0354, MCN016–0050 to –0052, and Flemmi self-reported that he was involved in loansharking, *see* Ex. 10, at MCN016–0050 to –0052. Over the years, other informants reported to their handlers that Bulger and Flemmi were involved in extortion, threats of violence, jury tampering, drug trafficking, and murder. These reports were recorded in the files of the Boston Office. *See, e.g.,* Ex. 16, Report of Agent Patterson and Agent Frahm's Review of Files Referencing Bulger or Flemmi at 9–10, July 1997; Ex. 17, Memo from

Vaules to SAC, Boston, Dec. 31, 1975; Ex. 14 at 4 (citing FBI Document authored by Daly, Oct. 18, 1977).

Greenleaf acknowledged that when he was the SAC, from 1982 to 1986, Bulger and Flemmi "had a reputation of having been involved in gambling and loansharking," Greenleaf June 22, 2006 Tr. at 57, and Ring testified that at the time he was the Supervisor of the C–3 Squad, from 1983 to 1990, he thought Bulger and Flemmi were involved in gambling and loansharking, Ring June 28, 2006 Tr. at 11.[41]

## 2. Reputation for Violence

The evidence shows that, by the mid 1970s, agents in the Boston Office and at FBI Headquarters knew that Winter Hill had a reputation for violent crime. Bulger repeatedly self-reported that Winter Hill was capable of violence. *See, e.g.,* Ex. 14, at 1 (citing FBI Document authored by Connolly, From SAC, Boston to Director, Sept. 6, 1974), 3 (citing FBI Document authored by Connolly from SAC, Boston to Director, Feb. 4, 1976); Ex. 12, at MCN016–1618 to –1620, MCN016–1360 to –1361. Ring testified that at the time he was Supervisor of the C–3 Squad, he believed Bulger and Flemmi were capable of violence, and that he knew they came out of a violent group. Ring June 27, 2006 Tr. at 56–57. In a 1983 memorandum to Greenleaf, Ring reported that the "Irish Mafia" (Winter Hill) dealt in gambling, bookmaker extortion, loansharking, drugs,

---

40. Judge Selya of the First Circuit Court of Appeals has observed: " 'Loansharking' is a term of criminal art which may roughly be defined as the unlawful lending of money at usurious rates of interest, repayment being encouraged by the employment (or threatened employment) of unorthodox collection measures, involving, *inter alia,* the breaking of bones." *United States v. Cintolo,* 818 F.2d 980, 984 (1st Cir.1987) (Selya, J.).

41. Ring acknowledged that loansharking was sometimes associated with violence. He testified that the Guidelines did not prevent the FBI from using informants who were involved in loansharking, but stated that if he had "specific and credible information" that they were using violence in the collection of debts, he would have launched an investigation into their activities. Ring June 28, 2006 Tr. at 12–13.

sophisticated robberies, murders, threats and intimidation. Ex. 59, at MCN055–3646.

In addition, Bulger and Flemmi each had well-earned, personal reputations for violence. Flemmi testified that Bulger generally was known as a violent person in the Boston area, and that the mere presence of Bulger and Flemmi would be enough to intimidate people. Flemmi June 5, 2006 Tr. at 84–86; Flemmi June 8, 2006 Tr. at 23–24. Weeks similarly testified that it was generally known that he, Bulger, and Flemmi were capable of extreme violence. Weeks June 8, 2006 Tr. at 77–78. Agents in the Boston Office and at FBI Headquarters were well aware of these reputations. In 1965, for example, the SAC wrote to the FBI Director that Flemmi "enjoys the reputation of being a very capable individual and ... it is believed that he probably is the individual that finally was successful in murdering Edward 'Punchy' McLaughlin." Ex. 10, at MCN 016–0198 to –0199. In 1966, Flemmi self-reported beating another man so severely that he needed 100 stitches in the face and head. Ex. 10, at MCN016–0678 to –0679, MCN016–0183 to–1086. Flemmi also self-reported that in 1967, he was offered the opportunity to become a member of Cosa Nostra and that ordinarily, a person would have to make a "hit" in order to be admitted as a member. Given Flemmi's reputation, however, Cosa Nostra offered to waive the hit requirement. Ex. 10, at MCN016–0655 to –0656, MCN016–0135 to –0141. Bulger also reported to Connolly that Flemmi was known to be an extremely dangerous person when aroused, and warned that he might "whack out" the owner of a club where his daughter had been beaten. Ex. 12, at MCN016–1509 to –1513. In addition, Bulger was repeatedly referred to as a "vicious individual" and "vicious animal" in the files of the Boston Office. See, e.g., Ex. 19, Airtel from SAC, Boston to Director, FBI at 3, Apr. 15, 1975; Ex. 21, Memo from Daly to SAC, Boston, Aug. 23, 1976. He was said to be "feared by many people because of his ability to kill anyone without even thinking twice." Ex. 20, Memo from Daly to SAC, Boston, Sept. 18, 1975. Fitzpatrick thought of Bulger as a "live psychopath." Fitzpatrick June 14, 2006 Tr. at 11–12.

Bulger and Flemmi were referred to in the files of the Boston Office as individuals who could be used by other criminals as contract killers to "hit" someone, Ex. 16, at 6, and officials from the FBI's Sensitive Information Unit, Criminal Investigative Division, reviewing Bulger and Flemmi's informant files in 1999, found seventeen instances between 1976 and 1988 where Bulger reported information that could be interpreted as a threat he made to the life of one or more individuals, and ten instances where Flemmi reported similar information, Ex. 50, at 9.

### 3. Specific Criminal Acts

#### a. Bennett Murder and Fitzgerald Bombing

In 1967, Edward "Wimpy" Bennett, a sometime confederate of Flemmi, was murdered. See Ex. 10, at MCN016–0665 to –0679. Some time later, attorney John Fitzgerald was injured when a bomb placed in his car exploded. See Ex. 10, at MCN016–0639 to –0640. In 1969, Flemmi was indicted, along with underworld figure Francis Salemme, for the murder of Bennett and the attempted murder of Fitzgerald. Before the indictment was issued, however, Rico warned Flemmi that he was about to be indicted, enabling Flemmi to go on the run for five years. Flemmi June 6, 2006 Tr. at 71–75. Flemmi was closed as an informant in 1969 because he was named in the indictment, see Ex. 88; Ex.

10, at MCN016–0110, but he remained in contact with Rico while he was "on the lam." Flemmi called Rico once each year, and in 1974, Rico informed Flemmi that he could return to Boston. Flemmi June 6, 2006 Tr. at 73–75. Although Salemme was convicted of the Fitzgerald bombing and spent ten years in prison, all of the charges against Flemmi were dropped. Flemmi June 6, 2006 Tr. at 75–77. Flemmi believed that Rico had promised to protect him from prosecution and then honored that promise. Flemmi June 6, 2006 Tr. at 78.

Although Flemmi was not officially re-opened as an informant in the 1970s, in 1974 or 1975 he met with Connolly and another agent, Dennis Condon, who had been Rico's partner, and agreed to begin providing information. Flemmi June 6, 2006 Tr. at 67, 78–80. Bulger was re-opened in 1975, and the two began to meet with Connolly together. Flemmi June 6, 2006 Tr. at 80–81.

### b. Castucci Murder

During the 1970s, Richard Castucci ("Castucci") was a bookmaker who did business with Winter Hill. Ex. 3, at 7. In 1970, he began cooperating with the FBI and was targeted for development in the Top Echelon informant program. Ex. 24, Memo from SAC, Boston to Director, FBI, Jan. 30, 1970.[42] In the fall and winter of 1976, Castucci informed the FBI that fugitives Joseph McDonald and James Sims, members of Winter Hill, were living in an apartment in Greenwich Village, Manhattan where their rent was being paid by Winter Hill. Ex. 24, Memo from Daly to SAC Boston, Sept. 30, 1976; Memo from Daly to SAC, Boston, Nov. 8, 1976; Memo

from Daly to SAC, Boston, Dec. 15, 1976; Memo from Daly to SAC, Boston Dec. 30, 1976. Of particular significance is information provided by Castucci to his handler, FBI Agent Thomas Daly, on December 2, 10, and 27, 1976. On each of those dates, Castucci gave Daly rather precise information concerning the comings and goings of McDonald and Sims to and from their Greenwich Village hideout. *See* Ex. 24, Memo from Daly to SAC Boston, Dec. 15, 1976; Memo from Daly to SAC, Boston, Dec. 30, 1976. On each report Daly prepared concerning information given to him by Castucci about McDonald and Sims, Daly noted that the information was "extremely singular and sensitive" and "should not be discussed or disseminated outside the FBI." Ex. 24, Memo from Daly to SAC, Boston, Sept. 30, 1976; Memo from Daly to SAC, Boston, Nov. 8, 1976; Memo from Daly to SAC, Boston, Dec. 15, 1976; Memo from Daly to SAC, Boston, Dec. 30, 1976.

In December 1976, Connolly somehow discovered that Castucci had provided information to the FBI concerning the whereabouts of McDonald and Sims,[43] and Connolly promptly disclosed what he had learned to Bulger. Flemmi June 5, 2006 Tr. at 91–92. Bulger, Flemmi, Winter, and Martorano then decided that Castucci had to be killed. Flemmi June 5, 2006 Tr. at 92; Ex. 3, at 7. On December 30, 1976, Martorano killed Castucci by shooting him in the head, and Bulger and Flemmi cleaned up and disposed of Castucci's body by leaving it in the trunk of his car. Flemmi June 5, 2006 Tr. at 92–94. It does not appear that the FBI launched its own investigation into the murder of Castucci, despite the fact that he was an important

---

**42.** Exhibit 24 is a compilation of seven documents regarding Castucci. When I cite Exhibit 24, I will identify the specific document to which I am referring.

**43.** The record before me does not provide information sufficient for me to conclude whether Connolly came by this information through appropriate or inappropriate means.

FBI informant and had provided information on fugitives presumably sought by the FBI. Nevertheless, in a teletype to FBI Headquarters, the Boston Office attributed Castucci's murder to his having displeased local bookmakers from whom he had won considerable amounts of money; the Boston Office "assured" FBI Headquarters that Castucci's death had nothing to do with his status as an informant. Ex. 24, Teletype from Boston to Director, Jan. 4, 1977. What the Boston Office did not tell FBI Headquarters, however, was that FBI agent Joseph L. Kelly had received information from one of his informants, within two weeks after the death of Castucci, that Bulger and Flemmi had killed Castucci. Ex. 76, Memo from SA Joseph Kelly to SAC, Boston, Jan. 13, 1977. Nor was the assurance to FBI Headquarters revised when one of Daly's informants reported to him in June of 1977 that "the Winter Hill crew" had killed Castucci.[44] Ex. 22, Memo from Unidentified SA to SAC, Boston, June 17, 1977.

Castucci was the first of four FBI informants killed by, or at the behest of, Bulger and Flemmi after the disclosure of his identity to them by Connolly.

### c. "Race Fix" Case

In 1979, several leaders of Winter Hill, including Sims, McDonald, Martorano and Winter were indicted by a grand jury of this court for racketeering in connection with a scheme to fix horse races at various racetracks in the New England area, by bribing jockeys to hold back certain horses. Bulger and Flemmi were involved in the scheme, and Connolly and Morris had reason to know of their involvement. In fact, Connolly told Bulger and Flemmi that they were going to be included in the indictment, but that Connolly and Morris had asked the prosecutor, federal Organized Crime Strike Force Chief Jeremiah O'Sullivan, to remove Bulger and Flemmi from the indictment because of their value to the investigations into Cosa Nostra. O'Sullivan complied, and neither Bulger nor Flemmi was indicted, although both were listed as unindicted co-conspirators. *See* Flemmi June 6, 2006 Tr. at 85–87; Ex. 12, at MCN016–0871 to –0872; Montanari June 22, 2006 at 43–44. Notably, at the time Connolly made this request, *neither* Bulger nor Flemmi was officially open as an informant. Flemmi had been closed since 1969, and Bulger was closed in 1978 because he "could possibly become involved in legal difficulties in the near future." Ex. 13b, Teletype from Director, FBI to SAC, Boston, Jan. 27, 1978; *see also* Ex. 87. A later teletype states that Bulger was closed because "he became a principal subject of [a] Bureau RICO investigation," which appears to be a reference to the "race fix" case. Ex. 12, at MCN016–0871 to –0872. When he was closed, FBI Headquarters observed that if

---

44. It may have been true that money was one of the factors contributing to Castucci's murder, but as Connolly well knew, there was also a connection between Castucci's murder and his status as an FBI informant. It does not appear from the record in this case that any FBI agent with supervisory authority over Connolly—or indeed any FBI agent generally—ever inquired of Connolly whether he knew anything about the involvement of Bulger and Flemmi in the Castucci murder. Castucci's murder, in prototypical gangland style (a bullet to the head and body stuffed in the trunk of a car), aroused significant media attention, Flemmi June 5, 2006 Tr. at 92–94, and while Connolly discussed the murder with Bulger and Flemmi, he never asked them whether they had committed it, Flemmi June 8, 2006 Tr. at 21–22. He did not need to ask; and he did not want to ask, because he knew that under the Guidelines and the MIOG, he would at least be required to report to FBI Headquarters if Bulger and Flemmi affirmed their involvement in the murder. Indeed, he might have been required to arrest his prized informants.

his legal difficulties did not materialize and the situation changed, he would be re-opened because he had provided "consistently excellent information." Ex. 13b. The legal difficulties did not materialize *precisely because* Connolly and Morris went to O'Sullivan and emphasized Bulger's contributions to the Cosa Nostra investigation. Bulger was re-opened in 1979 with no mention of any legal problems. Ex. 13c, Teletype from Boston to Director, May 4, 1979; *see also* Ex. 87. In fact, the teletype re-opening Bulger said only that he was "being reopened inasmuch as [he] is now in a position to provide information of value." Ex. 13c. Flemmi was officially re-opened on September 12, 1980 as a Top Echelon informant. Ex. 11a, Teletype from Boston to Director, Sept. 12, 1980; *see also* Ex. 88.

### d. Wheeler, Halloran, Donahue and Callahan Murders

In 1981, Bulger and Flemmi were involved in the murder of a Tulsa, Oklahoma businessman named Roger Wheeler. In the two years after that murder, Bulger and Flemmi were involved in three additional murders to cover up their involvement in the Wheeler murder. Agents in the Boston Office and at FBI Headquarters suspected that Bulger and Flemmi were involved in all of these murders and even investigated their possible involvement, eventually concluding that there was *evidence* that the murders were all committed by Winter Hill. Neither Bulger nor Flemmi was indicted for the murders until 1995. *See* Ex. 121, Memo from Organized Crime Section Chief McWeeney to Associate Deputy Director Revell at 1, Nov. 8, 1982.

### i. Wheeler Murder

Roger Wheeler was the owner of World Jai Alai ("WJA"), a business which operated in Florida and Connecticut. John Callahan was a respected CPA by day, but by night he hobnobbed with gangsters, particularly members of Winter Hill. Ex. 3, at 8. Callahan had been president of WJA, until his relationship with his gangster friends caused him to lose his license to operate a parimutuel betting business in Connecticut. Ex. 3, at 8–9. Thereafter he was fired by the owners of WJA. *Id.* While he was president of WJA, Callahan hired retired FBI agent Rico to head security at WJA. *Id.*

After Callahan was fired, he attempted (with Rico and one Richard Donovan) to regain control of WJA by purchasing it from Wheeler. Flemmi June 6, 2006 Tr. at 18; Ex. 3 at 9. He offered Bulger, Flemmi and Martorano a $10,000 per week "skim" from the parking lot and concession proceeds at WJA if Winter Hill would act as "muscle" for WJA against interference by outside groups like Cosa Nostra. Bulger and Flemmi agreed to the arrangement. Flemmi June 6, 2006 Tr. at 18; Ex. 3 at 9. Wheeler, however, resisted selling WJA to Callahan and his associates. As Flemmi testified, Wheeler was "a difficult person to deal with." Flemmi June 6, 2006 Tr. at 19–20. Callahan, Bulger, Flemmi and Martorano agreed that, because Wheeler was "difficult" and could not be persuaded to sell WJA, he had to be killed.[45] And so he was. Flemmi June 6, 2006 Tr. at 20–21; Ex. 3, at 9. Flemmi, with Bulger's help, "put a little package of weapons together," packed them in a suitcase, and shipped them by bus to Martorano and McDonald in Tulsa, Oklahoma. Flemmi June 6, 2006 Tr. at 21–22. Using

---

45. Flemmi confirmed with Rico that Rico concurred in the decision to kill Wheeler. Ex. 3, at 9.

one of the weapons from the "little package," Martorano shot and killed Wheeler on May 27, 1981 outside his Tulsa country club. Flemmi June 6, 2006 Tr. 2 at 21–22; Ex. 3, at 9–10; Ex. 1, ¶ 12(h).

Some time in the early evening of May 27, 1981, Connolly and Bulger had a telephone conversation in which they discussed the Wheeler murder. Connolly helpfully suggested to Bulger that if Bulger were implicated in the murder, Connolly would say that he and Bulger had spoken by telephone the night of the Wheeler murder, and that Bulger was in Boston at the time of the murder. Flemmi June 6, 2006 Tr. at 30–31. Two years after the murder, Connolly provided the promised alibi, reporting that he had called Bulger at home that night and discussed possible theories of the murder. Ex. 111, Memo from Connolly to SAC, Boston, Apr. 7, 1983.

### ii. Preliminary Investigation of Wheeler Murder

The Wheeler murder was investigated by the Tulsa and Oklahoma City police departments and by the Oklahoma City Office of the FBI ("Oklahoma City Office"). Montanari June 21, 2006 Tr. at 97–98. The Oklahoma City Office had composite sketches of the suspected perpetrators drawn from accounts given by eyewitnesses. The sketches show two white males, bearded and wearing dark glasses.[46] See Ex. 86, Composite Sketches of Suspects in Wheeler Murder. As part of its investigation of the Wheeler murder, the

Oklahoma City Office requested that the Boston Office interview Callahan in the summer of 1981. Connolly was assigned to conduct the interview. Montanari June 25, 2006 Tr. at 45–46. Apparently Connolly did conduct the interview, but the record is silent as to what he reported as a result. The Organized Crime Section at FBI Headquarters designated the investigation as a substantive RICO case in November 1981. Ex. 27, Informative Note at 1, Jan. 8, 1982.[47]

### iii. Halloran's Cooperation with Law Enforcement

On or around January 1, 1982, Edward "Brian" Halloran approached FBI special agent Leo Brunnick, a member of Boston's C–2 Squad, with information about the Wheeler murder and activities of Winter Hill in Boston. Halloran was a low-level criminal in Boston who had, at times, been involved with Winter Hill. See Ex. 121, at 2. At the time he approached Brunnick, Halloran was facing a murder charge in Suffolk County, Massachusetts. Moreover, he reported to Brunnick that members of Winter Hill had made several attempts on his life. See Montanari June 21, 2006 Tr. at 82; Ex. 26, Teletype from Boston to Director, Jan. 6, 1982. Although Halloran was in fear for his life, he told agents in the Boston Office that he was willing to testify in open court if he were given protection for himself and his family and immunity from prosecution. Ex. 27, Memo from McWeeney to Monroe at 2.

Brunnick and his partner, Montanari, conducted several interviews with Hallo-

---

46. In 1981, federal law enforcement officials in Boston were aware that it was a common modus operandi among members of Winter Hill to disguise themselves with fake facial hair and dark glasses in carrying out their criminal activities, particularly violent criminal activities. Montanari June 26, 2006 Tr. at 33–34; Ex. 27, Memo from McWeeney to Monroe at 5, Jan. 8, 1982.

47. Exhibit 27 contains two separate documents about the Wheeler murder investigation, an Informative Note dated January 8, 1982, and a Memorandum from McWeeney to Revell of the same date.

ran. During those interviews Halloran provided a consistent story about the Wheeler murder. He told Brunnick and Montanari that he had attended a meeting with Callahan, Bulger, and Flemmi in the late winter of 1980 or early spring of 1981, during which Callahan explained the problems with WJA and Wheeler and informed Halloran that they planned to kill Wheeler. Halloran also told Brunnick and Montanari that Rico was involved in the plot to kill Wheeler: Rico was to provide information about Wheeler's habits and whereabouts. Halloran reported that Callahan had offered him the job of killing Wheeler, but that he had declined. Halloran also said that approximately one week after his meeting with Callahan, Bulger, and Flemmi, Callahan gave him $20,000 to keep quiet about the planned murder. Halloran spent the money on furniture and a new car. Ex. 27, Informative Note at 2; Ex. 27, Memo from McWeeney to Monroe at 2; *see also* Montanari June 26, 2006 Tr. at 18–19.

Halloran claimed that after Wheeler was killed, he met with Callahan, who told him that Martorano, wearing a golf cap, sunglasses, and a fake beard, killed Wheeler; that Flemmi drove the getaway car; and that Bulger drove a "backup" car. Ex. 27, Informative Note at 2; Ex. 27, Memo from McWeeney to Monroe at 2. Halloran opined that Bulger, Flemmi, and Martora-

no rented cars in Boston, drove to Tulsa, stole Oklahoma plates, and disposed of everything after the murder.[48] Ex. 27, Memo from McWeeney to Monroe at 4. Halloran also reported that although he had not seen Martorano since the murder, he had heard that Martorano might be using Callahan's Fort Lauderdale condominium as a safehouse. Ex. 27, Memo from McWeeney to Monroe at 4.

Halloran also reported that Rico had a "pipeline into FBI offices." Ex. 84, Memo from Brunnick to SAC, Boston at 1, Jan. 7, 1982. Halloran told Brunnick that he knew that Bulger and Flemmi met with Connolly on a weekly basis; he knew that they had a "pipeline into the Boston Office," but he stated that it was not "necessarily" Connolly. Ex. 84, at 1. Neither Montanari nor Fitzpatrick took steps to investigate this allegation or to inform Ring; neither considered it a specific allegation of wrongdoing. Fitzpatrick June 15, 2006 Tr. at 36–40; Montanari June 26, 2006 Tr. at 47–51; *see also* Ring June 28, 2006 Tr. at 84–86. This is particularly troubling in light of the fact that both Montanari and Fitzpatrick were aware of "rumor and innuendo" about other leaks from the Boston Office to Bulger and Flemmi, and they knew that Connolly's name was sometimes mentioned in connection with the leaks.[49] Montanari June 26, 2006 Tr. at 51–52; Fitzpatrick June 14, 2006 Tr. at 87–88.

48. Although Halloran gave Brunnick and Montanari critical details concerning the Wheeler murder—including the fact that Bulger, Flemmi, and Callahan were involved and that the murder involved problems the conspirators had with Wheeler over WJA—his story is inconsistent with Flemmi's testimony on several points. For example, Flemmi did not confirm that he met with Halloran, Callahan, and Bulger before the murder, and Flemmi did not testify that he or Bulger traveled to Oklahoma to participate in the murder. I need not resolve these inconsistencies here, particularly because Flemmi has admit-

ted that he at least conspired to murder Wheeler. Wheeler's murder is "Racketeering Act 13" in the indictment to which Flemmi pleaded guilty. *See* Ex. 1, ¶¶ 33–35.

49. In particular, Montanari and other agents in the Boston Office knew about allegations from the Massachusetts State Police that Connolly leaked information to Bulger and Flemmi. In the late 1970s, Bulger and Flemmi learned from a source in the Massachusetts State Police about a wire at the Lancaster Street Garage, a Winter Hill gathering place. Connolly confirmed to Bulger that a wire was

Halloran believed that if Bulger, Flemmi, or Callahan learned he was talking to the FBI, they would kill him, and they also might kill his wife and family. Ex. 27, Memo from McWeeney to Monroe at 5. Accordingly, the FBI provided Halloran and his family with a residence on Cape Cod and gave Halloran instructions to stay away from Boston, except when instructed to come into the city by the FBI. Montanari June 21, 2006 Tr. at 91–92.

All of the information provided by Halloran was passed on to FBI Headquarters. See, e.g., Ex. 27, Memo from McWeeney to Monroe; Montanari June 21, 2006 Tr. at 97–99.

In April of 1982 one of Daly's informants advised Daly that members of Winter Hill thought Halloran was cooperating with the FBI, that Halloran therefore was at risk, and that if Halloran *was* cooperating, "he should be reeled in before he meets an untimely demise." Ex. 29, 209 Insert from Daly regarding Apr. 28, 1982 meeting. Daly prepared a form 209 containing this information. He also passed it on orally to Brunnick and Morris, Connolly's supervisor, on April 28, 1982. *Id.*

### iv. Halloran's Cooperation *Temporarily* Walled Off from Much of the Boston Office

Information about Halloran's cooperation was initially disseminated within the FBI on a "need-to-know" basis, restricted to Sarhatt; Fitzpatrick; Edward Ludeman, another ASAC in the Boston Office; Bruce Ellavsky, supervisor of the C–2 Squad; Brunnick; and Montanari. *See* Ex. 26, Teletype from Boston to Director, Jan. 6, 1982; Fitzpatrick June 14, 2006 Tr. at 106–108; Montanari June 21, 2006 Tr. at 88. Halloran's informant file was maintained under lock and key in Fitzpatrick's office. Fitzpatrick June 13, 2006 Tr. at 21–22; Montanari June 21, 2006 Tr. at 88–89. Despite the early attempts to keep knowledge of Halloran's cooperation closely held, however, by January 28, 1982, Morris knew that Halloran was cooperating. Indeed, Morris participated in the surveillance of at least one meeting between Halloran and Callahan. Ex. 28, Memo from Fitzpatrick to Sarhatt, Jan. 28, 1982.

### v. Investigation of Halloran's Allegations

Immediately after Halloran began speaking to the FBI, Brunnick and Montanari began an investigation to substantiate his allegations. *See* Ex. 27, Informative Note at 2. Bulger and Flemmi were a focus of the investigation, and Fitzpatrick confirmed Montanari's suspicion that the two were FBI informants. Montanari June 21, 2006 Tr. at 86.

in place at the garage, and reported that the funding for the wire came from Strike Force Chief O'Sullivan's office. Flemmi June 7, 2007 Tr. at 67; Flemmi June 8, 2006 Tr. at 19–20. The State Police investigation did not uncover information sufficient to lead to prosecution. At the time, the State Police believed that Bulger and Flemmi were FBI informants, and some officers believed that Connolly had tipped them off to the investigation. *See* Ex. 12, at MCN016–0855. SAC Sarhatt looked into these allegations and personally interviewed Bulger. He asked Bulger to divulge the identity of his State Police source, and Bulger refused. Ex. 109, Memo from Sarhatt to SAC, Boston (Bulger File) at MCN016–0853, Nov. 26, 1980. Sarhatt also asked whether Bulger had received any information about the Lancaster Street investigation from a member of the FBI, and Bulger responded negatively. *Id.* Sarhatt eventually came to the conclusion that there had been no wrongdoing by agents of the FBI, but in the course of his investigation, he learned that Bulger had warm feelings toward Connolly because both had grown up in South Boston and had similar childhood problems. *Id.* at MCN016–0852.

Several days after Halloran first made allegations against Bulger and Flemmi, his story was recounted to Strike Force Chief O'Sullivan. One of the eyewitnesses to the murder had reported that he or she thought that one of the killers was wearing a false beard. O'Sullivan reported that it was common for members of Winter Hill to use false beards or wigs when making a "hit or score," and, after looking at the composite sketches, he opined that one of the sketches resembled Martorano and the second resembled Flemmi. Ex. 27, Informative Note, at 2; Ex. 27, Memo from McWeeney to Monroe at 5–6. O'Sullivan also advised that he was "extremely interested" in prosecuting Winter Hill, and that he would personally pursue prosecution of the Wheeler matter for his office.[50] Ex. 27, Memo from McWeeney to Monroe at 6.

The initial goal of the investigation by Brunnick and Montanari was to have Halloran wear a body wire while talking to Callahan and thus to corroborate Halloran's story. Brunnick and Montanari believed that, armed with recorded conversations between Callahan and Halloran, they could confront Callahan to obtain more information about the Wheeler murder and Bulger and Flemmi's involvement. The ultimate goal was to "us[e] Callahan to go after Bulger and Flemmi on the Wheeler murder charge." Montanari June 21, 2006 Tr. at 87. Halloran did wear a wire against Callahan on several occasions. Montanari June 21, 2005 Tr. at 90; Montanari June 26, 2006 at 68–69; see also Ex. 27, Memo from McWeeney to Monroe at 5; Ex. 85, Teletype from Boston to Director

Jan. 8, 1982. Apparently, however, no useful information was gathered.

Brunnick and Montanari tried in other ways to corroborate Halloran's story. They pursued some details, but not others. For example, most of Halloran's admissions regarding his own criminal background were substantiated in the files of the Boston Division. Ex. 27, Memo from McWeeney to Monroe at 5. But inexplicably, the Boston Office never followed up on Halloran's claim that Martorano, the reported shooter in the Wheeler murder and a federal fugitive, was hiding out at Callahan's condominium in Florida. More than a year later, after three people had been killed in order to cover up details of the Wheeler murder, the Miami Office interviewed Callahan's mother-in-law and discovered that a man fitting Martorano's description stayed in Callahan's condominium when Callahan was away. Montanari June 26, 2006 Tr. at 31–32.

To give themselves some comfort as to Halloran's credibility, Brunnick and Montanari asked Halloran to take a polygraph. He refused. In part because of this refusal, Montanari and Brunnick told Halloran they would no longer work with him. Montanari June 26, 2006 Tr. at 66.

### vi. Halloran Murder

Sometime before May 11, 1982, Connolly told Bulger and later confirmed to Flemmi that Montanari was investigating the Wheeler murder, and that Halloran was going to wear a wire against Callahan.

---

**50.** O'Sullivan's reaction suggests that he thought that the information gathered to that point about the Wheeler murder was sufficient to justify a vigorous investigation which might lead to a RICO prosecution of Bulger and Flemmi. The Oklahoma City Office had produced eyewitness accounts of the murder, which resulted in composite sketches resembling Martorano and Flemmi, a disguise fre-

quently used by the members of Winter Hill. Halloran, in trouble with the law and with Winter Hill, independently had come forward with a story (part of which he claimed to be based on first-hand knowledge) that implicated Callahan, Bulger, Flemmi, and Martorano in the murder. No prosecution of any Winter Hill member for the Wheeler murder was undertaken, however, until 1995.

Flemmi June 6, 2006 Tr. at 34–35. Bulger and Flemmi warned Callahan to stay away from Halloran. Flemmi June 6, 2006 Tr. at 35–36.

On May 11, 1982, in broad daylight, Halloran and an associate, Michael Donahue, were shot and killed as they were leaving a restaurant in Boston. Bulger was the shooter and Weeks acted as a lookout. When Halloran left the restaurant, Weeks called Bulger and signaled him: "The balloon is in the air." Bulger then drove up in a 1975, souped-up Chevrolet Malibu, code-named "the tow truck," and shot Halloran several times. Weeks June 8, 2006 Tr. at 116–117. He then shot and killed Donahue. *See* Fitzpatrick June 19, 1006 Tr. at 78–79; Ex. 1, ¶ 38.[51] Halloran was killed because he had provided information to the FBI implicating Bulger, Flemmi and Martorano in the Wheeler murder. Weeks June 8, 2006 Tr. at 115–116; Ex. 3, at 11; Ex. 1, at ¶ 14(a)(2); Ex. 4, at § 10(a). It appears that Donahue was killed because he was with Halloran, classically "in the wrong place at the wrong time."

Montanari and Brunnick, of course, suspected that Bulger and Flemmi either directly murdered Halloran or authorized someone else to do it. Montanari June 26, 2006 Tr. at 72; *see also* Fitzpatrick June 15, 2006 Tr. at 56. They had good reasons for their suspicions: they knew of Halloran's accusations concerning the involvement of Bulger and Flemmi in the Wheeler murder; they knew that, at the time Halloran initially approached them, he expressed concern about attempts on his life by members of Winter Hill; they knew that one of Daly's informants had warned Daly that there were rumors abroad among members of Winter Hill that Halloran was cooperating with the FBI and was at risk for "an untimely demise"; and they also knew that an eyewitness to the Halloran murder, when shown a photo array that included a photograph of Bulger, had said that the "profile of the Bulger photograph was similar to that of the driver of the car, [although] the driver was not as old as the man in the Bulger photograph."[52] Ex. 812, Report Prepared by Montanari and Brunnick, May 21, 1982; Montanari June 26, 2006 Tr. at 75–76. Montanari and Brunnick confided their suspicions to Fitzpatrick. Fitzpatrick June 15, 2006 Tr. at 56. Even at FBI Headquarters in Washington, Organized Crime Section Chief Sean McWeeney noted in a memorandum to Associate Deputy Director of the FBI Oliver "Buck" Revell that "[t]here is some indication that the double murder [of Halloran and Donahue] was engineered by [Winter Hill]." Ex. 121, at 1.

### vii. Meeting at FBI Headquarters

---

51. After the murder, Bulger drove "the tow truck" to a garage on K Street in South Boston. Weeks June 8, 2006 Tr. at 119. Weeks was assigned the job of retrieving the car and having its balky speedometer repaired. Before he could do so, however, Connolly, Morris and other FBI agents gathered at Bulger's condominium in Louisburg Square in Boston one night. *Id.* at 119–120. Morris drank too much and revealed to Bulger that the FBI had the registration number of the car, and that the FBI knew that the car had been souped up. *Id.* at 120. Bulger instructed Weeks to forego the speedometer repair, telling him what Morris had said and adding: "Thank God for Beck's Beer" (apparently Morris's drink of choice that night). *Id.* The car was never found. Montanari June 26, 2006 Tr. at 71–72.

52. Inexplicably, a photo array shown to two other eyewitnesses did not include a photograph of Bulger. Ex. 813, Reports Prepared by SA McEligot, July 21, 1982; Montanari June 26, 2006 Tr. at 77–84.

On May 25, 1982, agents from Boston,[53] Miami,[54] and Oklahoma City,[55] as well as officials from FBI Headquarters [56] met in Washington to discuss the Wheeler and Halloran murders. Ex. 30, Memo from Fitzpatrick to Sarhatt at 1, May 27, 1982. The conferees discussed, among other things, the fact that FBI informants Bulger and Flemmi were suspects in the cases. Although it appears that at least one agent, Fitzpatrick, recommended that the informants be closed because of the murder investigation, others successfully maintained that Bulger and Flemmi should remain open because the allegations against them concerning the murders were unsubstantiated, and they were extremely valuable assets in the investigation of Cosa Nostra. *See* Ex. 30, at 1; Fitzpatrick June 15, 2006 Tr. at 55–61; Montanari June 26, 2006 Tr. at 94–95.

On May 27, 1982, a follow-up meeting was held in Boston among Fitzpatrick, Morris, Brunnick, Montanari, Connolly, and Mike Hanigan, supervisor of the C–2 Squad. The purpose of this meeting was to inform Connolly that Bulger and Flemmi were the focus of the investigation into the Wheeler and Halloran murders and to seek his help in getting information from his other informants that would assist in the investigation. Connolly defended his informants, arguing that they were not involved in the murders. *See* Ex. 30, at 2; Montanari June 21, 2006 Tr. at 102–103. It was agreed among the agents at the meeting that the agents investigating the murders would not directly interview Bulger or Flemmi, but they instead would have Connolly act as intermediary with

those informants. Ex. 30, at 2; Fitzpatrick June 15, 2006 Tr. at 61–63.

### viii. Continued Investigation of Wheeler, Halloran and Donahue Murders

Brunnick and Montanari continued their investigation by, among other things, interviewing witnesses, attempting to trace the vehicle driven by the shooter in the Halloran and Donahue murders, and continuing to try to develop a case against Callahan. They amassed some forty volumes of files during the investigation. Montanari June 21, 2006 Tr. at 96; Montanari June 26, 2006 Tr. at 64. They did not interview Callahan, however, believing that they did not have enough evidence to confront him. Montanari June 21, 2006 Tr. at 117–118.

### ix. Callahan Murder

On August 1, 1982, Martorano, assisted by McDonald, killed Callahan at the Fort Lauderdale International Airport. Flemmi June 6, 2006 Tr. at 40–41; Ex. 3, at 11–12. Martorano met Callahan at the airport, and after Callahan entered Martorano's vehicle, Martorano shot him several times in the back of the head. Flemmi June 6, 2006 Tr. at 40–41; Ex. 3, at 11. McDonald, in a separate vehicle at the airport, followed Martorano to a storage facility where the two of them transferred Callahan's body to the trunk of Callahan's leased Cadillac. Flemmi June 6, 2006 Tr. at 41; Ex. 3, at 11–12; Ex. 121, at 2. The body was later discovered after a parking attendant noticed blood dripping from the trunk of the Cadillac. Ex. 3, at 12.

---

53. Fitzpatrick and Montanari.

54. Supervisors Ronald Reese and Anthony Amoroso and Agent Joe Rush.

55. Agent Robert McEleney and SAC Ed Enright.

56. McWeeney, Jeff Jamar and Randy Prillaman.

The initial decision to kill Callahan was made by Bulger and Flemmi after Connolly told Bulger in July 1982 that the FBI was looking for Callahan to question him in connection with the Wheeler murder.[57] Flemmi June 6, 2006 Tr. at 37–38; see also Ex. 3, at 11. Connolly told Bulger that Callahan was a weak link who would not be able to withstand the pressure of an FBI interrogation. Flemmi June 6, 2006 Tr. at 38; Ex. 3, at 11. Martorano had a longstanding friendship with Callahan and was reluctant to kill him. Bulger and Flemmi persuaded him to do the job by pointing out that if Callahan were unable to resist law enforcement pressure, Martorano, as Wheeler's assassin, would face life in prison. Flemmi June 6, 2006 Tr. at 39–40; see also Ex. 3, at 11.

When news of Callahan's murder reached the Boston Office, Bulger and Flemmi, who were still FBI informants, were suspects. Montanari June 21. 2006 Tr. at 123. After all, with Callahan's murder, the death toll of those involved with or having knowledge about the role of Bulger and Flemmi in Wheeler's murder had climbed to three. Moreover, Callahan had been in Florida to meet with Martorano, the very person Halloran had identified as Wheeler's killer.[58] Ex. 121, at 2. At FBI Headquarters in November 1982, McWeeney reported to Revell that the murders of Wheeler, Halloran, and Callahan "are believed to be related, and there is evidence that they were committed by an organized crime group in Boston, Massachusetts, the Winter Hill gang." Ex. 121, at 1 (emphasis added).

### x. Flemmi Closed as an Informant

On September 23, 1982, Flemmi was closed as an informant.[59] Throughout the time he was officially "closed," Flemmi continued to provide information, which was recorded in his informant file. In fact, there are 136 pages in the substantive portion of his informant file recording information he provided between his "closing" in 1982 and "re-opening" in 1986. Ex. 10, at MCN016–0368 to –0504. During this time, Flemmi was approached by the FBI and asked for diagrams of the Bella

---

57. Because of the publicity surrounding the recent murder of Halloran in Boston, Bulger, Flemmi and Martorano decided to kill Callahan in Florida. See Ex. 3, at 11.

58. One might well wonder if the murder of Callahan might have been prevented if the FBI had followed up on Halloran's report that Martorano was staying at Callahan's condominium in Florida.

59. Although the official communications between the Boston Office and FBI Headquarters regarding Flemmi's closing and subsequent re-opening state that he was closed solely because of his possible implication in criminal activity discovered in the course of the Bostar investigation (involving electronic surveillance at Angiulo's headquarters at 98 Prince Street), Ex. 11d, Teletype from Boston to Director, Sept. 23, 1982; Ex. 11g, Teletype from Boston to Director, July 10, 1986, the internal communications in the Boston Office refer to the Wheeler/Halloran/Donahue/Callahan murder investigation as the reason for his closing, Ex. 11e, Memo from Connolly to SAC Boston (Attn: Ring), Apr. 26, 1983; Ex. 11f, Memo from Connolly to Ring, May 3, 1984. If the internal memoranda are to be trusted, one wonders why Bulger also was not closed, because his name had come up at least as often as Flemmi's in connection with the murders. On the other hand, the "official" explanation of Flemmi's closing is curious. Connolly had warned Bulger and Flemmi about several wiretaps, including the 98 Prince Street wiretap. See Flemmi June 6, 2006 Tr. at 93, 108–109; Flemmi June 7, 2006 Tr. at 6. Presumably, Bulger and Flemmi used this information to avoid making incriminating statements in those locations. Further, in 1985, Morris and Connolly told Bulger and Flemmi they did not need to worry about anything said about them on the 98 Prince Street tapes. Flemmi June 6, 2006 Tr. at 92–93.

Napoli restaurant and Francesco's restaurant; as I have already discussed, Flemmi complied with these requests and provided the sketches. *See* Ex. 10, at MCN016–0500 to –0502, MCN016–0497 to –0499. And Connolly sought to have Flemmi officially re-opened in April 1983 and May 1984, even as the Wheeler/Halloran/Donahue/ Callahan murder investigation was proceeding. Ex. 11 e; Ex. 11 f. Flemmi was officially reopened on July 10, 1986.

### xi. Concerns about the FBI Miami and Boston Offices Raised by State and Local Law Enforcement

The Boston Office worked on the Wheeler/Halloran/Donahue/Callahan murder investigation with the Oklahoma City and Miami Offices, as well as with state and local authorities in Oklahoma, Massachusetts, and Florida. In 1982, FBI Headquarters learned that state and local authorities in Florida were hesitant to work with the Miami and Boston offices because of concern that agents in those offices were close to members of Winter Hill. Ex. 121, at 1–3. On November 3 and 4, 1982, representatives from state and local law enforcement agencies and the FBI met in Tulsa, Oklahoma to discuss the investigation and the concerns of Florida state and local law enforcement agencies. The state and local representatives from Florida present at the meeting advised that they were concerned about several things.

First, they were troubled by what they perceived to be a too close association between personnel in the Miami Office and Rico. Specifically, the Florida representatives said that employees at WJA were involved in large-scale skimming, and that it was impossible for Rico not to have known about it. They worried that information concerning their own investigation of the Callahan murder had been leaked by the Miami Office to Rico and personnel at WJA. The Florida state and local representatives also were aware that, at the behest of the Miami Office, Rico had undertaken an undercover assignment in the investigation of corruption charges against then United States District Judge Alcee Hastings, and that Rico was likely to be a witness in an upcoming trial of Judge Hastings. In short, the Florida state representatives believed that the Miami Office had hindered their investigation into the Callahan murder because of their close association with Rico. *See* Ex. 121, at 3–6; Fitzpatrick June 15, 2006 Tr. at 38–39.

Second, the Florida state and local representatives expressed their concern that the Wheeler/Halloran/Donahue/Callahan murder investigation had been hindered by a too-close association between personnel in the Boston Office and members of Winter Hill. Ex. 121, at 3–6. Specifically, they were concerned that there were certain agents in the Boston Office who were "closely associated with members of the Winter Hill gang, since the Winter Hill gang is primarily suspects [sic] in all three murders." Ex. 121, at 5. The Florida state and local representatives believed that the relationship between the agents in the Boston Office and Winter Hill "could have possibly hindered the investigation [into the Wheeler, Halloran, Donahue and Callahan murders]." Ex. 121, at 5. For that reason, the Florida state and local representatives were reluctant to provide information from their own investigation to the Boston Office. Ex. 121, at 5. The details underlying the concerns of the Florida state and local representatives about the Miami Office and the Boston Office were not provided to the FBI personnel present, but McWeeney advised Revell as follows:

> Inferences could be drawn from conversations indicating that these state and local officials were of the opinion that the FBI had confidential informants

within the Winter Hill organization and because of this their efforts against this group were curtailed. In fact, FBI Boston has *previously* utilized two suspects in this matter as organized crime sources in the Boston division.

Ex. 121, at 5–6. In fact, the FBI *was, at that time,* using Bulger and Flemmi as sources; Bulger was open as an informant, and although Flemmi was officially closed, he was continuing to provide information, which was reported in his informant file. And three months later, on February 23, 1983, in the midst of the murder investigations, Bulger was designated a Top Echelon informant. The teletype from the Boston Office to FBI Headquarters explaining this change described him as the "titular head of the Winter Hill Mob." Ex. 13h; Ex. 87.

Despite the concerns of state and local law enforcement regarding potential leaks in connection with the Wheeler/Halloran/Donahue/Callahan murder investigation, and despite Halloran's report that Bulger and Flemmi had a "pipeline" into the Boston Office, neither Connolly's supervisors nor the Organized Crime Section Chief was concerned that Connolly was the source of any leaks to Bulger and Flemmi.[60] *See* Fitzpatrick June 15, 2006 Tr. at 64; Ex. 121.

### xii. Oklahoma City Request for Information from Boston

On April 4, 1983, the Oklahoma City Office requested information about Bulger and Flemmi from the Boston Office; it appears that the Boston Office had failed to provide previously requested information. Ex. 131, Teletype from Oklahoma City to Director, Boston, and Miami, Apr. 4, 1983. The Oklahoma City Office requested that Bulger and Flemmi be questioned about the Wheeler and Callahan murders and related allegations. *Id.* The Boston Office refused the request, upon instructions from FBI Headquarters that no one other than Connolly should interview Bulger and Flemmi. Ex. 31, Memo from Fitzpatrick to SAC (Attn: Hanigan and Ring), Apr. 8, 1983; Fitzpatrick June 15, 2006 Tr. at 71–72.

The Oklahoma City Office also requested that the Boston Office review Bulger and Flemmi's informant files to determine whether they had been contacted on or about May 27, 1981 (the date of the Wheeler murder) or August 1, 1982 (the date of the Callahan murder). Ex. 131. In response to this request, Connolly prepared a memo to "SAC, Boston" in which he provided alibis for Bulger: he reported that on the day of the Wheeler murder, he saw a report of the murder during a 7:00 p.m. national news program, and that he called Bulger at his home in Boston to set up a contact and discussed the Wheeler murder with Bulger, who had also watched the news program. Connolly reported that Bulger believed Wheeler was killed by people attempting to kidnap him for ransom.[61] Ex. 111. This was Connolly's first report of the contact, which allegedly occurred on the date of a murder for which

---

**60.** It is curious that local and state law enforcement officers in a location as remote from Boston as Miami, Florida were concerned about the relationship between Bulger and Flemmi and their handler, when the FBI itself was, at best, nonchalant about Connolly's interaction with Bulger and Flemmi while they were suspects in a murder investigation. The record of the November meeting indicates that a serious investigation involving law enforcement agencies in three states was being compromised by Connolly's relationship with Bulger and Flemmi, and by the FBI's failure seriously to take hold of the problem.

**61.** This is the same conversation discussed in Section II(D)(3)(d)(1), *supra.*

Bulger had been under investigation for *nearly two years*.[62] Connolly also wrote that Bulger was registered with a female companion at a motel in Provincetown, Massachusetts on the day of the Callahan murder. Ex. 111. The day after Connolly submitted the memo, Fitzpatrick reported to Greenleaf that the review requested by the Oklahoma City Office had been conducted and was negative. Ex. 31.

### xiii. Interview of Bulger and Flemmi

On November 2, 1983, Bulger and Flemmi finally were interviewed in connection with the Wheeler, Halloran, Donahue and Callahan murders. The Tulsa Police Department had requested the interviews, and because the Tulsa law enforcement officers, unlike the Oklahoma City Office, did *not* know that Bulger and Flemmi were informants, Montanari felt that he had to conduct the interviews in order to maintain Bulger and Flemmi's "cover," and because it would seem unusual if the FBI did not honor the Tulsa request. Montanari June 21, 2006 Tr. at 105–107.

The interview was conducted by Montanari and another agent, Brendan Cleary. It was arranged by Connolly; Montanari believed that Bulger and Flemmi, "as informants of an agent" would refuse to meet with him absent Connolly's intervention.[63] As Montanari testified: "There was no way that Brendan Cleary and I could go knocking on the doors of Bulger and Flemmi knowing their status with the Bureau as informants of an agent. They would never talk to me. It's unheard of." Montanari June 21, 2006 Tr. at 106–107. The interview was conducted in the back room of a club in South Boston owned by Bulger. *See* Flemmi June 7, 2006 Tr. at 17–18; Montanari June 21, 2006 Tr. at 105; Ex. 815, Reports Prepared by Montanari and Cleary, Nov. 9, 1983.[64] Bulger and Flemmi were interviewed together because they would agree to be interviewed only under that condition. Montanari June 21, 2006 Tr. at 105–107. As Montanari testified, "if I wanted to speak to them, I was going to have to abide by their ground rule[s]." Montanari June 21, 2006 Tr. at 106. It is clear that interviewing multiple suspects together is not typically the correct procedure, because it increases the possibility that the suspects will lie with and for one another.[65] *See* Fitzpatrick June 15, 2006 Tr. at 75; Montanari June 26, 2006 Tr at 115. In this case, however, Montanari and Cleary were not worried about the propriety of interviewing the suspects together because they did not actually expect to get any useful information, and were merely going through the motions of an interview. *See* Montanari June 21, 2006 Tr. at 106–107. Montanari testified that he did not expect much from the interview because he did not have sufficient leverage against Bulger and Flemmi; he would have preferred to have corroboration of their involvement in

---

62. According to the MIOG, the contact should have been recorded in Bulger's file at or near the time it occurred. Ex. 6, § 137–5(7) (1981).

63. Flemmi was not open as an informant at this time, but he was referred to, and treated as, an informant.

64. Exhibit 815 consists of two reports prepared by Montanari and Cleary regarding the interview of Bulger and Flemmi; one refers to Bulger, the other refers to Flemmi.

65. The notion that Montanari would accord to two murder suspects the privilege of interviewing them only upon terms they set is astounding. It is perhaps such deference that inspired Flemmi to testify at trial that FBI agents in the Boston Office treated him and Bulger like colleagues, "like we were FBI agents." Flemmi June 6, 2006 Tr. at 93–94.

the murders before interviewing them.[66] Montanari June 21, 2006 Tr. at 106–107.

Montanari began the interview by informing Bulger and Flemmi that before his death, Halloran had cooperated with the FBI. Montanari then outlined the allegations Halloran had made against them. Ex. 815, Report re: Flemmi Interview, at 1; Ex. 815, Report re: Bulger Interview, at 1. Montanari thus eliminated any potential leverage he might have had by letting Bulger and Flemmi know both what the FBI knew, and that the FBI's sole source of information was dead.

From the beginning of the interview, Bulger took control: he dictated the "ground rules" for the meeting—it took place at one of his clubs—and he told the agents that, although he and Flemmi would not usually agree to meet with law enforcement agents about any crime, they had agreed to this meeting because Wheeler appeared to have been a " 'legitimate' guy," and they wanted to refute the allegations against them. Ex. 815, Report re: Bulger Interview, at 1.

The two suspects denied that they had been involved in the Wheeler, Halloran, and Callahan murders, and professed not to know who had committed the crimes. Bulger stated that he knew he had been in Boston on the day the Wheeler murder first appeared on television, because he had seen the report at home. His statement thus jibed with the report Connolly made to SAC, Boston on April 7, 1985. See Ex. 111. Both Bulger and Flemmi denied attending a meeting with Callahan and Halloran and denied having a business relationship with Callahan. Both refused to take polygraph examinations and stated that they would allow themselves to be photographed only if ordered by a court to do so.

Bulger also clearly perceived himself to be in control of large portions of Boston: he told the agents that it was not his or Flemmi's "style" "to be involved in any criminal activities that they [could not] control completely and that they generally [felt] that they could not exercise sufficient control over things outside their own geographical area." Ex. 815, Report re: Bulger Interview, at 2. Just as Montanari had expected before going to the interview, no information pertinent to the investigation was obtained from this meeting with Bulger and Flemmi. In fact, Flemmi testified that at the meeting, he and Bulger "just provided them information that we wanted to provide them. It wasn't truthful." Flemmi June 7, 2006 Tr. at 70.

### xiv. Bulger and Flemmi Photographed

At some point in 1983, the Oklahoma City Office asked Montanari and Brunnick for recent photographs of Bulger and Flemmi. Although the two refused to be photographed voluntarily, they complied with a federal grand jury subpoena and were photographed in December 1983. See Ex. 11f. Connolly instructed Bulger and Flemmi to wear suits for the photographs, rather than their usual street clothes, so they would look more like businessmen and less like criminals. See Flemmi June 7, 2006 Tr. at 19–20. The resulting photographs were sent to Oklahoma to be shown to witnesses to the Wheeler murder. Ex. 11 f. Apparently,

---

**66.** However, it seems clear that the FBI had *some* leverage against Bulger and Flemmi. The files of the Boston Office were replete with references to other criminal behavior by the pair. Conceivably, Montanari and Cleary could have threatened arrest for those other crimes, or could have threatened to terminate Bulger and Flemmi's relationship with the FBI.

none of the eyewitnesses identified Bulger or Flemmi.

## xv. Conclusion of the Investigation

Brunnick and Montanari spent a significant amount of their time working on the murder investigations for three and a half years. Montanari June 21, 2006 Tr. at 96. However, no one was indicted for any of the murders until 1995,[67] and the investigation simply wound down in 1985 with no real conclusion. Montanari June 21, 2006 Tr. at 108.

The United States argued in its closing that Bulger and Flemmi were not indicted prior to 1995 because they were "very, very smart, and very, very cognizant of everything that was going on around them," and the FBI could not arrest them unless it had evidence that could "stick." United States Closing June 29, 2006 Tr. at 121. The truth is, however, that the FBI was not pounding the pavement looking for evidence that could "stick." Instead, the FBI stuck its head in the sand when it came to the criminal activities of Bulger and Flemmi. The agents of the Boston Office knew they had an obligation to report informants' criminal activity, so they carefully avoided knowledge of criminal acts by their informants. Connolly, for example, reported to Greenleaf that, because Bulger and Flemmi were aware of Connolly's obligation to report any of their criminal activity to FBI Headquarters, "they do not discuss any criminal activity which they may be engaged in in front of writer." Ex. 13*l*.

Although agents of the Boston Office did investigate Bulger and Flemmi's involvement in the murders of Wheeler, Halloran, Donahue, and Callahan, resulting in forty volumes of files, the investigation is more notable for what was not done than for what was done: there was no interview of Callahan subsequent to Halloran's statements implicating him in the Wheeler murder[68]; there was no follow-up of Halloran's claim that Martorano, then a fugitive, was hiding out in Callahan's Fort Lauderdale condominium; there was no meaningful attempt to have all the eyewitnesses to the Halloran/Donahue murder attempt to identify photographs of Bulger; there seems to have been no communication initiated with other law enforcement officers concerning Rico's involvement in the Wheeler murder; and there was no serious interrogation of the prime suspects, Bulger and Flemmi. Further, we now know that Connolly kept Bulger and Flemmi informed about the progress of the murder investigation. Flemmi June 7, 2006 Tr. at 71–72.

### e. Drug Trafficking

Over the years that they were informants, Bulger and Flemmi repeatedly told their FBI handlers that they were not involved in drug trafficking, see, e.g., Ex. 109, at MCN016–0854; Flemmi June 7, 2006 Tr. at 74; Fitzpatrick June 14, 2006 Tr. at 102, but the Boston Office received numerous reports from other sources that they were indeed involved in this criminal activity, see, e.g., Ex. 16, at 6; Ex. 25, 209 Insert regarding Mar. 27, 1981 Meeting. Nevertheless, Greenleaf testified that Ring informed him that the FBI had no intelligence suggesting that Bulger and Flemmi

---

**67.** Flemmi eventually pleaded guilty to racketeering acts that included the Wheeler and Callahan murders, and Weeks pleaded guilty to racketeering acts that included aiding and abetting the Halloran and Donahue murders.

**68.** Although Connolly was asked by the Oklahoma City Office to interview Callahan shortly after the Wheeler murder, before Halloran came forward, there is no evidence of the results of that interview in the record in this case.

were involved in drugs, Greenleaf June 22, 2006 Tr. at 58–59, and Connolly strongly defended his informant in response to an allegation from an unidentified source that Flemmi was involved in drug crimes in 1981:

> It has been contended that [Flemmi] has been involved in drug operations. A check with DEA and knowledgeable sources indicates that [Flemmi] has never, at any time, been linked with drug operations. It is writer's strenuous belief, having personal knowledge of [Flemmi], that this particular criminal endeavor is reprehensible to [him]. Writer believes that it is a ludicrous assertion to state that this particular individual is involved in drugs. However, the 'litmus test' is prove it!! Writer has no objection for any agency at any time to conduct a drug investigation of [Flemmi].

Ex. 110, at 3.

In fact, Bulger and Flemmi were involved in the drug trade from approximately 1981 to 1990. See Flemmi June 6, 2006 Tr. at 62–63. Bulger required all of the drug traffickers in South Boston to pay tribute to Winter Hill, and he and Flemmi often obtained a share of the profits from drug shipments brought into South Bos-

ton. See Ex. 3, at 22–23. In approximately April 1983, Bulger learned that a fellow denizen of the Boston criminal world, Joe Murray, was importing drugs into South Boston without approval from, and payment of, tribute [69] to, Winter Hill. In retaliation, Bulger provided information to Connolly about the warehouse in South Boston where Murray was storing a shipment of marijuana. The FBI seized the marijuana, Ex. 12, at MCN016–1117 to –0118; Ex. 3, at 12, and thereafter Murray commenced the payment of tribute to Bulger for the privilege of warehousing his illegal contraband in South Boston and for protection from Winter Hill,[70] Flemmi June 6, 2006 Tr. at 63–65; Weeks June 8, 2006 Tr. at 80–83; Ex. 3, at 23.

In the spring of 1984, the special agent in charge of the Boston office of the Drug Enforcement Administration ("DEA"), Robert Stutman, advised Greenleaf that the DEA was investigating suspected drug activity by Bulger and Flemmi. See Greenleaf June 22, 2006 Tr. at 21; Ex. 32, Teletype from Boston to Director, Apr. 24, 1984. Stutman believed the investigation would include matters of interest to the FBI and sought the FBI's assistance. Greenleaf June 22, 2006 Tr. at 21. The FBI chose not to participate in the DEA investigation, but later provided two

---

69. A lucrative form of extortion practiced by Bulger and Flemmi was the collection of "rent" or tribute for the privilege of operating a criminal activity within territory controlled by them. Flemmi explained it this way:

> Q. When Mr. Bulger told people, someone to pay the rent, they paid the rent?
> A: Well, you had an option, you could either quit or pay the rent if you wanted to stay in business.

Flemmi June 6, 2006 Tr. at 54. Weeks explained it this way:

> Q. Would you describe to the Court what rent is?
> A. People that paid us money to operate.... [I]t was more like paying us protection [—] against us. [sic]

Weeks June 8, 2006 Tr. at 80–81. And when a "renter" wanted to retire, he still might have an obligation to Bulger. When Murray decided get out of the drug business, for example, Bulger extracted from him what Bulger called a "severance package" of $500,000 to compensate for the loss of Murray' s rent. Murray delivered the severance package within twenty-four hours after it was demanded. (Weeks June 8, 2006 Tr. 83–84.)

70. Bulger effectively had used the FBI to do his dirty work by striking out at Murray, who dared to conduct criminal business in South Boston without the blessing of Winter Hill, and without paying a steep price for that "blessing."

agents from the C–3 Squad to work on the case under Fitzpatrick's supervision. Greenleaf June 22, 2006 Tr. at 22; Ring June 27, 2006 Tr. at 50–51; Ex. 32.

After learning of the DEA investigation of Bulger and Flemmi, Greenleaf and Ring discussed whether to close Bulger as an informant. They decided to keep him open, and not to participate in the investigation at that point. They testified that they did so because they believed that closing Bulger would alert him to the fact that there was a significant investigation in progress. *See* Greenleaf June 22, 2006 Tr. at 21–22; Ring June 27, 2006 Tr. at 41–42; Ex. 13j, at 2. To put it another way, Ring justified eschewing participation in a joint investigative effort against Bulger and Flemmi out of concern that the resulting termination of contact with Bulger and Flemmi would tip them off to the investigation.

I do not find this explanation credible. Bulger and Flemmi already knew they were under intense physical surveillance: Bulger had informed Connolly that they were aware, from their own observation and their "sources in the local and State Police, as well as in the District Attorney's office," that they were being investigated by the DEA, the Quincy (Massachusetts) Police Department, the Massachusetts State Police, and Norfolk County District Attorney William Delahunt. *See* Ex. 13j, at 1–2; Greenleaf June 22, 2006 Tr. at 102–104; Ring June 29 Tr. at 17. The real reason that Greenleaf and Ring kept Bulger open, as the Boston Office advised FBI Headquarters in September of 1984, was because of his "past, present, and future valuable assistance to the FBI." Ex. 32; *see also* Ex. 33.

In any case, Ring wrote, on October 17, 1984, that he was not aware of the DEA's specific allegations against Bulger and Flemmi and did "not wish to know any of these details for the obvious reasons.... If these individuals are violating the law and subject to investigation, that is their problem. There is not and will not be any authorization by the FBI for these individuals to commit any criminal acts unless such authorization conforms to present Bureau regulations." Ex. 13j, at 2–3.

The DEA investigation did not produce any positive results. Bulger and Flemmi were not indicted for their drug trafficking activity until 1995. Flemmi testified at trial that, throughout the DEA investigation, Connolly provided him and Bulger with information about developments in that investigation. Flemmi June 7, 2006 Tr. at 23.

Notably, Ring and Greenleaf were largely indifferent to the investigations of Bulger and Flemmi by other law enforcement agencies in Massachusetts: Greenleaf testified that he simply did not focus on such investigations. They were matters "[t]hat just didn't register with [him]." Greenleaf June 22, 2006 Tr. at 104. He "assumed, because of their backgrounds, that a lot of people were looking at them." *Id.* It thus appears that the Boston Office did not regard multiple investigations by other law enforcement agencies to be cumulative indications that its informants were engaging in serious ongoing criminal activity.[71]

---

71. Further, the FBI seemed unconcerned that Bulger and Flemmi had "sources in the local and State Police, as well as in the District Attorney's office." Ex. 13j. In October 1984, Greenleaf asked Connolly to prepare a memorandum summarizing Bulger and Flemmi's knowledge of investigations about them, *see* Ex. 13j, Addendum by Greenleaf, but he never actually read Connolly's response, Greenleaf June 22, 2006 Tr. at 112–115. If he had, he would have learned that Connolly did not answer his question; rather, Connolly responded that it would be "an impossible task" to summarize all information provided by Bulger and Flemmi about investigations into their activities. Connolly said that Bulger

In sum, during the period 1975–90, there were scores of reports in the files of the Boston Office (including many based on self-reports by Bulger and Flemmi themselves) concerning criminal activity, none of which were deemed worthy of serious investigation by the Boston Office. Although Greenleaf testified that such reports should have been brought to his attention, the agents under his supervision apparently thought otherwise, because they did not bring the reports to his attention. *See* Greenleaf June 22, 2006 Tr. at 49–82.

### E. Connolly Praised for Work with Informants

During the period 1976 through 1990, Connolly was consistently praised for his development and handling of informants and was considered a specialist or expert in the handling of informants. He "was regarded as being extremely proficient at the development and operation of informants. It was a skill that not every agent had, most agents don't have it. He had the skill to that level[,] that that had been his primary role on the squad, and he had

been recognized for that role." Ring June 27, 2006 Tr. at 24.

From 1978 through 1987, Connolly consistently received one of the FBI's top two ratings [72] for his overall performance and his handling of informants in annual performance reviews. The only exception is a six-month review for the period July 1981 through December 1981, the first evaluation period after the FBI changed to a new rating system. The new ratings were, in order from worst to best: minimally acceptable, fully successful, superior, exceptional. Connolly received a rating of "fully successful" for his overall performance and a rating of "superior" for his handling of informants. Ex. 55f. Even during this that period, however, Morris noted that Connolly,

> with only minimal supervisory guidance, instruction and training, develops and operates several extremely well placed organized crime informants. These informants provide highly significant information, substantially contributing to the success of the Boston Division's Organized Crime Program. His informants have been utilized to establish

---

and Flemmi "freely admit that they have established sources within the law enforcement community, [but] they steadfastly refuse to divulge same to writer." Ex. 13*l*, at 1, 5. (continued . . .)

Greenleaf testified at trial that there was no investigation to determine the identity of Bulger and Flemmi's law enforcement sources. Greenleaf June 22, 2006 Tr. at 116–117, 123. Ring never instructed Connolly to ask Bulger and Flemmi to identify their sources in the state and local police and implied that if he had threatened to close Bulger and Flemmi for their failure to reveal such information, he would have been reversed by officials higher up in the FBI. Ring June 29, 2006 Tr. at 18–19, 71–72. It appears then that no one in the Boston Office ever insisted that Bulger and Flemmi identify their sources of intelligence within law enforcement agencies, even though, as noted earlier, state and local law enforcement agencies in Florida expressed

their concern as early as 1982 that Bulger and Flemmi might be obtaining information concerning investigations of their criminal activities from the Boston Office itself, Ex. 121; Fitzpatrick June 15, 2006 Tr. at 38–39, 64, and there had long been allegations of leaks by Connolly from the Massachusetts State Police, *see, e.g.,* Ex. 12, at MCN016–0855; Ex. 109. Nor does it appear that the Boston Office was concerned with the kind of information that Bulger and Flemmi were receiving from their sources. Greenleaf June 22, 2006 Tr. at 119.

**72.** From 1978 to 1981, he received "excellent" and "outstanding" ratings. In 1981, the ratings changed to: exceptional, superior, fully successful, and minimally acceptable. He received "superior" and "exceptional" ratings throughout the 1980s. *See* Ex. 55b; Ex. 55c; Ex. 55d; Ex. 55e; Ex. 55f; Ex. 55*l*.

probable cause in the majority of applications for electronic surveillances concerning organized crime. He executes his duties in compliance with rules, regulations and guidelines resolving policy issues through discussions with the supervisor. He is a recognized expert in the development and handling of informants whose advice and expertise is frequently sought by other experienced, as well as inexperienced, agents.

Ex. 55f, at MCN003–0089.

On one occasion, however, Ring rated Connolly "superior" for informant development, and was chastised in the course of an routine inspection of the Boston Office[73] by Inspector Bob Reutter because he did not rate Connolly "exceptional." Ring June 28, 2006 Tr. at 7–8. Reutter, in criticizing Ring's rating, listed Connolly's accomplishments and stated that he considered "the contributions made by SA Connolly as crucial to the overall OC program and substantial in terms of the results achieved." Ex. 55w, Memo from Inspector Reutter to SAC Ahearn, July 8, 1987.

Such praise was common: Connolly's reviews are replete with references to his "outstanding" development of informants, major contributions to the success of the Organized Crime Program, and expertise in informant development. *See, e.g.*, Ex. 55a; Ex. 55b; Ex. 55c; Ex. 55d; Ex. 55*l*; Ex. 55w; Ex. 55bb, Letter from Director William S. Sessions to Connolly, Mar. 17, 1988. In 1982, Morris raved: "His performance has been at the level to which *all*

should aspire to attain but few will realistically reach."[74] Ex. 55e, at MCN003–0063 (emphasis added). In addition, Connolly was repeatedly recommended for increases in salary and monetary awards on the basis of his performance, Ex. 55j, Memo from SAC, Boston to Director, FBI, Mar. 22, 1983; Ex. 55bb; Ex. 55ii, Letter from Director Sessions to Connolly, Oct. 5, 1990, and he was asked by FBI Headquarters to instruct other federal agents on the development and handling of informants, Ex. 55*l*; 55r, Letter from Paul Sullivan to Greenleaf, Nov. 7, 1984; Ex. 72. In 1988, Connolly was promoted to Supervisory Special Agent and became the Organized Crime Drug Enforcement Task Force Coordinator in the Boston Office. *See* Ex. 55z, Airtel from SAC, Boston to Director, FBI, Mar., 1, 1988; Ex. 55aa, Memo from Otto to Sharp, Mar. 10, 1988. He continued to receive praise for his informant handling: in 1990, Director William S. Sessions commended him in connection with several investigations, saying:

> You skillfully recruited and operated a high-level member of this organization who supplied intelligence of uncommon worth in investigations of this sort. The precarious management of this individual required great expertise and discretion, as the crucial information provided demanded the most cautious dissemination to preserve the safety of the informant and integrity of the investigation.

Ex. 55ii.

Connolly was valuable to the FBI, not only because he was viewed as an expert in

---

**73.** Inspectors from FBI Headquarters conducted an investigation of each FBI field office every two years. A team of twenty to thirty inspectors would "spend three weeks reviewing the files of the office for efficiency, effectiveness, and to ensure that we were operating by the rules and regulations." Greenleaf June 22, 2006 Tr. at 88; *see also* Fitz-

patrick June 14, 2006 Tr. at 21; Fitzpatrick June 15, 2006 Tr. at 83.

**74.** Note that this review covers the period of time in which Halloran, Donahue, and Callahan were murdered after Halloran suggested that Connolly might be the source of Bulger and Flemmi's "pipeline" into the Boston Office of the FBI.

the development and handling of informants, but because he was the sole link to two of the Bureau's most valuable informants. Bulger and Flemmi communicated almost exclusively with Connolly, and they refused to work with any other handler. *See, e.g.,* Fitzpatrick June 15, 2006 Tr. at 109. In fact, when Connolly retired suddenly in 1990, Bulger and Flemmi were immediately closed as informants. Ex. 10, at MCN016–0024; Ex. 12, at MCN016–0741.

Despite these glowing reviews, Connolly's performance was not without observed flaws. Supervisor Ring observed, on one occasion, that Connolly was too friendly with Bulger and Flemmi and told Connolly "that informants were not friends, they were not consultants, and they're to be treated accordingly. He should know that, I shouldn't have to say that to him." [75] Ring June 27, 2006 Tr. at 76. Ring also admonished Connolly on two separate occasions about meeting with informants at his own home. Ring June 27, 2006 Tr. at 75–76. He also instructed Connolly to provide a written record of every contact with an informant after he discovered that Connolly was not providing 209s for every contact with his informants. [76] Ring June 27, 2006 Tr. at 81–82. In addition, Fitzpatrick was, at times, concerned that Connolly was drinking too much and talking about FBI business in public. Fitzpatrick June 15, 2006 Tr. at 85. There was a joke in the office that Connolly was beginning to look like the people he investigated, and he was nicknamed "Cannoli." [77] Fitz-

patrick June 15, 2006 Tr. at 85–86. Even Bulger was concerned: he thought Connolly was spending too much money and was too ostentatious, especially when Connolly purchased a "flashy" boat. Weeks June 8, 2006 Tr. at 111–12.

### III. Findings of Fact Regarding the Murder of John McIntyre

With the foregoing background, we come, at last, to the central concern of this case, the murder of John McIntyre. McIntyre was murdered by Bulger and Flemmi on November 30, 1984, after they learned he was cooperating with law enforcement. [78] McIntyre was thirty-two years old at the time of his death. *See* Ex. 45, Certificate of Death as to John L. McIntyre, Feb. 17, 2000. He had worked as a fisherman and built and repaired boats; he had also been involved in criminal activity. *See* Emily McIntyre June 16, 2006 Tr. at 37–40; Ex. 603, Partial Transcript of McIntyre Interview, Oct. 17, 1984. At the time of his death, he was working for Joe Murray, assisting in his drug and weapons smuggling activity. *See* Ex. 603.

### A. McIntyre's Cooperation with Law Enforcement

In the fall of 1984, a ship called the *Valhalla* departed Gloucester, Massachusetts loaded with weapons and ammunition for the Irish Republican Army ("IRA"). The *Valhalla* traveled to the coast of Ireland, where it was met by an Irish ship, the *Marita Ann.* The *Valhalla* off-loaded

---

75. Ironically, Ring gave this admonition the day after he and Connolly were guests of Bulger and Flemmi at a dinner at the home of Flemmi's parents. Ring June 27, 2006 Tr. at 73–76.

76. Ring later testified that he requested 209s only for meetings, not necessarily for phone calls which resulted in no positive information. Ring June 28, 2006 Tr. at 98–99.

77. Bulger, Flemmi and their associates knew Connolly by the nickname "Zip."

78. Flemmi pleaded guilty to racketeering acts that included McIntyre's murder, and Weeks pleaded guilty to racketeering acts that included aiding and abetting the murder.

its cargo to the *Marita Ann* and returned to Massachusetts. The *Marita Ann,* however, was seized by Irish authorities before it reached port. The United States Customs Service ("Customs") received notice of the transfer, and began looking for the *Valhalla.* Brady June 21, 2006 Tr. at 6–7.

On October 16, 1984, the *Valhalla* was discovered in Boston. *See, e.g.,* Brady June 21, 2006 Tr. at 6; Ex. 99, Andrew L. Adams, *Trawler Seized; IRA Link Suspected,* Boston Globe, Oct. 17, 1984, at 1.[79] Customs seized the ship and found two crew members, Bob Andersen and McIntyre, on board. Brady June 21, 2006 Tr. at 9–11, 36. McIntyre indicated that he wished to speak with a Customs agent. He told Brady that he was already cooperating with several DEA agents, and that he wished to cooperate in the *Valhalla* investigation. *Id.* at 7–9. Neither Andersen nor McIntyre was arrested, and Brady made a plan to meet with McIntyre the following day. *Id.* at 9, 11.

On October 17, 1984, McIntyre met twice with law enforcement. Brady June 21, 2006 Tr. at 11. During the first, short meeting, Brady informed McIntyre that he would no longer be working with the DEA; rather, "he's now an *informant for Customs* ... exclusively, and any information he's supposed to give to us." *Id.* at 12. Later that day, McIntyre met with Brady and FBI agents Roderick Kennedy and George Bertram at the office of the Drug Task Force. *Id.* at 13–14. The Drug Task Force consisted of representatives from Customs, the IRS, and the FBI. Brady and Kennedy were both members of the Task Force. Kennedy, an agent in the

C–2 Squad of the Boston Office, was present at the meeting because he was the FBI's representative to the Task Force, and Bertram was present because he covered the IRA for the FBI. *Id.* at 13–14, 33.

McIntyre had been known to both Brady and Kennedy before October 1984. In the summer of 1984, Kennedy had provided information about the Joe Murray gang to Brady. Kennedy showed Brady pictures of several individuals working with Murray, including McIntyre. The agents also knew that Murray was connected to Bulger; Kennedy reported to Brady that Murray was in trouble with Bulger because he was running drugs through South Boston and was consequently paying tribute to Bulger. Kennedy informed Brady that Bulger was to receive a share of Murray's next drug smuggling operation. *See* Brady June 21, 2006 Tr. at 34–35. Kennedy discussed all of this with Brady more than one year after Bulger had reported Murray's warehouse of marijuana to the FBI and the marijuana had been seized;[80] and several months after the Boston Office was informed of the DEA's investigation into Bulger and Flemmi's drug activity.[81] However, at the time, Brady did not know that Bulger and Flemmi were FBI informants. Brady June 21, 2006 Tr. at 77–78.

During the meeting on October 17, 1984, which is partially reported in a verbatim transcript, McIntyre discussed his three-year association with Murray, the details of the *Valhalla* operation, Murray's drug operations, and an upcoming drug shipment expected by Murray. *See* Ex. 603;

---

**79.** Exhibit 99 consists of two articles from the Boston Globe; one is dated October 17, 1984, and the other is dated November 13, 1984.

**80.** The warehouse was seized in April 1983. *See* Ex. 12, at MCN016–1117 to –1118; Ex. 3, at 12.

**81.** Greenleaf learned of the DEA investigation from Stutman in April 1984. *See* Ex. 32.

Ex. 36, Memo from Kennedy to SAC, Oct. 17, 1984. McIntyre reported that Murray was responsible for sending the *Valhalla* to Ireland loaded with weapons. McIntyre himself was involved in preparing the *Valhalla* for the trip by helping to load the weapons onto the boat in Gloucester during the night of September 13 and early morning of September 14. He also was a member of the crew on the trip from September 14 to October 12. *See* Ex. 603, at 10–26.

McIntyre was the *first person* to provide a link between Joe Murray and the *Valhalla*. Brady June 21, 2006 Tr. at 38. McIntyre also discussed a link between Murray and Bulger, advising that, after the warehouse seizure in April 1983, "an individual named Whitey [82] who operates a liquor store in South Boston became partners with Joe Murray." Ex. 36, at 1. Unbeknownst to McIntyre, Bulger and Flemmi had provided some of the weapons to the shipment on the *Valhalla,* and Bulger and Weeks acted as lookouts while the *Valhalla* was being loaded in Gloucester. Flemmi June 6, 2006 Tr. at 47; Weeks June 8, 2006 Tr. at 123–124.

At the end of the October 17 meeting, the following exchange took place between an unidentified law enforcement agent and McIntyre:

Q: As of this date you don't feel you need any Federal Protection?

A: No.

Q: In other words you['re] declining it?

[A:] I'm just saying that at this point if it came to that the cat would be out of the bag the first thing by putting me under any kind of protection. Like I told you, I advised you against meeting up here tonight. And for the future I think it was a foolish mistake to do this. I have more concern with where we meet and how we meet than giving me any kind of protection. You would protect me better ... [ellipses in original]

Q: Okay, so you don't want any Federal Protection at this time. Is that right?

A: Well, the type of protection like I say, is to be more discreet.

Q: I mean physical protection, security, agents guarding you, whatever.

A: No. I don't want to go into the witness protection program like I said I like living around here, you know.

Q: You want to continue life as normal?

A: Yeah.

End of Interview, 10:15 p.m.

Ex. 603, at 49–50. Brady believed that McIntyre turned down the offer of 24/7 surveillance because Murray's group did considerable counter-surveillance, and McIntyre was worried that they might spot anyone who was watching him. Brady June 21, 2006 Tr. at 57.

Following the October 17 meeting, McIntyre was released. He agreed that he would cooperate with Customs and the FBI in the investigation into Joe Murray's drug operations. Ex. 36 at 2. Brady testified that "there was an agreement struck by the powers that be" that Customs, the FBI, and the DEA would jointly investigate the information provided by McIntyre. Brady June 21, 2006 Tr. at 46. Brady was the lead Customs agent; Kennedy was the lead FBI agent; and Jimmy Connolly, John Connolly's brother, was the lead DEA agent. Brady June 21, 2006 Tr. at 46–47. In addition, Brady reported in writing that "it was jointly agreed [with] the Boston Office of Investigations and FBI to proceed covertly." Ex. 117, Memo from Brady to Area Special Agent in Charge, Oct. 18, 1984.

---

82. "Whitey" was a nickname often used to refer to Bulger. *See, e.g.,* Ex. 1, ¶ 1.

Brady met with McIntyre every few days after these initial meetings. Brady June 21, 2006 Tr. at 17. On the basis of information provided by McIntyre, the combined law enforcement agencies seized Murray's next drug shipment on a ship called the *Ramsland* as it entered Boston Harbor on or about November 14, 1984. Ex. 1, ¶ 14(a)(4); Ex. 3, at 14; Flemmi June 6, 2006 Tr. at 47. McIntyre was on board as a member of the "substitute crew" that had replaced the ship's English crew at the mouth of the harbor. Brady June 21, 2006 Tr. at 19. The ship was carrying thirty tons of marijuana, and Bulger and Flemmi expected to receive a significant portion of the proceeds from its sale. Flemmi testified that he expected to receive $1 million, and Weeks testified that he, Bulger, and Flemmi each were to receive $3 million. Flemmi June 6, 2006 Tr. at 48; Weeks June 8, 2006 Tr. at 125–26.

After the *Ramsland* was seized, McIntyre reported to Brady that Murray suspected someone in the substitute crew of cooperating, and threatened to kill the person responsible for leaking the information.[83] Brady June 21, 2006 Tr. at 48, 64–65. According to Brady, "McIntyre didn't feel he was in danger. He was reporting it with a smirk." Brady June 21, 2006 Tr. at 65. At the time, Brady also believed that McIntyre was safe because McIntyre's relationship with Murray had not changed since he began cooperating: there were no suspicions, confrontations, or accusations, and he continued to have "free

run of the place." Brady June 21, 2006 Tr. at 67.

In November 1984, several days before the *Ramsland* was seized, Brady arranged a meeting between McIntyre and Kennedy, because Kennedy had some questions for McIntyre and Brady "wasn't really interested in what it was." Brady June 21, 2006 Tr. at 20–21. Brady attended the meeting, but does not remember what topics were discussed. He recalled only that the topics were "things that were of no interest to us," and that Kennedy showed McIntyre photographs and asked him to identify the subjects. *Id.*

On November 22, 1984, McIntyre told Brady that Pat Nee ("Nee"), a Bulger associate, had offered him the opportunity to invest $20,000 in a drug smuggling venture. Brady recommended that McIntyre accept the offer, and Customs provided him with the money on November 29, 1984. That same day, McIntyre delivered the money to Nee. *See* Brady June 21, 2006 Tr. at 21–22, 25–26; Ex. 115, Memo from Brady to Area Special Agent in Charge, Nov. 27, 1984; Ex. 116, Memo from Group Supervisor to Area Special Agent in Charge, Dec. 21, 1984. This was the last time Brady would ever see McIntyre. Brady June 21, 2006 Tr. at 28–29.

In December 1984, the information McIntyre had provided was included in a successful application for electronic surveillance of Murray's house and telephone. The affidavit was signed by Brady and Kennedy. Brady June 21, 2006 Tr. at 73–

---

**83.** Brady believes Murray was alerted to the existence of an informant because the Customs special agent in charge, Chris Nelson, lied to the press when asked how the government had discovered the *Ramsland;* he stated that the ship was spotted on a zigzag course and was stopped by authorities. Brady thought it was a "stupid, transparent lie," which alerted Murray to the fact that there had been a leak somewhere in Boston. Bra-

dy June 21, 2006 Tr. at 65. This appears to be correct: unbeknownst to Brady, Flemmi reported to Connolly that the Murray crew did not believe the newspaper story about the strange route; instead, they thought that law enforcement had penetrated the offload crew or that people involved with the operation had been overheard on a wiretap. Ex. 10, at MCN016–0416 to –0418.

74.[84] Customs did not have technical personnel in Boston who could install the wire, so the FBI offered to do it. *Id.* at 75. The wire was never installed, and the court order lapsed. *Id.* at 74–76. Brady believed that the wire was not installed because the FBI procrastinated and failed to take advantage of opportunities when Murray was away from home.[85] *Id.*

## B. Leak of McIntyre's Identity

Sometime between October 17, 1984 and November 22, 1984, Connolly disclosed to Bulger that one of the two people taken off the *Valhalla* on or about October 16 was cooperating with law enforcement. Connolly later repeated this information in Flemmi's presence. Flemmi June 6, 2006 Tr. at 48–49; Flemmi June 7, 2006 Tr. at 28; Weeks June 8, 2006 Tr. at 126–27. Before this tip from Connolly, neither Bulger nor Flemmi suspected that any member of the *Valhalla* crew was cooperating with law enforcement. Flemmi June 7, 2006 Tr. at 58. Although Connolly never mentioned a *name* in tipping Bulger and Flemmi about the *Valhalla* informant, the information Connolly conveyed was sufficient to identify McIntyre. Bulger and Flemmi knew that McIntyre was one of the two people on the *Valhalla;* and at some point after Connolly's leak, Bulger told Flemmi that he believed McIntyre was the informant. Flemmi June 7, 2006 Tr. at 28–29. Bulger and Flemmi developed a plan to confront McIntyre to confirm whether he was the informant; they decided to lure McIntyre to meet them with the "offer" of a $20,000 investment in a drug deal. McIntyre was the only person offered this "deal." Flemmi June 7, 2006 Tr. at 29, 62–64; Flemmi June 8, 2006 Tr. at 42–44; Weeks June 8, 2006 Tr. at 129–30; Weeks June 9, 2006 Tr. at 10. McIntyre thought the offer was real and disclosed it to Brady, and Brady provided $20,000 to McIntyre in order to put him in the middle of the "deal." *See* Brady June 21, 2006 Tr. at 21–22, 25–26; Ex. 115; Ex. 116.

## C. Murder of John McIntyre

On November 30, 1984 Nee brought McIntyre to 799 East Third Street in South Boston, a house owned by Nee's brother. Flemmi June 7, 2006 Tr. at 29–30. They arrived around noon or 1:00 p.m. Weeks June 8, 2006 Tr. at 133. McIntyre had given Nee the $20,000 "investment" the day before and came to the house carrying a case of beer, anticipating a social gathering. Flemmi June 7, 2006 Tr. at 30; Weeks June 8, 2006 Tr. at 128. When McIntyre walked into the kitchen, Bulger stepped forward from behind a refrigerator and pressed a submachine gun into his chest. Flemmi June 7, 2006 Tr. at 30–31; Weeks June 8, 2006 Tr. at 131–32. McIntyre stumbled backward, and Weeks grabbed him by the throat and shoulders and took him to the floor. Weeks June 8, 2006 Tr. at 132. Bulger and Flemmi had arrived earlier in the day with a bag (dubbed by the plaintiffs a "duffel bag of death") containing a rope, handcuffs,

---

**84.** Although no signed copy of the affidavit was produced in this case, Brady testified that he and Kennedy signed it.

**85.** Specifically, Brady testified that there came a time when Murray was scheduled to attend a wedding. Brady testified that it would have been easy to install the wire while Murray was at the wedding: "Yes, it would have been easy. We would have had some-

body outside the wedding hall to make sure he was still in there; and if he did exit, they could radio back to the house that he was on his way. It was a perfect situation." Brady June 21, 2006 Tr. at 75. When asked for his explanation of why the wire was not installed, Brady said he did not remember a specific explanation, but recalled "a lot of jive talk" from the Boston Office of the FBI. *Id.* at 76.

chains, and firearms (a Mac–11 submachine gun and a .22 rifle with a silencer). Flemmi June 7, 2006 Tr. at 29–30; Weeks June 8, 2006 Tr. at 131, 140; *see also* Plaintiffs Opening June 5, 2006 Tr. at 28. McIntyre was placed in a kitchen chair, where Flemmi handcuffed and chained him. Flemmi June 7, 2006 Tr. at 31; Weeks June 8, 2006 Tr. at 132–33. Bulger began to question him, and McIntyre confessed, almost immediately, that he was cooperating with Customs.[86] Flemmi June 7, 2006 Tr. at 32; Weeks June 8, 2006 Tr. at 134. In fact, he told his inquisitors that the $20,000 he had given Nee the day before came from Customs as part of its effort to capture and prosecute members of Winter Hill. *See* Flemmi June 8, 2006 Tr. at 43. He apologized to Bulger and Nee, explaining that he cooperated because he was weak. Flemmi June 7, 2006 Tr. at 32; Weeks June 8, 2006 Tr. at 134. He was clearly frightened; as Flemmi testified: "Look at the position he was in. I mean, who wouldn't be [frightened] under those circumstances? Of course he was in fear. The mental anguish." Flemmi June 7, 2006 Tr. at 37–38. Bulger and Flemmi discussed various options: they talked about the possibility of sending McIntyre to South America or of sending him into the grand jury with a "script." Flemmi June 7, 2006 Tr. at 35, 38–39; Weeks June 8, 2006 Tr. at 128, 135. When McIntyre began to get "a little excited," Bulger told him to calm down, and that there was the possibility that he would be sent to South America or the grand jury to perjure himself in testimony about Murray, Bulger, and Flemmi. Flemmi June 7, 2006 Tr. at 39.

Weeks left the house at about 5:00 p.m. to get dinner; he later received a call on his beeper and returned. *See* Weeks June 8, 2006 Tr. at 133–138. McIntyre was still bound in the chair with chains and handcuffs. At that point, he had been handcuffed and chained for five to six hours. *See* Weeks June 8, 2006 Tr. at 138.

At some point during the day, Bulger made the decision to kill McIntyre, and Flemmi concurred. As Flemmi testified at trial: "That was [Bulger's] decision. Naturally I went along with it." Flemmi June 7, 2006 Tr. at 36. Shortly after Weeks returned, he, Bulger, and Flemmi moved McIntyre to the basement. Flemmi June 7, 2006 Tr. at 40–41; Weeks June 8, 2006 Tr. at 138–39. McIntyre was placed in a chair, still handcuffed and with the chains still around his body. Flemmi June 7, 2006 Tr. at 41; Weeks June 8, 2006 Tr. at 138. As Weeks began to walk back up the stairs, Bulger placed a boat rope around McIntyre's neck and began to strangle him. Flemmi June 7, 2006 Tr. at 41–43; Weeks June 8, 2006 Tr. at 139–141. McIntyre consciously struggled for one to two minutes, gagging, gurgling, and vomiting.[87] Weeks June 8, 2006 Tr. at 139–41; *see also* Flemmi June 7, 2006 Tr. at 42–44. Bulger ultimately decided that his attempt to strangle McIntyre was not succeeding. He said: "This ain't working," and asked McIntyre: "Do you want one in the head?"

---

**86.** Weeks testified that this confession came two minutes into the questioning; Flemmi stated that it took only thirty seconds. Flemmi June 7, 2006 Tr. at 32; Weeks June 8, 2006 Tr. at 134.

**87.** After all, as Flemmi testified at trial, "[McIntyre] was being choked. He made some kind of sounds." Flemmi June 7, 2006 Tr. at 42–43. When testifying at trial about the strangling by Bulger of another of his victims, Deborah Hussey, Flemmi said: "Bulger's a pretty powerful person, ... depending on the damage to a person's throat, it could take a while and then you can break someone's neck. I don't know the circumstances how actually she—how long she lasted before she died, hard to say." Flemmi June 6, 2006 Tr. at 51–52.

Flemmi June 7, 2006 Tr. at 44; Weeks June 8, 2006 Tr. at 139. McIntyre replied "Yes, *please*," seeking, I infer, to bring surcease to his suffering. Flemmi June 7, 2006 Tr. at 44; Weeks June 8, 2006 Tr. at 139. Bulger obliged and shot him in the head. Flemmi June 7, 2006 Tr. at 44; Weeks June 8, 2006 Tr. at 139. Flemmi bent down to feel McIntyre's pulse and reported that he was still alive. Flemmi June 7, 2006 Tr. at 44–45; Weeks June 8, 2006 Tr. at 142. Flemmi then grabbed McIntyre by the hair, pulled him up, and Bulger shot him again a few times, saying: "He's dead now." Weeks June 8, 2006 Tr. at 142; *see also* Flemmi June 7, 2006 Tr. at 45–46.

After McIntyre was dead, Bulger went upstairs to lie down, Flemmi June 7, 2006 Tr. at 46, while Flemmi and Weeks stripped McIntyre's clothes and, using pliers, extracted his teeth and crushed them, all in an effort to hinder the identification of his body. Flemmi June 7, 2006 Tr. at 46–47; Weeks June 8, 2006 at 142. They then buried McIntyre in the basement next to the remains of Arthur "Bucky" Barrett, a safe-cracker and bank robber whom Bulger and Flemmi had lured to 799 East Third Street and (after shackling, chaining and interrogating him) murdered in July of 1983.[88] Flemmi June 6, 2006 Tr. at 44–46; Flemmi June 7, 2006 Tr. at 47; Weeks June 8, 2006 Tr. at 87–90, 142–43. They then drove McIntyre's pickup truck to a bar in the Quincy area and left it there. Flemmi June 7, 2006 Tr. at 47–48.

McIntyre was killed because he was an informant. Flemmi June 7, 2006 Tr. at 37;

*see also* Ex. 1, § 14(a)(4) (listing the McIntyre murder as an activity "designed to hinder and obstruct the administration of justice"). Flemmi testified that Bulger decided to kill McIntyre because someone who had cooperated once could not be trusted not to cooperate again. Flemmi June 7, 2006 Tr. at 36–37.

A few days after McIntyre's murder, Bulger, Flemmi, Weeks and Nee divided among themselves, in equal shares, the $20,000 Customs had given McIntyre to "invest" in what turned out to be a fictitious drug deal. Flemmi June 7, 2006 Tr. at 48. Bulger later remarked to Weeks: "Customs were upset they lost their witness and their money." Weeks June 8, 2006 Tr. at 130.

## IV. Conclusions of Law and Ultimate Findings of Fact

The plaintiffs claim, and I have found, that Connolly provided information to Bulger and Flemmi that was essential to their identification of McIntyre as an informant. The plaintiffs allege that Connolly's disclosure led to McIntyre's wrongful death, and that the United States is liable for damages resulting from that wrongful death pursuant to the FTCA. Under the FTCA, the United States may be sued for money damages for personal injury or death caused by the negligent or otherwise wrongful acts or omissions of its employees. *See* 28 U.S.C. § 1346(b)(1). The statute operates as a limited waiver of the sovereign immunity of the United States. *Muniz–Rivera v. United States*, 326 F.3d 8, 12 (1st Cir.2003). One relevant limita-

---

88. In early 1985, at 799 East Third Street, Bulger and Flemmi would also murder an erstwhile object of Flemmi's carnal interest, Deborah Hussey, by strangling her with a rope. They then would remove her clothes, extract her teeth, and bury her in the basement, near the remains of Barrett and McIntyre. Flemmi June 6, 2006 Tr. at 49–52. On

Halloween night in 1985, when it appeared that the house at 799 East Third Street would be sold, Weeks and others disinterred the remains of Barrett, McIntyre and Hussey and re-buried them near Florian Hall in the Dorchester section of Boston. Weeks June 8, 2006 Tr. at 65, 143.

tion on the waiver is that the act or omission targeted by the FTCA suit must be one for which a private person could be sued under "the law of the place where the act or omission occurred," here, the Wrongful Death Statute of Massachusetts, which allows recovery for deaths caused by negligence or other "willful, wanton or reckless act[s]." *See* 28 U.S.C. § 1346(b)(1); Mass. Gen. Laws ch. 229, § 2. In addition, to be imputed to the United States, the act or omission of the government employee must have been committed within the scope of his or her employment. *See* 28 U.S.C. § 1346(b)(1).[89]

■ To succeed in their tort claim against the United States, the plaintiffs must establish that (1) Connolly owed McIntyre a duty, (2) Connolly breached that duty, (3) McIntyre suffered injury, (4) Connolly's breach of duty was a proximate cause of McIntyre's injury, and (5) in breaching his duty to McIntyre, Connolly was acting within the scope of his employment as an FBI agent. *See McCloskey v. Mueller,* 446 F.3d 262, 267 (1st Cir.2006) (applying Massachusetts law); *Jupin v. Kask,* 447 Mass. 141, 146, 849 N.E.2d 829

(2006) (setting forth the elements of a tort claim under Massachusetts law). The Massachusetts Wrongful Death Statute provides that the wrongful death claim may be brought against someone who was negligent *or* someone who by willful, wanton, or reckless[90] conduct causes death. Mass. Gen. Laws ch. 229 § 2. The FTCA likewise creates a claim for personal injury or death caused by the negligent or wrongful act or omission of a government employee acting within the scope of his employment. 28 U.S.C. § 1346(b)(1). Wrongful acts under the FTCA, insofar as investigative and law enforcement officers are concerned, include certain intentional torts like assault, battery, and malicious prosecution, for causes of action accruing after March 16, 1974. 28 U.S.C. § 2680(h).

Although noting that a fair inference from Connolly's conduct "is that the conduct exceeds negligence," the plaintiffs proceeded at trial on the theory that the disclosure Connolly made to Bulger and Flemmi concerning McIntyre was a negligent act "that increased the risk of foreseeable harm to McIntyre."[91] Plaintiffs

---

**89.** Another limitation on the United States' liability under the FTCA is the discretionary function exception.

**90.** For its definition of reckless conduct, the Massachusetts Supreme Judicial Court has adopted the "reckless disregard of safety standard" set forth in RESTATEMENT (SECOND) OF TORTS § 500 (1965): "The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." *Boyd v. National R.R. Passenger Corp.,* 446 Mass. 540, 546, 845 N.E.2d 356 (2006).

**91.** In their pretrial memorandum, the plaintiffs advanced, as one theory of liability, the concept of aiding and abetting wrongful conduct, as set forth in the RESTATEMENT OF TORTS. Under this theory a person (A) is subjected to liability for harm caused to a plaintiff (B) by a third person (C) if A "knows that [C's] conduct constitutes a breach of duty [to B] and [A] gives substantial assistance and encouragement to [C] so to conduct himself." RESTATEMENT (SECOND) OF TORTS § 876. This aiding and abetting concept has been recognized by the Massachusetts Supreme Judicial Court. *See Davis v. United States,* 340 F.Supp.2d 79, 91 (D.Mass.2004) (collecting cases). Thus, the plaintiffs also might have argued, based on the record developed at trial, that Connolly's conduct was in reckless disregard of McIntyre's safety, as that phrase is defined in *Boyd,* 446 Mass. at 546, 845 N.E.2d 356. One commentator has observed, however, that the concept of recklessness is largely

Closing June 29, 2006 Tr. at 159–65. The United States appeared to accept that negligence was the appropriate standard to be applied, but argued that Connolly did not actually leak McIntyre's identity as an informant to Bulger and Flemmi (an argument the United States appeared to abandon in its closing, *see* United States Closing June 29, 2006 at 95), and that if he did, his conduct was outside the scope of his employment. United States Opening June 5, 2006 Tr. at 50–51; United States Closing June 29, 2006 Tr. at 98–113. Accordingly, I assess Connolly's conduct under the negligence standard.

**A. Duty**

Much ink has been spilled in this case on the question of whether the FBI defendants had a tort duty to protect McIntyre from Bulger and Flemmi. The discussion has centered on whether Connolly and other agents and officials of the FBI had a special relationship with Bulger and Flemmi or with McIntyre sufficient to create a duty to protect McIntyre from harm. *See generally, McCloskey,* 446 F.3d at 267–70 (setting forth circumstances in which Massachusetts law recognizes the existence of a special relationship between a defendant and another person sufficient to give rise to a duty of the defendant to the plaintiff). These special relationships arise in circumstances where the "negligence consists of an omission rather than an act of commission" and create duties as exceptions to the general rule that "there is no duty . . . to control the conduct of a third person as to prevent him from causing physical harm

to another." *Id.* at 267 (quoting RESTATEMENT (SECOND) OF TORTS § 315 (1965)) (ellipsis in original; internal quotation marks and citation omitted); *see also Davis v. United States,* 340 F.Supp.2d 79, 91–93 (D.Mass.2004).

The question of duty, on the present record, is much simpler, because it is to be determined not on the basis of what the relevant actor, Connolly, failed to do, but on his commission of an act. "Speaking in terms of classical tort principle, when one claims that negligence lies in the *commission* of an act, a defendant's duty not to behave negligently typically extends to include all those whom the defendant might reasonably have foreseen to be potential victims of the negligence." *Carrier v. Riddell, Inc.,* 721 F.2d 867, 868 (1st Cir.1983) (Breyer, J.) (citing *Palsgraf v. Long Island R.R. Co.,* 248 N.Y. 339, 341–43, 162 N.E. 99 (1928) and RESTATEMENT (SECOND) OF TORTS § 281) (emphasis in original); *see also Remy v. MacDonald,* 440 Mass. 675, 677, 801 N.E.2d 260 (2004) ("As a general principle of tort law, every actor has a duty to exercise reasonable care to avoid physical harm to others.") (citing RESTATEMENT (SECOND) OF TORTS § 302 cmt. a (1965)).

The Supreme Judicial Court ("SJC") recently addressed the duty applicable in this case, determining that a duty exists when an "actor realizes or should realize that [his action] involves an unreasonable risk of harm to another through the conduct of . . . a third person which is intended to cause harm . . . even though [the third person's] conduct is criminal." *Ju-*

---

irrelevant in tort cases, except where mere negligence is not a sufficient ground for liability or recklessness provides a basis for punitive damages. DAN B. DOBBS, THE LAW OF TORTS § 27 (2001). Punitive damages may not be recovered against the United States, 28 U.S.C. § 2674, and, as an alternative theory, the aiding and abetting concept offers the plain-

tiffs no benefit that cannot be derived from the negligence theory. Perhaps that is why, in his closing, counsel for the plaintiffs, in response to a question about other theories of liability, responded: "Under the death statute we only have to prove negligence." Plaintiffs Closing June 29, 2006 Tr. at 159.

*pin,* 447 Mass. at 148, 849 N.E.2d 829 (quoting RESTATEMENT (SECOND) OF TORTS, § 302B (1965)). This duty does not depend on any special relationship between employees of the FBI and Bulger and Flemmi or between employees of the FBI and McIntyre. Indeed it does not depend on Connolly's, or any other person's, status as an FBI agent. It is simply the duty that one person owes to another to act with care when he knows or should know that his action poses an unreasonable risk of harm to the other through the intentional conduct of a third person. "A precondition to this duty is, of course, that the risk of harm to another be recognizable or foreseeable to the actor." *Jupin,* 447 Mass. at 147, 849 N.E.2d 829.

 The question now raised is whether Connolly knew or should have known that his disclosure to Bulger and Flemmi that one of two persons on the *Valhalla* was an informant created an unreasonable risk of harm to McIntyre. In her closing, counsel for the United States conceded the point:

> THE COURT: [I]f I find that Connolly leaked this information would you say that the death of McIntyre was not foreseeable?
>
> . . . . .
>
> MS. LIPSCOMB: No. We would submit that it was foreseeable under this record.

United States Closing June 29, 2006 Tr. at 112–13. Since the trial, the United States has apparently had a change of mind, arguing in its post-trial memorandum that I should conclude that the injury to McIntyre was "so extraordinary that it could not reasonably have been foreseen." Post–Trial Proposed Findings of Fact and Rulings of Law of the United States at 29–30 (quoting *Delaney v. Reynolds,* 63 Mass. App.Ct. 239, 242, 825 N.E.2d 554 (2005)), *United States v. McIntyre,* No. 01–10408 (D.Mass. July 17, 2006). No explanation is

given for the insight that has motivated this change of position. Regardless, I find that harm to McIntyre, including his death, was foreseeable to Connolly when he made his disclosure to Bulger and Flemmi.

As counsel for the United States emphasized throughout the trial, in their questioning of witnesses and in their closing argument, *see, e.g.,* United States Closing June 29, 2006 Tr. at 94–104, FBI regulations strictly prohibit revealing an informant's identity. The reason is obvious. "You [have] an informant's life in your hands. If that identity got out, ... the informant's life would be in danger," especially if the informant is providing information on organized crime. Ring June 27, 2006 Tr. at 7–8. Therefore, an informant is *always* at risk of harm from a disclosure of his identity.

In addition to the general risk to which all informants are exposed, there was a specific, foreseeable risk to McIntyre. Bulger and Flemmi were violent criminals, known by the FBI to be involved in gambling and loansharking and suspected of involvement in robberies, drug trafficking and murder. They headed Winter Hill, a violent criminal organization. As noted earlier, there were reports in the files of the Boston Office referring to Bulger as a "vicious animal," Ex. 21, "feared by many people because of his ability to kill anyone without even thinking twice," Ex. 20. Both Bulger and Flemmi were mentioned in the files as potential hit men for other criminal groups. McIntyre was providing information that could implicate Bulger and Flemmi of drug trafficking and weapons smuggling. He thus was an informant who endangered the criminal careers of Bulger and Flemmi. In the eight years preceding McIntyre's death, as Connolly knew, three separate FBI informants— Castucci, Halloran and Callahan—had

been killed after Connolly disclosed to Bulger and Flemmi that they were providing or would provide information that would implicate Bulger and Flemmi in serious criminal activity. Perhaps Connolly did not *actually* know that Bulger and Flemmi killed these three men, because he did not confront Bulger and Flemmi directly. However, as a seasoned FBI agent, observing the pattern of murders following his disclosures, he should have known that McIntyre was placed unreasonably at risk by his tip to Bulger and Flemmi about the two men on the *Valhalla.*

## B. Breach

The next question is whether Connolly breached this duty to McIntyre. This too is an easy question to answer. For all the reasons discussed above, Connolly's disclosure of McIntyre's identity to Bulger and Flemmi created an unreasonable risk of harm to McIntyre, and therefore was an obvious breach of duty.

## C. Scope of Employment

■ Wrongdoing by Connolly does not itself impose liability upon the United States. Under the FTCA, the United States is liable only for those actions of its employees undertaken within the scope of their employment. 28 U.S.C. § 1346(b)(1). The operative question then is whether Connolly was acting within the scope of his employment as an FBI agent when he tipped off Bulger and Flemmi to McIntyre's identity.[92] With respect to an employee of the United States, federal law defines the "nature and contours of his or her federal responsibilities." *Aversa v. United States,* 99 F.3d 1200, 1209 (1st Cir.1996). Whether the employee was act-

ing within the scope of those responsibilities, however, is determined by state law. *Id.*

■ Under Massachusetts law, conduct of an employee is within the scope of his or her employment if (1) it is of the kind he or she is employed to perform; (2) it occurs substantially within the authorized time and space limits; and (3) it is motivated, at least in part, by a purpose to serve the employer. *Wang Labs., Inc. v. Bus. Incentives, Inc.,* 398 Mass. 854, 859, 501 N.E.2d 1163 (1986); *see also Howard v. Town of Burlington,* 399 Mass. 585, 590, 506 N.E.2d 102 (1987) ("The scope of an employee's employment is not construed restrictively.").

An employee's scope of employment is delineated by his or her actual and customary duties, not simply those formally described. *Howard,* 399 Mass. at 590, 506 N.E.2d 102 (citing RESTATEMENT (SECOND) OF AGENCY § 229 cmt. a (1958)). Thus in this case, the first and second prongs of the *Wang* test are interrelated. The management of informants was both a formal job requirement and an actual and customary duty of FBI agents like Connolly. In fact, the FBI considered informants "the single most important tool available to the FBI," Ex. 8, at 9, and made both individual agents and the SAC responsible for maintaining adequate informant coverage. An entire section of an agent's performance evaluation was devoted to the agent's development and management of informants. *See Coyne v. United States,* 270 F.Supp.2d 104, 109 (D.Mass.2003) (finding it "crystal clear" on the record in that case that an FBI agent's interactions with an informant were within the scope of her employment), *rev'd as to the constitutional claim*

92. The United States has certified that all FBI defendants, except Connolly and Morris, were acting within the scope of their employment at times relevant to this case. *See* Order

Granting Motion for Partial Substitution, *United States v. McIntyre,* No. 01–10408 (D.Mass. Jan. 31, 2003).

*against the individual def. sub nom Coyne v. Cronin,* 386 F.3d 280 (1st Cir.2004).

In *Wang,* the SJC held that the employer, Wang, was liable for its employee's willful interference with Wang's contract with its tax preparer. 398 Mass. at 859, 501 N.E.2d 1163. In concluding that the employee's tortious conduct fell within the "kind of conduct he was employed to perform," the court considered that the employee's appraisals of the tax preparer's services and involvement with the relevant contract "were repeatedly endorsed and utilized by Wang's executives." *Id.* at 860, 501 N.E.2d 1163. Those circumstances also exist here. Connolly's superiors in the FBI repeatedly endorsed and relied on his management of Bulger and Flemmi as informants. Connolly was consistently recognized for his exceptional development of informants in general and of Bulger and Flemmi in particular, both in his performance reviews and in commendations from FBI Headquarters. Connolly was recommended for salary increases, monetary awards and promotions based on his excellence in handling informants. His skills were considered so exemplary that he gave lectures to other federal agents on the development and handling of informants.

One of Connolly's most significant duties was to obtain information from Bulger and Flemmi. To do that, it was critical that he maintain his relationship with them and cultivate their goodwill. To that end, Connolly's superiors allowed and even encouraged him to keep in contact with Bulger and Flemmi even when they were closed as informants. Furthermore, his supervisors up the chain of command approved of keeping Bulger and Flemmi open even when they were suspects in several investigations for serious criminal activity by law enforcement agencies, including the FBI itself.

For decades preceding the McIntyre murder, agents of the FBI protected Bulger and Flemmi as informants by shielding them from prosecution for crimes they had committed. Examples of the time and manner of the FBI's protection of Bulger and Flemmi are detailed in Sections II(D)(3)(a) and II(D)(3)(c) above. These examples speak to the value the FBI placed on Bulger and Flemmi as informants and demonstrate that Connolly's actual and customary duties included maintaining the informant relationship with Bulger and Flemmi. When McIntyre informed law enforcement officials about Bulger and Flemmi's criminal activities, he endangered that relationship because the information he provided could have led to the prosecution of Bulger and Flemmi.[93]

---

93. The SJC's decision in *Miller v. Federated Dep't Stores, Inc.,* 364 Mass. 340, 350, 304 N.E.2d 573 (1973), which describes a separate test for scope of employment in situations involving an employee's at-work assault of another, provides an instructive analogy. The case holds that when an employee assaults another person while at work, the employee's actions will be found to be within the scope of employment—and therefore the employer will be liable—if "the employee's assault was in response to the plaintiff's conduct which was presently interfering with the employee's ability to successfully perform his duties." *Id.* Similar examples of an employee's wrongful conduct found to be within the scope of employment include: an assault by a furniture store employee against a delinquent customer resisting repossession of his furniture, *Levi v. Brooks,* 121 Mass. 501 (1877); an employee's lobbing of ice into a crowd of children swarming a stationary railroad ice car that the employee was required to guard, *Zerngis v. H.P. Hood & Sons,* 255 Mass. 603, 152 N.E. 50 (1926); an assault on a gasoline station attendant by a trucker after a dispute over whether the attendant was timely fueling the trucks, *Hobart v. Cavanaugh,* 353 Mass. 51, 228 N.E.2d 439 (1967); a bartender's beating and kicking of a patron when the patron insulted another bartender, *Orasz v. Colonial Tavern, Inc.* 362 Mass. 881, 289 N.E.2d 841 (1972); and an assault on a police officer by a

The United States argues that Connolly's leak could not be within the scope of his employment because it was not authorized. In support of this argument, the United States points to the specific regulations prohibiting the disclosure of a confidential informant's identity. This argument misapprehends the test for scope of employment. Under Massachusetts law, "[f]orbidden and criminal acts may also be within the scope of employment." *Davis*, 340 F.Supp.2d at 88 (applying Massachusetts law and citing cases); *see also Commonwealth v. Jerez*, 390 Mass. 456, 461–62, 457 N.E.2d 1105 (1983) (collecting cases).

Moreover, the argument of the United States that Connolly was not hired to disclose informants' identities proves much too much. Surely no government employee is hired to engage in wrongful conduct. Nevertheless, the FTCA creates a remedy for wrongful conduct by government employees to the extent that a private person would be liable under the law of the place where the act or omission occurred. Indeed, as noted earlier, insofar as "investigative or law-enforcement officers" of the United States are concerned, wrongful conduct includes a variety of intentional torts, including assault, battery, and malicious prosecution.[94] One assumes that investigative and law enforcement officers are not hired to commit assaults, to batter, or to prosecute maliciously. Yet the FTCA provides a remedy against the United States for such misconduct. Taken to its logical conclusion, the argument of the United States is that if the conduct is wrongful, though undertaken to achieve some proper government purpose, it is beyond the government employee's scope of employment, because the employee was not hired to engage in wrongful conduct. It is an argument that makes the FTCA entirely pointless.

The third prong of the *Wang* test is whether the employee's action is at least partially motivated to advance the interests of the employer. Flemmi testified that he and Bulger gave Connolly in excess of $200,000 in cash and gifts during the period 1981 through 1990.[95] Flemmi June 6, 2006 Tr. at 98; Flemmi June 7, 2006 Tr. at 82–83. I credit that testimony. The United States points to the testimony as evidence that Connolly's motivation for

---

diplomat on his way to a diplomatic function, *Commonwealth v. Jerez*, 390 Mass. 456, 462, 457 N.E.2d 1105 (1983). These cases demonstrate the principle set forth in § 230 of the Restatement of Agency. "An act, although forbidden, or done in a forbidden manner, may be within the scope of employment." Restatement(Second) of Agency § 230; *see also* § 231 ("An act may be within the scope of employment although consciously criminal or tortious.") As applied to the facts here, this principle brings Connolly's disclosure within the scope of his employment, because, to the extent that McIntyre provided information concerning the criminal activities of Bulger and Flemmi, he was a threat to Connolly's ability to do his job, specifically, his ability to keep at large and maintain informants who could provide critical intelligence on Cosa Nostra.

**94.** 28 U.S.C. § 2680(h) reads in relevant part:

[W]ith regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter [28 USCS §§ 2671 et seq.] and section 1346(b) of this title [28 USCS § 1346(b)] shall apply to any claim arising, on or after the date of the enactment of this proviso [enacted March 16, 1974], out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution.

**95.** Flemmi testified that the payments came from a slush fund which he and Bulger called the "X fund" (for extra fund). Every time they made a "score" they took a percentage from that score and deposited to the X fund. The fund was used, in part, for illicit payments to law enforcement officers. It was from the X fund that payments were made to Connolly. Flemmi June 6, 2006 Tr. at 97–98.

leaking information that led to the discovery of McIntyre as an informant was personal. I find that Connolly was motivated in part by greed and his friendship with Flemmi and especially Bulger.

Under Massachusetts law, however, it is not enough for the United States to show that Connolly was motivated in *part*—or even mostly—by personal considerations. To take Connolly's actions outside the scope of his employment, his motivations must have been *purely* personal. *Pinshaw v. Metro. Dist. Comm'n*, 402 Mass. 687, 694–95, 524 N.E.2d 1351 (1988) (only if the employee acts from purely personal motives, completely unrelated to any interest of the employer, can he be said generally to have departed from his employment (citing W. PROSSER AND W. KEETON, TORTS 506 (5th ed. 1984))). "The fact that the predominant motive of the agent is to benefit himself does not prevent the act from coming within the scope of employment as long as the act is otherwise within the purview of his authority." *Wang*, 398 Mass. at 859–60, 501 N.E.2d 1163; *see also Operation Rescue Nat'l v. United States*, 975 F.Supp. 92, 108–09 (D.Mass.1997) (noting that under Massachusetts law, an employee acts outside the scope of employment only if his motivations are purely personal and in no way connected to his official duties).

The employee's motivation is a question of fact for the factfinder. *Pinshaw*, 402 Mass. at 696, 524 N.E.2d 1351; *Int'l Bhd. of Police Officers, Local 433 v. Mem'l Press*, 31 Mass.App.Ct. 138, 140, 575 N.E.2d 376 (1991). For reasons already discussed, I find that Connolly was motivated, at least in part, by a desire to promote the FBI's goal of taking down Cosa Nostra through the use of Bulger and Flemmi as informants.[96]

### D. Proximate Cause

 "To establish proximate cause, a plaintiff must show that his or her injuries were within the reasonably foreseeable risks of harm created by the defendant's negligent conduct." *Staelens v. Dobert*, 318 F.3d 77, 79 (1st Cir.2003) (applying Massachusetts law). For reasons explained in detail in Section IV(A) above, the plaintiffs have shown that McIntyre's murder was a foreseeable risk of Connolly's disclosure of information by which Bulger and Flemmi could identify him as an informant. Moreover, the record establishes that Bulger and Flemmi had no reason to seek out an informant from among the crew of the *Valhalla* until Connolly told them that one of two people on that vessel was cooperating with law enforcement agencies.

---

**96.** The cases cited by the United States in which the employee's actions were found to be outside the scope of employment are readily distinguishable. *Doe v. Purity Supreme, Inc.*, 422 Mass. 563, 664 N.E.2d 815 (1996), and *Timpson v. Transamerica Ins. Co.*, 41 Mass.App.Ct. 344, 669 N.E.2d 1092 (1996), concern rape and sexual harassment, respectively. It is easy to see how that conduct was not motivated in any part by a desire to advance the interests of the employer. *Attallah v. United States*, 955 F.2d 776 (1st Cir.1992), applies Puerto Rico law to hold that two Customs agents who robbed and murdered a courier were not in any way acting for the benefit of the Customs Service. Again, there is no obvious way in which the employees' motivations would overlap with those of the Customs Service. Finally, in *International Brotherhood of Police Officers, Local 433 v. Memorial Press, Inc.*, 31 Mass.App.Ct. 138, 575 N.E.2d 376 (1991), the court held that a newspaper was not liable for an intentional misprint in a union advertisement that embarrassed the union. This ruling relied on the fact that the plaintiffs, who had been unable to identify the employee who had caused the misprint, had presented no evidence that this unknown employee had acted to further the interests of the paper. *Id.* at 141, 575 N.E.2d 376.

The United States fancifully argues that the leak was not the cause of McIntyre's death because Bulger and Flemmi did not decide definitively to kill McIntyre until after they had interrogated him for several hours. This temporal separation does not break the causal link between Connolly's disclosure and McIntyre's murder. I have found that Bulger decided to kill McIntyre because McIntyre was an informant. The risk that this decision would be made and carried out was well known to Connolly, both as a general matter and from the experience derived from the murders of Castucci, Halloran and Callahan. *See* supra Section IV(A).

■ The United States claims that Connolly's leak could not be the proximate cause of McIntyre's death because Bulger and Flemmi's criminal acts break the causal chain. However, under Massachusetts law, criminal conduct is not an intervening or superseding cause so long as it is foreseeable. *Poskus v. Lombardo's of Randolph, Inc.,* 423 Mass. 637, 639–40, 670 N.E.2d 383 (1996) (collecting cases). In this case, injury by criminal conduct was the precise harm foreseeably flowing from Connolly's disclosure.

I find that Connolly's leak was the proximate cause of McIntyre's death.

### E. Injury

The injury in this case is obvious: McIntyre was murdered.

### F. Conclusion as to Liability

In sum, Connolly, acting within the scope of his employment as an FBI agent, breached his duty to McIntyre who was foreseeably at risk from the breach. The United States is therefore liable for damages resulting from McIntyre's death.

### G. Damages

The United States is liable "to the same extent as a private individual under like circumstances," but it is not liable for punitive damages or interest prior to judgment. 28 U.S.C. § 2674. Under sections 2 and 6 of the Massachusetts Wrongful Death Statute, the United States is liable for compensatory damages in the amount of the "fair monetary value of the decedent to the persons entitled to receive the damages recovered," including the loss of reasonably expected net income and loss of consortium, reasonable funeral and burial expenses; and the conscious suffering of the decedent. Mass. Gen. Laws ch. 229, §§ 2, 6. Damages under section 2 are awarded to the administrators of the decedent's estate, Mass. Gen. Laws ch. 229, § 2 ("Damages under this section shall be recovered in an action of tort by the executor or administrator of the deceased."), with damages for the fair monetary value of the decedent awarded for the benefit of the person entitled to recover for his or her loss, as determined by section 1 of the statute, *see Mitchell v. United States,* 141 F.3d 8, 21 (1st Cir.1998) ("the nominal recipient of the award is the Administratrix of the Estate of Alfred J. Hassey, for the benefit of Evelyn Hassey"). Damages under section 6, for the decedent's conscious suffering, are awarded to the estate of the decedent. Mass. Gen. Laws ch. 229, § 6 ("any sum so recovered shall be held and disposed of by the executors or administrators as assets of the estate of the deceased").

#### 1. Proper Claimant Under Wrongful Death Statute

Section 1 provides a priority of potential takers of damages for the fair value of the decedent, as follows:

(1) If the deceased shall have been survived by a wife or husband and no chil-

dren or issue surviving, then to the use of such surviving spouse.

(2) If the deceased shall have been survived by a wife or husband and by one child or by the issue of one deceased child, then one half to the use of such surviving spouse and one half to the use of such child or his issue by right of representation.

(3) If the deceased shall have been survived by a wife or husband and by more than one child surviving either in person or by issue, then one third to the use of such surviving spouse and two thirds to the use of such surviving children or their issue by right of representation.

(4) If there is no surviving wife or husband, then to the use of the next of kin.

Mass. Gen. Laws ch. 229, § 1. The plaintiffs have argued that, because McIntyre had no children, Emily McIntyre, as his next of kin, is the person entitled to receive compensatory damages. The United States objects that Emily McIntyre is not entitled to recover such damages because McIntyre had a surviving spouse, Pearl McIntyre, who precedes Emily McIntyre in the priority of potential takers.

The relevant factual situation is as follows. Pearl McIntyre filed a complaint for divorce from McIntyre in the Norfolk County (Massachusetts) Probate Court on July 23, 1984. McIntyre never contested the divorce. On November 30, 1984, he disappeared; we now know that he was murdered that day. A decree of divorce nisi entered on May 25, 1985, and the decree became absolute or final on August 26, 1985. Shortly after the divorce became final, Pearl McIntyre remarried. In January 2000, McIntyre's remains were discovered. His death certificate, dated the day of the discovery of his remains, listed him as divorced. See Ex. 45; Ex. 46, Report of Investigation, Jan. 20, 2006. On May 25, 2000, McIntyre's "estate" filed with the

FBI the administrative claim that is the basis of the present lawsuit. See Ex. 129, Letter from Gordon to Freeh and Mawn, May 25, 2000. The next day, Emily and Christopher McIntyre were appointed administrators of the Estate; and they filed an amended administrative claim on June 8, 2000. See Ex. 48, Probate File regarding Estate of John L. McIntyre; Ex. 130, Letter from Gordon to Freeh and Mawn, June 8, 2000. This lawsuit was filed on March 8, 2001.

■ The question of whether Pearl McIntyre is John McIntyre's surviving spouse for purposes of the Wrongful Death Statute is not an easy one. Although McIntyre actually died before there was a divorce decree of any kind, his death is one part of a constellation of extraordinary circumstances. Because the date of his actual death was not known until 2000, his legal status at the time the final decree of divorce issued was "missing," not deceased. Not surprisingly, there is no controlling SJC precedent on the subject of who is entitled to recover for the fair monetary value of the decedent under these circumstances. Therefore, to resolve the question I must use the limited landscape of SJC decisions on related questions to predict what that court would decide if faced with this issue. My conclusion is that the SJC would conclude that Pearl McIntyre is not McIntyre's surviving spouse for purposes of the Wrongful Death Statute.

My starting point is that the Norfolk Probate Court issued a facially valid final decree of divorce to John and Pearl McIntyre on August 26, 1985. Pearl McIntyre acted in reliance on that decree when she remarried shortly after the decree issued. In my view, Pearl McIntyre, in order to make a claim as McIntyre's surviving spouse, would first have to challenge the validity of that divorce decree. It does not

appear that she has done so, but even if she had, Massachusetts precedent suggests that she would be precluded from making a claim as McIntyre's surviving spouse under the Wrongful Death Statute for any damages resulting from this litigation.

A line of SJC cases establishes that individuals are estopped from challenging *invalid* divorce decrees in order to claim benefits linked to their former marriages. For example, in *Poor v. Poor*, 381 Mass. 392, 409 N.E.2d 758 (1980), a husband sought an annulment of his marriage on the ground that the divorce his wife had obtained from her first husband in Haiti was invalid under Massachusetts law. The court held that notwithstanding the invalidity of the foreign divorce, the plaintiff husband was estopped from challenging it. *Id.* at 397, 409 N.E.2d 758. Important to this decision were the facts that both the plaintiff husband and wife believed the Haitian divorce to be valid and acted in reliance on it in entering into their subsequent marriage. *Id.* at 395–96, 409 N.E.2d 758; *see also McCarthy v. McCarthy*, 361 Mass. 359, 360, 280 N.E.2d 151 (1972) (where wife participated in her husband's Mexican divorce proceedings against her and accepted property during that divorce, she was estopped from later challenging validity of the divorce); *Chapman v. Chapman*, 224 Mass. 427, 434, 113 N.E. 359 (1916) (where wife colluded in the obtaining of an invalid foreign divorce from her husband and subsequently remarried, she was estopped from claiming inheritance from her first husband's estate).

These cases suggest that Pearl McIntyre, who possessed a *valid* divorce decree and acted in reliance on it in remarrying would have even less success challenging that decree in order to make a claim here as McIntyre's surviving spouse under the Wrongful Death Statute. Massachusetts follows the common law rule that unexplained absence from an established domicile for seven years creates a presumption of death; before seven years have passed, however, there is the opposite presumption—that the missing person is alive. *Ross v. Cohen*, 352 Mass. 51, 53, 223 N.E.2d 805 (1967). Indeed, that presumption is reflected here in the fact the Probate Court entered a final decree of divorce, because "[t]here can be no divorce unless both parties are alive at the time it is granted." *Diggs v. Diggs*, 291 Mass. 399, 401–02, 196 N.E. 858 (1935). Without the divorce, Pearl McIntyre would have been unable to enter into a valid marriage for at least seven years following the disappearance of McIntyre. In short, Pearl McIntyre terminated her marriage to McIntyre when he was legally, although not factually, alive.[97] By so doing, she

---

**97.** The United States has argued that Pearl McIntyre's divorce decree was not valid, pointing out that McIntyre was actually dead before the divorce decree entered, and citing the general rule that a spouse's death after the issuance of a decree nisi but before the divorce becomes final makes the other spouse widowed, not divorced. *See Diggs v. Diggs*, 291 Mass. 399, 401–402, 196 N.E. 858 (1935) (reversing the entry of a final decree of divorce entered after the death of one of the parties, *nunc pro tunc* to a date preceding the death). I find this argument unpersuasive for several reasons. First, there was a *final* divorce decree in this case, and "[d]ivorce decrees are conclusive and binding on the parties with regard to all matters they actually or necessarily determine, until revoked or modified." *Anderson v. Anderson*, 407 Mass. 251, 255, 552 N.E.2d 546 (1990) (citing *Bloom v. Bloom*, 337 Mass. 480, 482, 150 N.E.2d 24, (1958); *Jelly v. Jelly*, 327 Mass. 706, 708, 100 N.E.2d 681 (1951); and *Whitney v. Whitney*, 325 Mass. 28, 31, 88 N.E.2d 647 (1949)). As I have noted, it does not appear that the McIntyre divorce has been revoked, modified or even challenged. Indeed, Massachusetts continued to recognize the divorce as valid as recently as 2000, when McIntyre's death certificate described him as divorced. Second,

renounced her status as McIntyre's surviving spouse.

Furthermore, and perhaps more to the point, Pearl McIntyre has not made a claim against the Estate. Even when the possibility appeared that McIntyre's Estate had value (in the form of this lawsuit), she made no claim. Pearl McIntyre did not file an administrative claim with the United States; nor did she contest the appointment of Emily and Christopher McIntyre as administrators of McIntyre's Estate.[98] Moreover, Pearl McIntyre has never attempted to intervene or assert any claim on behalf of McIntyre or herself; and she herself is not now seeking to be identified as the surviving spouse for purposes of the Wrongful Death Statute.[99] This is in stark contrast to Emily McIntyre's long crusade to discover what happened to her son and to hold accountable those responsible for his death.

One final consideration is the nature of the Wrongful Death Statute itself. An important purpose of the Statute—as is plain from the language of section 2—is to compensate survivors for the loss of the decedent's life. See *Thibert v. Milka*, 419 Mass. 693, 695, 646 N.E.2d 1025 (1995). As a remedial statute, it should be liberally construed to effectuate that purpose. See *Town of Franklin v. Wyllie*, 443 Mass. 187, 196, 819 N.E.2d 943 (2005).[100] The

at the time the divorce decree was finalized, no one knew that McIntyre was dead; in *Diggs*, there was no doubt on that subject.

Even assuming, for the sake of argument, that Pearl McIntyre's divorce was *invalid*, the SJC cases—*Poor*, *McCarthy*, and *Chapman*—indicate that because Pearl McIntyre sought a divorce and acted in reliance on it, she would be estopped from challenging its validity in order to claim benefits as John McIntyre's surviving spouse.

98. Counsel for the United States wrote to the Probate Court to inform the court of the timeline of events concerning Pearl and John McIntyre's divorce, suggesting that "the Decree appointing Emily and Christopher McIntyre as co-administrators of the Estate of John L. McIntyre may be defective because it is based on incomplete or inaccurate information." Letter from Bridget Bailey Lipscomb to Clerk of the Court, Probate and Family Court, Norfolk Division, Sept. 15, 2005, Pl.'s Opp. to Def. United States' Mot. in Limine to Exclude Damages Evidence Ex. 1, *McIntyre v. United States*, No. 01–10408 (D.Mass. May 18, 2006). However, the Probate Court took no action in response to this letter. *See* Letter from William Christie to Schmidt, Registrar's Office, Norfolk Probate and Family Court, Sept. 28, 2005, Pl.'s Opp. to Def. United States' Motion in Limine to Exclude Damages Evidence Ex. 2, *McIntyre v. United States*, No. 01–10408 (D.Mass. May 18, 2006).

99. The United States has made the argument ostensibly on her behalf. The argument is not advanced to protect her interests, but rather to decrease the potential liability of the United States. The United States argues that if Pearl McIntyre is the surviving spouse, and compensatory damages should be measured by her loss, then there are *no* compensatory damages on the current record. In the alternative, the United States argues that Pearl McIntyre is the only person who could bring a claim on McIntyre's behalf, and her failure to file an administrative claim means that there can be no lawsuit. I point out that I have already ruled that the Estate is the proper party to bring this suit. *see* Order Denying Mot. to Dismiss for Lack of Jurisdiction for Failure to Prosecute in the Name of the Real Party in Interest, *McIntyre v. United States*, No. 01–10408 (D.Mass. Sept. 9, 2005); Order on United States' Mot. for Reconsideration, *McIntyre v. United States*, No. 01–10408 (D.Mass. May 31, 2006).

100. Although the FTCA is to be interpreted strictly, neither extending nor narrowing the waiver of sovereign immunity that Congress intended, *Rakes v. United States*, 442 F.3d 7, 19 n. 6 (1 st Cir.2006), the question here is not the interpretation of the FTCA, but the interpretation of the Massachusetts Wrongful Death Statute. Because the United States is liable to the extent that a private party would be liable, I am required to determine how the Wrongful Death Statute should be interpreted in the circumstances of this case, and then apply that interpretation to the facts.

only party who asserted loss and sought recompense for McIntyre's death is Emily McIntyre.[101]

The issue now raised as to the proper party to recover for the fair economic value of McIntyre is not likely to have been within the contemplation of the drafters of the statute. Nevertheless, available precedent and my sense of what best effectuates the purpose of the statute impel me to conclude that the SJC would decide that Pearl McIntyre is not the surviving spouse of McIntyre within the meaning of the Wrongful Death Statute, and that Emily McIntyre, his mother, as the next of kin, is the "person[ ] entitled to receive the damages recovered."

## 2. Economic Damages

■ The "fair monetary value of the decedent," under the Wrongful Death Statute, is measured in part by the loss to the recovering party of "the reasonably expected net income . . . of the decedent." Mass. Gen. Laws ch. 229 § 2. The plaintiffs have presented evidence as to McIntyre's reasonably expected future earnings. There is no evidence, however, that Emily McIntyre has suffered a loss attributable to or measured by McIntyre's reasonably expected future net earnings. There was no evidence of her financial dependence on McIntyre at the time of his death, or that she otherwise generally derived a benefit from his earnings. Indeed,

Emily McIntyre testified that her son never gave her any money. And there is no evidence that she expected to receive any part of McIntyre's future earnings had he lived. Accordingly, I make no award to Emily McIntyre for economic loss.

## 3. Loss of Consortium

The Wrongful Death Statute also allows recovery for the loss to the person entitled to recover of the "services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of the decedent." Mass. Gen. Laws ch. 229, § 2. This description of potential loss often is referred to by the collective shorthand of "loss of consortium damages," and may be recovered by the parents of an adult decedent. See Schultz v. Grogean, 406 Mass. 364, 367–68, 548 N.E.2d 180 (1990).

■ Emily McIntyre testified that she had a close relationship with her son, and that they enjoyed visiting and conversation over lunch and tea. McIntyre June 16, 2006 Tr. at 40–49. She also testified that McIntyre did odd jobs for her around the house, including mowing the lawn, shoveling snow and building a backyard patio, and that he gave her handmade gifts, including a chess set and a nativity creche. Id.; see also Christopher McIntyre Deposition 214–22, Jan. 21, 2005 (made a part of the trial record). Christopher McIntyre, the co-plaintiff and McIntyre's brother,

---

101. *Guy v. Johnson*, 15 Mass.App.Ct. 757, 448 N.E.2d 1142 (1983), although it arises in a different context, is instructive. The Court of Appeals affirmed a probate court's decision approving the distribution of damages for wrongful death in the amount of $37,786.06 to the decedent's mother and $103.41 to the decedent's father. The court found that the disposition was "fair on its face" because "the father had in effect abandoned connection with the child," and "was without value to the father in the statutory sense, but of value to the mother." *Guy*, 15 Mass.App.Ct. at 758–

59, 448 N.E.2d 1142. The court determined that, given the purpose of section 2, it should deny the father what ordinarily would be his statutory share of the damages under section 1, because he was one "who is shown to have been dissociated from the decedent—who cannot justly claim that the decedent had any monetary value for him." *Id.* at 761, 448 N.E.2d 1142. In reaching this conclusion, the court emphasized that the primary purpose of the statute is "just compensation to the *deserving* survivor." *Id.* at 761–62, 448 N.E.2d 1142 (emphasis added).

testified that their "mother's house was always that home port for John," and that McIntyre kept things of value at her house. Christopher McIntyre Deposition 59–60.

Based on the foregoing evidence, I find that Emily McIntyre has suffered a loss of consortium attributable to McIntyre's murder, and therefore is entitled to an award for that loss. Such damages, however, are "notoriously difficult to quantify." *Havinga v. Crowley Towing and Transp. Co.*, 24 F.3d 1480, 1484 (1st Cir.1994). There is, after all, "no scientific formula or measuring device that can be applied to place an exact dollar value on noneconomic damages...." *Muniz v. Rovira*, 373 F.3d 1, 8 (1st Cir.2004). Nevertheless, the amount awarded must be the product of "a process of rational appraisal" and based upon "the evidence adduced at trial." *Ruiz v. González Caraballo*, 929 F.2d 31, 35 (1st Cir.1991). Taking account of all the facts and circumstances of her relationship with McIntyre, as revealed in the record, I find that an award of $100,000 to Emily McIntyre is appropriate for her claim of loss of consortium.

#### 4. Funeral and Burial Expenses

Section 2 of the Wrongful Death Statute also allows damages for reasonable funeral and burial expenses. Those expenses were shown by the plaintiffs to be $1,876. *See* Ex. 49, Invoice of Funeral Expenses, Mar. 22, 2000. I award that amount.

#### 5. Conscious Suffering

A separate source of damages in a wrongful death action is compensation to the estate for the decedent's "conscious suffering." Mass. Gen. Laws ch. 229, § 6. The statute provides:

> In any civil action brought under section two ..., damages may be recovered for conscious suffering resulting from the same injury, but any sum so recovered shall be held and disposed of by the executors or administrators as assets of the estate of the deceased.

*Id.*

Placing its reliance on the phrase "the same injury," the United States argues that no award for conscious suffering should be made. According to the United States, the phrase "same injury" should be interpreted narrowly so as to encompass only the final gun shot that actually caused McIntyre's death, excluding all of the preceding events. By this argument, the United States would remove from consideration any suffering McIntyre endured from Bulger's efforts to strangle him.

In support of its position, the United States cites language from the Massachusetts Appeals Court decision, *Gage v. City of Westfield*, that "the relevant period for purposes of measuring compensation for conscious pain and suffering has consistently been defined in our appellate decisions as commencing with the impact of the fatal injury." 26 Mass.App.Ct. 681, 696, 532 N.E.2d 62 (1988). The *Gage* court's ruling was that the Massachusetts Wrongful Death Statute does not allow recovery for "pre-impact fright," in that case, for the terror felt by the two decedents in the moments before they were hit by a train. The case, however, does not speak to the question of what events may be characterized as the "fatal injury."[102]

---

**102.** Respectfully, I am not convinced that *Gage* accurately predicts the direction the SJC would follow. First, none of the cases which the court in *Gage* cites in support of its ruling, 26 Mass.App.Ct. at 696, 532 N.E.2d 62, actu-

ally addresses the question of pre-impact fright. *See Royal Indem. Co. v. Pittsfield Elec. Co.*, 293 Mass. 4, 8, 199 N.E. 69 (1935); *Campbell v. Romanos*, 346 Mass. 361, 191 N.E.2d 764 (1963); *Carr v. Arthur D. Little,*

I find the argument of the United States as to the injury that caused death largely unreasonable in the circumstances of the case. There is no logical reason to compensate a victim who, for example, is shot once and experiences three minutes of conscious suffering before dying from that injury, but not to provide compensation if, at the end of that three minutes, the wrongdoer shoots the decedent a second time, causing his instant death. The wrongdoer and those whose liability derives from his acts should not benefit because the wrongdoer's first attempt at causing the victim's death, during a single uninterrupted effort to kill him, caused a great deal of suffering, but was not, in itself, successful.

■ I find that the relevant injury is not as narrowly defined as the United States argues. I find instead the whole of the physical assaults on McIntyre by Bulger, during the period of McIntyre's confinement in the basement at 799 East Third Street, to be a unitary event, undertaken with the single intention of causing McIntyre's death. Accordingly, I find that the strangulation and shooting of McIntyre, while he was handcuffed, with chains around his body, comprise the "injury" as to which any conscious suffering is to be considered.[103]

The evidence of both McIntyre's consciousness and his suffering is ample. For a period of about one to two minutes, Bulger, an accomplished murderer and "a pretty powerful person," as Flemmi put it, tried to strangle McIntyre. In the abstract, one to two minutes is not a long time. But consider the annoyance of some motorists at an overlong traffic light, when all they have to do is wait for a period of seconds. McIntyre was not simply waiting; he was being murdered. He was handcuffed, his body encircled with chains. The rope around his neck—the first instrument applied to the task of accomplishing

*Inc.*, 348 Mass. 469, 204 N.E.2d 466 (1965). For another, the First Circuit has taken a different view from the Appeals Court. *See Bullard v. Cent. Vt. Ry., Inc.*, 565 F.2d 193, 197 (1st Cir.1977) (applying Massachusetts law to hold that plaintiff's fright immediately preceding being hit by a train was compensable mental distress). As the First Circuit has noted, the SJC gives a "warm reception" to Restatement principles, *see McCloskey*, 446 F.3d at 269, and the holding of the court in *Bullard*, unlike that in *Gage*, is consistent with principles set forth in Restatement (Second) of Torts § 456 cmts. c and e. The Restatement § 456 comment c states in relevant part:

> Where the tortious conduct in fact results in bodily harm, and makes the actor liable for it, a cause of action is independently established, and there is sufficient assurance that the resulting emotional disturbance is genuine and serious. There may be recovery for such emotional disturbance, even though the emotional disturbance does not result in any further bodily harm.

Comment e explains:

> [This] rule ... is not limited to emotional disturbance resulting from the bodily harm itself, but includes also such disturbance resulting from the conduct of the actor. Thus one who is struck by a negligently driven automobile and suffers a broken leg may recover not only for his pain, grief, or worry resulting from the broken leg, but also for his fright at seeing the car about to hit him.

Finally, the holding in *Gage* is inconsistent with the acknowledgment by the SJC in *Kennedy v. Standard Sugar Refinery*, 125 Mass. 90, 92 (1878), that mental distress suffered by a person during a 20 foot fall might be compensable if there were evidence of such distress. *Kennedy* is a very old case, to be sure, but what it says about pre-injury mental distress has not been overruled or abrogated by the SJC and is consistent with the foregoing principles of the Restatement.

**103.** I do not consider, however, what might have been McIntyre's physical and mental distress during all the events that transpired from the time that he arrived at 799 East Third Street until his death, as the plaintiffs would have me do.

the murder—undoubtedly caused extreme pain and constricted his breathing. Then there was the pain of the handcuffs, which, by that point, had bound him for five or six hours. Applying common sense and logic to the facts of record, I find that after the attempted strangulation began, McIntyre likely was in extreme pain throughout his body. It is reasonable to infer, and I do infer, that when McIntyre did not die right away, Bulger increased the pressure on the rope, thereby increasing the agony experienced by McIntyre.[104] McIntyre vomited and audibly gasped for air, making gagging and gurgling sounds. And McIntyre suffered more than physical pain. If, as Flemmi testified, McIntyre suffered mental anguish even before any attempt was made to hill him, the anguish he experienced as the attempt began and progressed must have intensified dramatically. He was terrified; he knew his tormentors intended, and would likely succeed in accomplishing, his murder. He had been an informant, and he would pay the price typically paid by revealed informants. He knew that there would be no time for goodbyes to his loved ones or for putting his affairs in order; for he would not leave that basement alive. It is difficult to imagine a more distressing set of circumstances—physically and mentally—than those encountered by McIntyre during the minutes preceding his death in the basement of 799 East Third Street on November 30, 1984. It was, as Emily McIntyre said, torture. See Emily McIntyre June 16, 2006 Tr. at 79. I infer that, for McIntyre, the one to two minutes of physical and mental pain were an eternity. It is not surprising, therefore, that when Bulger offered him the opportunity of a swifter death by a gunshot to the head, McIntyre pleaded for that gruesome, but quick relief from his suffering. It is his "yes, please" that is the most certain evidence of his conscious suffering.

It is difficult, of course, to ascribe a dollar value to conscious suffering: "converting feelings such as pain, suffering, and mental anguish into dollars is not an exact science." *Correa v. Hospital San Francisco*, 69 F.3d 1184, 1198 (1st Cir. 1995). Under the circumstances described above, however, I find that a reasonable award is $3 million. As factfinder, I am "free to run the whole gamut of euphonious notes" to set the award "at the highest or lowest points for which there is a sound evidentiary predicate" so long as the award is "a rational appraisal or estimate of the damages" based on that evidentiary predicate. *Milone v. Moceri Family, Inc.*, 847 F.2d 35, 37 (1st Cir.1988). Needless to say, my judgment is that, in making the award—applying common sense and experience to the evidence—I have followed this course. *See Campbell v. Diguglielmo*, 148 F.Supp.2d 269, 276 (S.D.N.Y.2001) (finding it reasonable for a jury to have awarded $2.5 million in damages for conscious suffering where the decedent was fatally shot after a parking dispute, saw the gun before he was shot, looked horrified and grimaced at passersby during the short time that he was conscious after he was shot).

## V. Conclusion

Based on all of the foregoing, I find that the United States is liable to the plaintiffs for the wrongful acts of John Connolly that foreseeably caused the death of John McIntyre, in accordance with the Massachusetts Wrongful Death Statute as follows:

---

104. Indeed, Bulger, apparently exhausted by his efforts to kill McIntyre, had to lie down after McIntyre was finally dead.

1. $100,000 as damages for loss of consortium for the benefit of Emily McIntyre.

2. $1,876 in funeral and burial expenses.

3. $3,000,000 as compensation for McIntyre's conscious suffering.

SO ORDERED.